*Appeal No. 23-55133*

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JANE DOE,
an individual, et al.,

Plaintiff-Appellants,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California, et al.,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Southern District of California
Hon. Larry A. Burns
Case No. 22-CV-10-LAB-DEB

---

## PLAINTIFF-APPELLANTS'
## OPENING BRIEF

---

Michael B. Reynolds
Colin R. Higgins
Cameron J. Schlagel
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California  92626-7689
Telephone: 714.427.7000
Facsimile:  714.427.7799
mreynolds@swlaw.com
chiggins@swlaw.com
cschlagel@swlaw.com

Attorneys for Plaintiff-Appellants Jane Doe, et al.

1

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellants Jane Doe *et al.* respectfully request oral argument. This case raises important questions about the Fourteenth Amendment's due process and privacy protections, the Second Amendment, and the retroactivity doctrine. Counsel's responses to this Court's questions may aid the Court in its decisional process. *See* Fed. R. App. P. 34(a)(1).

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ................................................2

TABLE OF AUTHORITIES ................................................................5

INTRODUCTION ..........................................................................13

JURISDICTIONAL STATEMENT .......................................................15

STATEMENT OF ISSUES .............................................................16

CIRCUIT RULE 28.2.7 STATEMENT .................................................17

STATEMENT OF THE CASE...........................................................17

I.      FACTUAL AND PROCEDURAL BACKGROUND.................................17

        A.      California's Regulatory Scheme Historically Protected
                Appellants' Confidential Personal Information. .................................17

        B.      The California Firearm Violence Research Center............................20

        C.      Researchers Lobby to Remove Limitations on Information
                Disclosure from the Firearms Databases.............................................23

        D.      The AB 173 Amendments Expose the Private Personal Data of
                Millions of Law-Abiding Californians................................................25

II.     PROCEDURAL HISTORY.........................................................26

III.    THE DISTRICT COURT'S ORDER ...........................................28

STANDARD OF REVIEW ..........................................................30

SUMMARY OF ARGUMENT ......................................................30

ARGUMENT ...........................................................................32

I.      AB 173 VIOLATES APPELLANTS' RIGHT TO INFORMATIONAL PRIVACY. ........32

        A.      The Right to Informational Privacy is Well Established. ...................34

        B.      The Nature of Appellants' Personal Information Weighs
                Decisvely In their Favor.........................................................37

                1.      CCW Applicants' SSNs Are Protected under this Court's
                        Precedents. ......................................................................38

**TABLE OF CONTENTS**
(continued)

Page

2. Appellants Have a Reasonable Expectation of Confidentiality in their Personal Information Stored in the Firearms Databases. ...................................................39

3. The Constitution Protects Information Reflecting Individuals' Expressive and Private Decisions to Exercise Their Second Amendment Rights. ............................44

C. AB 173's Broad Disclosure Mandate Is Standardless and Untethered to the State's Proclaimed Interest. ...................................45

D. There Are No Safeguards to Prevent Unauthorized Disclosure. ........51

II. AB 173 VIOLATES APPELLANTS' RIGHTS UNDER THE SECOND AND FOURTEENTH AMENDMENTS...................................................56

A. Appellants State a Claim that AB 173 Directly Violates the Second Amendment. ...................................................56

1. The Text and History Standard Applies to Second Amendment Challenges. ...................................................57

2. The AB 173 Amendments Burden the Right to Keep and Bear Arms. ...................................................59

3. The AB 173 Amendments Are Not Consistent with Historical Firearms Regulations. ...................................................61

B. The AB 173 Amendments Unconstitutionally Chill the Exercise of Second Amendment Rights...................................................67

C. AB 173 Imposes Unconstitutional Conditions on the Exercise of Second Amendment Rights...................................................70

III. AB 173 IS UNCONSTITUTIONALLY RETROACTIVE...................................................72

IV. APPELLANTS STATED A CLAIM THAT THE FEDERAL PRIVACY ACT PREEMPTS CAL DOJ'S CCW APPLICATION FORM AND THE GOVERNING STATUTES . ...................................................73

CONCLUSION...................................................75

CERTIFICATE OF SERVICE ...................................................77

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abagninin v. AMVAC Chem. Corp.*,
  545 F.3d 733 (9th Cir. 2008).................................................................30

*Americans for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ................................................................. 67, 69

*Andrews v. State*,
  50 Tenn. 165 (1871).......................................................................60

*Arakawa v. Sakata*,
  133 F. Supp. 2d 1223 (D. Haw. 2001) ................................................38

*Bauer v. Becerra*,
  858 F.3d 1216 (9th Cir. 2017) ..........................................................59

*Bellotti v. Baird*,
  443 U.S. 622 (1979).......................................................................69

*Camp v. Cason*,
  220 Fed. Appx. 976 (11th Cir. 2007)..................................................75

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................. passim

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011) ..........................................................73

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)....................................................................69

*Doe v. Attorney General*,
  941 F.2d 780 (9th Cir. 1991).......................................................35, 36

*Drummond v. Robinson*,
  9 F.4th 217 (3d Cir. 2021)...............................................................64

*Duncan v. Bonta*,
  19 F.4th 1087 (9th Cir. 2021) ..........................................................57

*Eagle v. Morgan*,
  88 F.3d 620 (8th Cir. 1996)...................................................34, 39, 42

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Elrod v. Burns*,
427 U.S. 347 (1976) ....................................................................70

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011)......................................................60

*Fraternal Ord. of Police, Lodge No. 5 v. City of Philadelphia*,
812 F.2d 105 (3d Cir. 1987).......................................................38

*Harmon v. Villasenor*,
2019 WL 188428 (E.D. Cal. Jan. 14, 2019) .......................................42

*Heller v. D.C.*,
670 F.3d 1244 (D.C. Cir. 2011) ..................................................63

*Holman v. Central Arkansas Broadcasting Co.*,
610 F.2d 542 (8th Cir. 1979).....................................................42

*In re Crawford*,
194 F.3d 954 (9th Cir. 1999)................................................ passim

*Jackson v. City of San Francisco*,
746 F.3d 953 (9th Cir. 2014).....................................................60

*James v. City of Douglas, Ga.*,
941 F.2d 1539 (11th Cir. 1991) ..................................................39

*Johnson v. Bryco Arms*,
224 F.R.D. 536 (E.D.N.Y. 2004) ..................................................45

*Jones v. Bonta*,
34 F.4th 704 (9th Cir. 2022) ................................................ 59, 60

*Konigsberg v. State Bar of Cal.*,
366 U.S. 36 (1961)...............................................................58

*Koontz v. St. Johns River Water Management District*,
570 U.S. 595 (2013) ..............................................................71

*Lamont v. Postmaster General*,
381 U.S. 301 (1965)...............................................................67

*Landgraf v. Usi Film Prods.*,
511 U.S. 244 (1994) ..............................................................72

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ........................................................ 32, 51

*Mangels v. Pena*,
  789 F.2d 836 (10th Cir. 1986) ........................................................39

*Martin v. Hadix*,
  527 U.S. 343 (1999) ........................................................................73

*McDonald v. Chicago*,
  561 U.S. 742, (2010) .......................................................... 57, 62, 64

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ........................................................................68

*Nelson v. Nat'l Aeronautics & Space Admin.*,
  530 F.3d 865 (9th Cir. 2008) ..........................................................35

*Nelson v. National Aeronautics & Space Admin.*,
  568 F.3d 1028 (9th Cir. 2009) ........................................................44

*New York State Rifle and Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ............................................................. passim

*Nilson v. Layton City*,
  45 F.3d 369 (10th Cir. 1995) ..........................................................42

*Nixon v. Administrator of Gen. Servs.*,
  433 U.S. 425 (1977) .................................................................. 34, 35

*Norman–Bloodsaw v. Lawrence Berkeley*,
  *Lab.*, 135 F.3d 1260 (9th Cir. 1998) ...............................................35

*Paul v. Davis*,
  424 U.S. 693 (1976) ........................................................................39

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ........................................................................71

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ........................................................................67

*Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) ........................................................................66

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sheets v. Salt Lake Cnty.*,
45 F.3d 1383 (10th Cir. 1995) .................................................................. 34, 35, 39

*Talley v. California*,
362 U.S. 60 (1960) ........................................................................................68

*Teixeira v. County of Alameda*,
873 F.3d 670 (9th Cir. 2017)........................................................................ 59, 71

*Thornburgh v. American College of Obstetricians and Gynecologists*,
476 U.S. 747 (1965) ........................................................................ 67, 68, 69, 70

*Thorne v. City of El Segundo*,
726 F.2d 459 (9th Cir. 1983)........................................................................ 35, 45

*United States Dep't of Justice v. Reporters Comm. for Freedom of* the *Press,*
489 U.S. 749 (1989) ..................................................................................... 34, 39

*United States v. Marchant*,
55 F.3d 509 (10th Cir. 1995)............................................................................48

*United States v. Sec. Indus. Bank*,
459 U.S. 70 (1982) ...........................................................................................72

*United States v. Westinghouse Elec. Corp.,*
638 F.2d 570 (3d Cir. 1980)............................................................................36

*Walls v. Petersburg*,
895 F.2d 188 (4th Cir. 1990)...........................................................................39

*Whalen v. Roe*,
429 U.S. 589 (1977).........................................................................................34

*Young v. Hawaii*,
992 F.3d 765 (9th Cir. 2021)...........................................................................57

## STATUTES

20 U.S.C. § 1232g.................................................................................................53

28 U.S.C. § 1291 ..................................................................................................16

28 U.S.C. § 1331 ..................................................................................................15

5 U.S.C. § 552a ....................................................................................................74

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

5 U.S.C. § 552a(b) ...................................................................50

Cal. Civ. Code § 1798.100 .......................................................50

Cal. Civ. Code § 1798.115 .......................................................50

Cal. Civ. Code § 1798.121 .......................................................50

Cal. Health & Safety Code § 103206.1(a) ...............................49

Cal. Health & Safety Code § 103206.1–103206.2 ..................49

Cal. Health & Safety Code § 103206.2(b).................................49

Cal. Health & Safety Code § 130200–130203 .........................49

Cal. Pen. Code § 11075............................................................18

Cal. Pen. Code § 11105..................................................... 20, 41

Cal. Pen. Code § 11105(b) & (c) ...................................... 19, 41

Cal. Pen. Code § 11105(b)(1)–(6)..................................... 19, 41

Cal. Pen. Code § 11105(g)........................................................42

Cal. Pen. Code § 11106.................................................... passim

Cal. Pen. Code § 11106(a)(1) ...................................................19

Cal. Pen. Code § 11106(a)(1)(B)–(C) & (d) ............................74

Cal. Pen. Code § 11106(a)(1), (b)(1)(A), (C), (F), & (I) ... 41, 42

Cal. Pen. Code § 11106(a)(2) & (c)...................... 72, 73, 74

Cal. Pen. Code § 11106(c) ................................................ 19, 42

Cal. Pen. Code § 11106(c)-(d) ..................................................72

Cal. Pen. Code § 11106(d)................................................ passim

Cal. Pen. Code § 14230............................................................36

Cal. Pen. Code § 14230(e)........................................................65

Cal. Pen. Code § 14231.................................................... passim

Cal. Pen. Code § 14231(a)(2) ...................................................65

Cal. Pen. Code § 14231(c)........................................................43

9

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Cal. Pen. Code § 14231(c)(1) ..................................................24

Cal. Pen. Code § 14231(c)(1)–(3) & (f)–(g)...........................24

Cal. Pen. Code § 14231(c)(2) ............................... 22, 46, 49, 52

Cal. Pen. Code § 14231.5................................................18

Cal. Pen. Code § 14236...................................................65

Cal. Pen. Code § 14240...................................................24

Cal. Pen. Code § 18115...................................................18

Cal. Pen. Code § 26175........................................ 17, 23, 31, 74

Cal. Pen. Code § 26175(a)...............................................74

Cal. Pen. Code § 28050...................................................17

Cal. Pen. Code § 28210...................................................17

Cal. Pen. Code § 28210(a)–(c) .........................................18

Cal. Pen. Code § 28215...................................................17

Cal. Pen. Code § 28215(a)–(d) .........................................18

Cal. Pen. Code § 30000...................................................18

Cal. Pen. Code § 30005...................................................18

Cal. Pen. Code § 30312...................................................17

Cal. Pen. Code § 30352................................................ passim

Cal. Pen. Code § 30352(b)......................................... 19, 41, 72

Cal. Pen. Code § 30352(b)(1)–(2).....................................24

Cal. Pen. Code § 30352(b)(2) ....................................... 46, 52

U.S. Const. amend. II.....................................................56

### RULES

Fed. R. App. P. 4(a)(1)(B)(i)...........................................16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

4-Z Cal. Regulatory Notice Reg. 75 (Jan. 22, 2021) ...............................................23

AB 173 ................................................................................................... passim

ANTONIN SCALIA & BRIAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195–213 (2012) .............................................................................42

*Armed and Prohibited Persons System (APPS) 2019: Annual Report to the Legislature*, CAL. DEPT. OF JUSTICE (2019) .........................................................41

Hannah Wiley, *California AG Office Withholding Data on Gun Sales, Restraining Orders from Researchers*, SACBEE.COM (Mar. 4, 2021) ........... 22, 43

Hannah Wiley, *Gun Violence Researchers Fight California Department of Justice's Plan to Withhold Data*, SACBEE.COM (Mar. 15, 2021) ........................22

Kate Washington, *Armed with Knowledge*, SACTOWN MAGAZINE (June 2019)......................................................................................................................21

*Meet the Doctor Who Gave $1 Million of His Own Money to Keep His Gun Research Going*, PRO PUBLICA (Apr. 22, 2014)................................................21

Notice of Proposed Rulemaking (rev. Feb. 19, 2021) .............................................53

Philip E. Agre, *Beyond the Mirror World: Privacy and the Representational Practices of Computing, in* TECHNOLOGY AND PRIVACY: THE NEW LANDSCAPE 29, 53 (Philip E. Agre & Marc Rotenberg eds., 1997) ...................52

Pub. L. No. 93–579, 88 Stat. 1909 (1974) ........................................................ 74, 75

*Rising Gun Violence Threatens U.S. Democracy, Warns Researcher*, THE CRIME REPORT (Nov. 8, 2021) .........................................................................21

*SLDS Technical Brief 3: Statistical Methods for Protecting Personally Identifiable Information in Aggregate Reporting*, NCES 2011-603 (Dec. 2010)......................................................................................................................53

Wintemute et al., *Effectiveness Of A Program To Deny Legal Handgun Purchase To Persons Believed To Be At High Risk For Firearm Violence*, 89 AM. J. PUB. HEALTH 88 (1999).........................................................................21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Wintemute et al., *Prior Misdemeanor Convictions As A Risk Factor For Later Violent And Firearm-Related Criminal Activity Among Authorized Purchasers Of Handguns*, 280 J. AM. MEDICAL ASSN. 2083 (1998)...................20

**INTRODUCTION**

For decades California has compelled consumers to disclose personally identifiable information when making firearms-related transactions and applying for firearms licenses. This disclosure is not optional – it is a condition on the exercise of Second Amendment rights in California. The State regulates these transactions through a complex statutory scheme, ostensibly designed to ensure that only law-abiding citizens are allowed to purchase firearms.

The California Department of Justice stores the personal information collected from firearms transactions in various government databases. Historically these databases could only be accessed for law enforcement purposes like background checks, investigations, and prosecutions. This compelled disclosure was buttressed by assurances from the State, through its laws and policies, that personally identifiable information warehoused in these government databases would be used by State agencies only for authorized law enforcement purposes and would otherwise remain confidential within the government.

Unbeknownst to the public, for years, the California Department of Justice had been quietly disclosing personal biographical information from its firearms databases to a select group of public-policy academics who then used this data to advocate for more draconian gun control policies.

13

Regardless of the wisdom or efficacy of California's byzantine firearms regulations, it was abundantly clear that the Department of Justice was not authorized to disseminate confidential, personally identifying information from the firearms databases that it maintains. Attorney General Becerra decisively ended this covert information-sharing arrangement, citing privacy rights and laws prohibiting disclosure of private information to third parties.

But the small group of academics who had built their careers on policy research derived from this data, and whose research grants depended on the government's rich databases, campaigned relentlessly to create a right to access, without oversight, to the personally identifying information of millions of Californians. The California Legislature listened and, through a backdoor budget procedure, amended the laws governing disclosure of California's firearms data to allow researchers unlimited access. It did so without any regard to the constitutional privacy rights of Californians whose sensitive personal information is stored in the firearms databases. The removal of confidentiality protections and qualifications on disclosure, and the decision not to include any standards for research requests, uniquely targets individuals who have exercised their Second Amendment rights and whose personal information is consequently stored in the firearms databases. This evinces the government's disdain for law-abiding Californians who lawfully exercise their Second Amendment rights.

14

Appellants are law-abiding citizens who have exercised their Second Amendment rights in California and whose personally identifiable information is now being disclosed, without limitation, to unaccountable third parties – some of whom have publicly advocated for restricting those very rights.

Appellants assert four claims in this lawsuit. First, these newly-enacted amendments violate their right to informational privacy under the Fourteenth Amendment by mandating that the Deparatment of Justice disclose their confidential information to third parties without justification. Second, these amendments directly violate Appellants' Second Amendment rights and impermissibly chill the exercise of those rights. Third, the laws are also retroactive in violation of the Fifth and Fourteenth Amendments. Fourth, the new laws are preempted by the Federal Privacy Act.

The district court improperly considered extrinsic evidence and erred when it dismissed Appellants' well-pleaded claims under Rule 12(b)(6). This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. On January 12, 2023, the district court entered its order granting Defendant-Appellee's

Motion to Dismiss the operative First Amended Complaint.[1] Plaintiff-Appellants Jane Doe *et al.* ("Appellants") timely filed their notice of appeal on February 10, 2023.[2] The district court entered final judgment on March 17, 2023.[3] This Court has jurisdiction under 28 U.S.C. Section 1291, having approved the appeal pursuant to Rule 4(a)(1)(B)(i) of the Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUES

1.      Whether the district court erred in concluding that Appellants did not state a claim that AB 173 violates their right to informational privacy under the Fourteenth Amendment.

2.      Whether the district court erred in concluding that Appellants did not state a claim that AB 173 impermissibly chills the exercise of their Second Amendment rights in violation of the Fourteenth Amendment.

3.      Whether the district court erred in concluding that Appellants did not state a claim that AB 173 directly violates their Second Amendment rights to acquire and carry arms.

---

[1]  1-ER-005–030.

[2]  4-ER-806–810.

[3]  1-ER-002–004.

16

4.      Whether the district court erred in concluding that Appellants did not state a claim that AB 173 is impermissibly retroactive in violation of the Fourteenth Amendment.

5.      Whether the district court erred in concluding that Appellants did not state a claim that AB 173 is preempted by the Federal Privacy Act of 1974.

## CIRCUIT RULE 28.2.7 STATEMENT

All applicable constitutional provisions and statutes are contained in the addendum to this Opening Brief.

## STATEMENT OF THE CASE

### I.      FACTUAL AND PROCEDURAL BACKGROUND

#### A.      California's Regulatory Scheme Historically Protected Appellants' Confidential Personal Information.

California comprehensively regulates the sale and possession of firearms and ammunition. The State requires every purchaser of firearms and ammunition, and all applicants for a license to carry a concealed firearm ("CCW"), to provide sensitive personal information, including name, residence address, place of birth, phone number, occupation, sex, and California driver's license or ID number.[4] *See* Cal. Penal Code §§ 26175, 28050, 28210, 28215, 30312, 30352.[5] This information is

---

[4]  4-ER-544–546 (¶¶ 41–49); 4-ER-549–553 (¶¶ 57–69).

[5]  Unless otherwise specified herein, all references to code sections refer to the California Penal Code.

ultimately submitted to the State via a "Dealer's Record of Sale."[6] *Id.* §§ 28210(a)–(c), 28215(a)–(d). CCW applications include additional fields for social security number ("SSNs"), business address, and personally identifying information of the applicant's spouse.[7]

The California Department of Justice ("Cal DOJ") maintains this information in a registry called the "Automated Firearms System" (the "AFS") or, for ammunition purchases, the "Ammunition Purchase Records File" database (the "APRF"; jointly with the AFS, the "Databases").[8] *See id.* §§ 11106, 30352. Cal DOJ maintains separate databases for people prohibited from purchasing firearms, such as convicted criminals and individuals subject to a gun violence restraining order or mental health hold. *See id.* §§ 11075 (criminal offender information); 30000 & 30005 (Prohibited Persons System); 14231.5 (discussing Restraining and Protective Order System); 18115 (gun violence restraining orders).

For decades, the government's authority to use or disclose information from the Databases was carefully limited. Section 11106, which governs the AFS, authorized disclosure of only a small subset of AFS data to other State agencies and

---

[6]  *See* 4-ER-544–546 (¶¶ 41–49); 4-ER-549–553 (¶¶ 57–69); 4-ER-686–687.

[7]  *See ibid.*; 4-ER-704–718.

[8]  4-ER-549–553.

18

law enforcement personnel[9] for specifically-enumerated reasons, such as "the investigation of crime, the prosecution of civil actions by city attorneys . . . the arrest and prosecution of criminals, and the recovery of lost, stolen, or found property." Penal Code § 11106(a)(1). Subsequent disclosure was limited to the subject's name, the number of firearms listed in the record, and the firearm information. *Id.* § 11106(c). Disclosure to victims of domestic violence was also authorized, but only after the "subject of the record" received due process through a criminal or civil proceeding – i.e., a judicial determination that the "subject of the record" had perpetrated domestic violence and thus had a diminished privacy interest. *Id.*

There were similar limits on disclosure of information from the APRF. In 2016, voters approved Proposition 63 requiring information in the APRF database to "remain confidential." *Id.* § 30352(b) (eff. Jan. 1, 2017 to Sept. 22, 2021). The only authorized use was between State agencies "through the California Law Enforcement Telecommunications System *only for law enforcement purposes*," specifically those enumerated in Penal Code sections 11105(b) and (c). *Id.* (emphasis added).

---

[9] This discrete class of law enforcement-affiliated persons and entities includes state courts, peace officers, district attorneys, probation officers and city attorneys pursuing prosecutions, gang injunctions or drug abatement. Penal Code § 11105(b)(1)–(6).

Thus, when Appellants and millions of other Californians submitted their personal information to Cal DOJ, they did so with the assurance that their information would remain confidential and be used only for authorized law enforcement purposes. And Cal DOJ agreed. Indeed, Cal DOJ stated in at least one court filing that the "confidential personally identifiable information" stored in the AFS is protected by a right of privacy.[10] In the same filing, it emphasized that the limited purpose of the AFS is to "assist in the prosecution of civil actions by city attorneys, the arrest and prosecution of criminals, and the recovery of lost, stolen, or found property."[11] Cal DOJ further observed that Section 11106 imposed "strict limits on who can access information within [the AFS] registry," authorizing disclosure only to law enforcement personnel or the subject of the record, or pursuant to a court order.[12] *See also* Penal Code §§ 11105 & 11106.

### B. The California Firearm Violence Research Center.

Unbeknownst to the public – and apparently even some Cal DOJ attorneys – Cal DOJ had for decades been granting a small group of third-party researchers special access to the vast stores of personal information in the Databases.[13] Chief

---

[10]  3-ER-449–454.

[11]  3-ER-453.

[12]  *See* 3-ER-450–454.

[13]  *See, e.g.*, Wintemute et al., *Prior Misdemeanor Convictions As A Risk Factor For Later Violent And Firearm-Related Criminal Activity Among Authorized Purchasers Of Handguns*, 280 J. Am. Medical Assn. 2083 (1998) (utilizing individual-level

20

among them was UC Davis' Garen Wintemute, a self-professed expert in the "epidemiology of firearm violence." Throughout his career, Wintemute has been heavily involved in the development of California's gun control policies.[14] Professor Wintemute's advancement appears to have been due, in large part, to the special access he had to the Databases.

Cal DOJ granted this special access despite lacking statutory authority to do so. In 2016, the California legislature attempted to enshrine this access into law by establishing the California Firearm Violence Research Center ("CFVRC" and/or the "Center") with Professor Wintemute as its director. *See* Penal Code § 14231 (eff. June 27, 2016 to Sept. 22, 2021). The Center's mission is to conduct "transformative research with a mission to provide the scientific evidence on which sound firearm

---

data from AFS database); Wintemute et al., *Effectiveness Of A Program To Deny Legal Handgun Purchase To Persons Believed To Be At High Risk For Firearm Violence*, 89 AM. J. PUB. HEALTH 88 (1999) (same).

[14] *See, e.g., Rising Gun Violence Threatens U.S. Democracy, Warns Researcher*, THE CRIME REPORT (Nov. 8, 2021), https://thecrimereport.org/2021/11/08/rising-gun-violence-threatens-u-s-democracy-warns-researcher/ (claiming that Republican states have incited more avenues for political violence); Kate Washington, *Armed with Knowledge*, SACTOWN MAGAZINE (June 2019), https://www.sactownmag.com/armed-with-knowledge/ (describing Wintemute as "instrumental in putting California in the vanguard of a national movement for states to tighten gun control laws"); *Meet the Doctor Who Gave $1 Million of His Own Money to Keep His Gun Research Going*, PRO PUBLICA (Apr. 22, 2014), https://www.propublica.org/article/meet-the-doctor-who-gave-1-million-to-keep-his-gun-research-going (Wintemute lobbied the California legislature to ban alcohol users from purchasing firearms).

violence prevention policies and programs can be based." *Id.* § 14231(a) (eff. June 27, 2016 to Sept. 22, 2021). In furtherance of this objective, the enabling statute directs State agencies, including Cal DOJ, to "provide to the [C]enter, upon proper request and following approval by the [C]enter's governing institutional review board when required, the data necessary for the [C]enter to conduct its research." *Id.* § 14231(c)(2).

Section 14231 did not, however, provide any guidelines as to what data would be "necessary" for the Center's research. But it did establish important guardrails – that the provision of data be "[s]ubject to the conditions and requirements established elsewhere in statute." *Id.* (emphasis added). These guardrails necessarily included the existing limitations on use and disclosure of information stored in the Databases, as then provided by governing statutes. *See* Penal Code §§ 11106, 30352.

In late 2020, Attorney General Xavier Becerra began enforcing those guardrails, determining the information-sharing arrangement between Cal DOJ and the Center violated the laws governing the use of the Databases. Thereafter, Cal DOJ began denying researchers' requests for data, citing Cal DOJ's obligation to protect Californians' private information and laws prohibiting its disclosure.[15] To that end,

---

[15] *See, e.g.*, Hannah Wiley, *Gun Violence Researchers Fight California Department of Justice's Plan to Withhold Data*, SACBEE.COM (Mar. 15, 2021), https://www.sacbee.com/news/politics-government/capitol-alert/article249863633.html; Hannah Wiley, *California AG Office Withholding Data on Gun Sales, Restraining Orders from Researchers*, SACBEE.COM (Mar. 4, 2021),

in January 2021, Attorney General Becerra proposed regulations designed to protect personal information stored in the Databases by prohibiting disclosure of non-aggregated (i.e., individual-identifying) data to researchers – except where researchers *first* provided identifying information for Cal DOJ to match up with the criminal history database.[16]

### C. Researchers Lobby to Remove Limitations on Information Disclosure from the Firearms Databases.

In response to Becerra's decision to deny researchers access to the Databases, Wintemute and other CFVRC-affiliated researchers began lobbying the Assembly to reestablish their access. In September 2021, as a budget trailer bill, California enacted Assembly Bill 173, 2021 Cal. Stat., Ch. 253, amending, *inter alia*, Sections 11106, 14231, and 30352 ("AB 173").[17] AB 173 mandated the Attorney General release personal information stored in the Databases to researchers affiliated with the Center and authorized disclosures to any other "nonprofit bona fide research

---

https://www.sacbee.com/news/politics-government/capitol-alert/article249653908.html.

[16] *See, e.g.*, 2021 CA REG TEXT 575593 (NS) (WestLaw), 4-Z Cal. Regulatory Notice Reg. 75 (Jan. 22, 2021), *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/research/gvro-text-prop-regs-012221.pdf. This condition restricted non-law enforcement access to information concerning criminal defendants, whose privacy interests are diminished.

[17] Appellants challenge only the amendments to Penal Code sections 11106, 14231, and 30352. They also challenge Section 26175 to the extent it violates the Federal Privacy Act.

23

institutions." *See* Penal Code §§ 11106(d); 14231(c)(1)–(3) & (f)–(g); 30352(b)(1)–(2) (eff. Jan. 1, 2022).

The result was a drastic overhaul of the confidentiality protections and limitations on the government's use of personal information that existed under the previous regime. Specifically, Section 14231 was amended to give the Center access to "data kept by State agencies that is necessary for the conduct of its research." Penal Code § 14231(c)(1).

Section 11106, which previously limited disclosure of AFS data to State agencies and law enforcement, was amended to add the following provision:

> All information collected pursuant to this section shall be maintained by the department and *shall be available to researchers affiliated with the [Center] for academic and policy research purposes* upon proper request and following approval by the [C]enter's governing institutional review board when required. At the department's discretion, and subject to Section 14240, information collected pursuant to this section *may be provided to any other nonprofit bona fide research institution* accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence and following approval by the institution's governing institutional review board or human subjects committee when required. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals.

Penal Code § 11106(d) (emphasis added).

24

In other words, Cal DOJ is now required to turn over all information in the Databases to third-party researchers affiliated with the Center upon request, and is authorized to release confidential information to other bona fide non-profits. This dramatically expanded the scope of authorized disclosure.

Finally, AB 173 removed prior confidentiality protections from Section 30352, while expanding the scope of authorized disclosure to include third-party researchers.

In sum, AB 173 demonstrates California no longer wishes to protect the individual privacy of firearms owners.

### D. The AB 173 Amendments Expose the Private Personal Data of Millions of Law-Abiding Californians.

AB 173 violates the rights of Appellants and millions of similarly-situated, law-abiding firearm owners and CCW holders to control the use of their confidential information and greatly increases their risk of public exposure.[18] Californians who purchased their firearms and ammunition, or applied for a CCW, before AB 173 reasonably expected their personal information to remain confidential and be used only for law enforcement purposes. These expectations of privacy and security were dashed when AB 173 became law. Millions of Californians have effectively become unwitting test subjects for "epidemiological" policy research.

---

[18] *See* 4-ER-534–43 (¶¶ 9–37); 4-ER-555–57 (¶¶ 76–87); 4-ER-562–64 (¶¶ 99–109).

Due to the absence of adequate safeguards, AB 173 greatly increases the risk of further unauthorized dissemination (beyond that which is, but should not be, permitted by statute), subjecting Appellants and others similarly situated to a heightened risk of harassment, violence, and criminal efforts to steal firearms from their homes and businesses.[19]

## II.   PROCEDURAL HISTORY

Appellants commenced the underlying action on January 5, 2022, seeking declaratory and injunctive relief to prevent Appellee from enforcing AB 173.[20] Appellants filed an *Ex Parte* Application for a Temporary Restraining Order, which the district court denied on January 22, 2022. Thereafter, on February 8, 2022, Appellants moved for a preliminary injunction. On February 9, 2022, the State concurrently moved to dismiss the original complaint.[21]

Appellants subsequently filed the operative First Amended Complaint (the "Amended Complaint") on February 18, 2022,[22] thereby mooting the State's pending motion to dismiss.[23] The State filed its Motion to Dismiss the Amended

---

[19]  *See* 4-ER-535 (¶ 12); 4-ER-537 (¶ 18); 4-ER-539 (¶ 24); 4-ER-541 (¶ 30); 4-ER-543 (¶ 37); 4-ER-558–59 (¶¶ 82–87).

[20]  4-ER-561–74 (¶¶ 93–161).

[21]  4-ER-816 (Dkt. 27).

[22]  *Id*. (ECF No. 28).

[23]  *Id*. (ECF No. 35).

Complaint on March 4, 2022 (the "Motion to Dismiss").[24] Appellants opposed on March 22, 2022,[25] and the State replied on March 29, 2022.[26] The district court held a hearing on Appellants' Motion for Preliminary Injunction and Appellee's Motion to Dismiss on April 5, 2022, and took both motions under submission.

After Cal DOJ publicly released hundreds of thousands of confidential records from the Databases in June 2022, Appellants moved for reconsideration of their initial application for a temporary restraining order or, in the alternative, to supplement the record in support of their Motion for Preliminary Injunction.[27] The district court also separately ordered supplemental briefing on the impact of the Supreme Court's landmark decision in *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022),[28] to which the parties responded on July 25, 2022.[29]

On January 12, 2023, the district court issued an order (1) granting Appellee's Motion to Dismiss the Amended Complaint, (2) denying Appellants' Motion for Preliminary Injunction as moot, (3) denying Appellants' Ex Parte Motion for

---

[24] *Id*. (ECF No. 36).

[25] *Id*. (ECF No. 38).

[26] *Id*. (ECF No. 39).

[27] *Id*. (ECF No. 49); *see also id*. (ECF Nos. 51, 52, 54).

[28] 4-ER-818 (ECF No. 47); 2-ER-171–72.

[29] 4-ER-818 (ECF No. 55); 4-ER-819 (ECF No. 56); 2-ER-104–27; 2-ER-128–44.

Reconsideration as moot, and (4) granting requests for judicial notice (the "Order").[30] Appellants timely filed this appeal on February 10, 2023.[31]

## III.  THE DISTRICT COURT'S ORDER

The district court determined that Appellants had failed to state a claim for which relief could be granted. First, without conducting the historical analysis *Bruen* requires, the district court determined that Appellants did not plead a direct violation of the Second Amendment because the AB 173 Amendments do not *prevent* the exercise of the right to keep and bear arms. Instead, in the district court's view, they qualify as a regulatory "precondition," meaning the burdens they impose on Appellants' privacy interests are too attenuated from the Second Amendment right to state a plausible claim.[32]

Second, the district court determined that Appellants failed to state a claim that their Second Amendment rights were chilled because (1) the "categorical prohibition" on public dissemination renders the risk of disclosure no higher than other California laws that compel citizens to provide their personal information to

---

[30]  4-ER-819 (ECF No. 60); 1-ER-5–30.

[31]  4-ER-819 (ECF No. 61, 65); 4-ER-806–10.

[32]  1-ER-14–18.

28

the government, and (2) much of this information is already subject to the public records law.[33]

Third, the district court held that Appellants failed to state a claim that the disclosure of their personal identifying information to third-party researchers violates their right to informational privacy under the Fourteenth Amendment.[34] Applying this Court's informational privacy test, the district court found that the potential for harm from disclosure of Appellants' private information was "not trivial."[35] Nevertheless, on balance, it determined that Appellants' privacy interests were outweighted by the public's interest in research into firearm violence. The district court further held – based on evidence the State submitted in oppositon to Appellants' *Motion for Preliminary Injunction* that was beyond the four corners of the Amended Complaint – that third-party research organizations' self-reported data security measures were adequate to protect shared information.[36]

Fourth, the district court held that AB 173 does not violate the anti-retroactivity doctrine under the Fifth and Fourteenth Amendments.[37] This

---

[33]  1-ER-18–20.

[34]  1-ER-20–24.

[35]  1-ER-23.

[36]  1-ER-21–24.

[37]  1-ER-24–28.

conclusion was based primarily on the district court's earlier findings that there were no viable claims under the Second or Fourteenth Amendments.[38]

Finally, the district court determined the AB 173 Amendments are not preempted by the Federal Privacy Act of 1974 because, although Cal DOJ's CCW application form includes a field for an applicant's social security number, it did not appear to be mandatory.[39]

## STANDARD OF REVIEW

This Court reviews a dismissal for failure to state a claim under Rule 12(b)(6) *de novo*. *Abagninin v. AMVAC Chem. Corp*., 545 F.3d 733, 737 (9th Cir. 2008).

## SUMMARY OF ARGUMENT

AB 173's amendments to Sections 11106, 14231, and 30352 are unconstitutional for at least the following reasons:

*First*, they violate Appellants' right to informational privacy by requiring Cal DOJ to disclose Appellants' confidential SSN and biographical information, which Appellants reasonably expected the State would keep confidential. This mandated disclosure is not "narrowly tailored" to achieving the State's interest in the prevention of firearms violence. The amended statutes lack standards for assessing researchers' data requests, or whether a particular research project requires unlimited

---

[38] 1-ER-26–27.

[39] 1-ER-29.

access to personally identifying information. Furthermore, the amended statutes lack safeguards against unauthorized disclosure (whether or not intentional), and Appellants have no remedies in the event an unauthorized disclosure occurs.

*Second*, AB 173 directly violates the Second Amendment. The amended statutes burden the core Second Amendment rights to purchase firearms and ammunition lawfully, and to obtain a CCW, but there is no historical precedent for conditioning the exercise of these fundamental rights on the surrender of sensitive personal information to third parties for non-law enforcement, policy research purposes. This unconstitutional condition also serves impermissibly to chill the exercise of these core Second Amendment rights

*Third*, AB 173 violates the antiretroactivity principle under Fifth and Fourteenth Amendments by removing prior confidentiality protections and attaching new consequences – disclosure of private information to third parties – to conduct that took place before the statute was enacted, thereby violating Appellants' right to informational privacy.

*Fourth*, Cal DOJ's mandatory CCW application form, prescribed by Section 26175, violates the Federal Privacy Act by requesting an applicant's SSN without specifying whether the request is mandatory or voluntary, or what uses will be made of the SSN. Because collecting this information violates the Privacy Act, so too does

31

disclosing it to third-party researchers under Section 11106(d), as amended by AB 173.

## ARGUMENT

## I. AB 173 VIOLATES APPELLANTS' RIGHT TO INFORMATIONAL PRIVACY.

Appellants pleaded ample facts in their Amended Complaint that, when taken as true and construed in Appellants' favor, state a claim for violation of their constitutional right to informational privacy.[40] Appellants seek to prevent California from disclosing their personal information to third-party researchers outside of government, for non-law enforcement purposes. Appellants legitimately expected this information would be kept confidential when they exercised their Second Amendment rights, and they did not consent to it being shared with third parties for non-law enforcement purposes.

The district court duly acknowledged the "constitutional right to informational privacy,"[41] and the government's "burden of showing that its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest."[42] But the district court erred in balancing those interests. It failed to credit the well-pleaded allegations in Appellants' Amended

---

[40] 4-ER-532–33 (¶¶ 5–7); 4-ER-534–43 (¶¶ 9–37); 4-ER-555–57 (¶¶ 76–87); 4-ER-562–64 (¶¶ 99-109).

[41] 1-ER-20.

[42] 1-ER-21 (cleaned up).

Complaint and to construe those allegations in Appellants' favor. Even worse, it improperly accepted extrinsic evidence and the State's factual assertions. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (reversing dismissal where district court improperly "assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in the light most favorable to plaintiffs"). These errors infected the district court's entire analysis, leading it wrongly to conclude that Appellants had failed to state a plausible informational privacy claim. For instance, the district court's finding that adequate safeguards exist to prevent unauthorized disclosure of Appellants' confidential information was primarily based on its view of declaration evidence that the state submitted in opposition to Appellants' concurrently-filed motion for preliminary injunction.[43] The district court's reliance on this evidence was particularly egregious because it was disputed and plainly contradicted the relevant statutory text and the facts alleged in Appellants' Amended Complaint.

When properly credited and construed, Appellants' well-pleaded allegations plausibly state a claim that AB 173 violates their right to informational privacy.

---

[43] 1-ER-22–23.

## A.     The Right to Informational Privacy is Well Established.

This Court has recognized – and the State does not dispute – that the Constitution protects a right to informational privacy. *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999); *accord Whalen v. Roe*, 429 U.S. 589, 599 (1977).[44] The Supreme Court first recognized that right in *Whalen*, where it explained that the right to privacy includes "at least two different kinds of interests," including the one at issue here: "the individual interest in avoiding disclosure of personal matters." 429 U.S. at 599. Soon after *Whalen*, the Supreme Court again addressed this privacy interest in *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977), reiterating that the Constitution protects the right to informational privacy. *See id.* at 457.

This privacy interest encompasses the right to control information about ourselves, including by limiting access to that information. The Supreme Court has affirmed this, holding that this privacy interest "encompasses the individual's control of information," and recognizing that an individual's control over who receives his or her personal information is integral to dignity and identity. *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press* ("*Reporters Comm.*"), 489 U.S. 749, 763 (1989).

---

[44]   Other courts call this interest the right to "confidentiality." *See, e.g.*, *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996); *Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1387 (10th Cir. 1995), *cert. denied*, 517 U.S. 817.

34

Since *Whalen* and *Nixon*, the Supreme Court has not further elaborated on the scope of the informational privacy right or the appropriate level of scrutiny for evaluating alleged violations of that right. There is, however, broad agreement among the federal circuit courts, including this Court, that that the right to informational privacy protects a wide range of personal information, including at least sexual activities, medical information, and financial matters. *Nelson v. Nat'l Aeronautics & Space Admin. ("Nelson I")*, 530 F.3d 865, 877 (9th Cir. 2008), *rev'd and remanded*, 562 U.S. 134 (2011) (citing *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983)); *Norman–Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998); *Crawford*, 194 F.3d at 958 (agreeing that public disclosure of social security numbers may implicate the right to informational privacy in "an era of rampant identity theft").

There is also broad consensus that informational privacy claims warrant heightened scrutiny. Thus, "courts balance the government's interest in having or using the information against the individual's interest in denying access." *Doe v. Attorney General*, 941 F.2d 780, 796 (9th Cir. 1991); *see also Nixon*, 433 U.S. at 459 (concluding the invasion of President Nixon's right to privacy was justified after balancing the competing interests). At base, the government must establish that "its use of the information would advance a legitimate state interest and that its actions are narrowly tailored to meet the legitimate interest." *Crawford*, 194 F.3d at 959; *but*

*see Sheets*, 45 F.3d at 1387 ("[d]isclosure of such information must advance a compelling state interest which, in addition, must be accomplished in the least intrusive manner").

This Court therefore balances "the government's interest in having or using the information against the individual's interest in denying access" by weighing the following non-exclusive factors:

> [T]he type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Doe*, 941 F.2d at 796 (quoting *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 578 (3d Cir. 1980)). These factors, however, are not exhaustive, and the "the relevant considerations . . . necessarily vary from case to case." *Crawford*, 194 F.3d at 959. In most cases, "the overall context, rather than the particular item of information," dictates the tipping of the scales. *Id.*

Here, AB 173 requires Cal DOJ to disclose to third-party researchers the confidential information of millions of Californians who have lawfully exercised their Second Amendment rights to purchase firearms and ammunition, and to apply for, obtain, or renew a CCW. The State for its part claims a broad interest in

researching "firearm violence and its prevention." *See* Penal Code § 14230. But when balanced against Appellants' fundamental interest in keeping their personal information and Second Amendment activities confidential, and considering the feasibility of less intrusive alternatives, it is clear AB 173 is not narrowly tailored to achieve the State's interest.

### B. The Nature of Appellants' Personal Information Weighs Decisvely In their Favor.

Appellants' personal biographical information stored in California's Databases is confidential and protected by the Fourteenth Amendment. This is for three reasons: (i) the information is inherently sensitive; (ii) Appellants reasonably expected California to keep their information confidential; and (iii) the information relates to the private exercise of fundamental Second Amendment rights.

Specifically, the Databases include CCW applicants' SSNs,[45] which are protected by the right to informational privacy under *Crawford*. 194 F.3d at 958. Appellants also had a legitimate expectaion of privacy in their biographical personal and firearms-related information stored in the Databases[46] because prior law mandated that it would remain confidential while in the State's possession. And the

---

[45] *See* 4-ER-549–50 (¶ 59).

[46] Personal information in the Databases includes names, addresses, dates of birth, and driver's license numbers. The Databases also contain corresponding firearms information, including make, model, caliber, barrel length, serial number, the date of purchase, and the seller's identity.

biographical and firearms transaction information in the Databases reflects expressive, private decisions concerning the exercise fundamental Second Amendment rights.

### 1.    CCW Applicants' SSNs Are Protected under this Court's Precedents.

While "the Supreme Court has expressed uncertainty regarding the precise bounds of the constitutional 'zone of privacy,'" it is indisputable that SSNs fall well within recognized zones of privacy. *Crawford*, 194 F.3d at 958 (citing authorities supporting conclusion that disclosure of SSNs implicates the right to informational privacy); *see also Arakawa v. Sakata*, 133 F. Supp. 2d 1223, 1226–27, 1229 (D. Haw. 2001) (finding that the plaintiff had a constitutional right to privacy in his SSN). "When the information is inherently private, it is entitled to protection." *Fraternal Ord. of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 116 (3d Cir. 1987).

Appellants pleaded sufficient facts, supported by the relevant statutes and exhibits subject to judicial notice, to show plausibly that the Databases include CCW applications and therefore SSNs.[47]

---

[47]    *See* 4-ER-549–50 (¶ 59); 4-ER-552 (¶ 68, n. 20); 4-ER-705–18. CCW applications must be made on the standardized form prescribed by the California Attorney General, which requires the applicant's name, date of birth, age, *social security number*, California driver's license or ID number, occupation, residence and

38

## 2. *Appellants Have a Reasonable Expectation of Confidentiality in their Personal Information Stored in the Firearms Databases.*

Though this Court has not addressed expectation-based informational privacy, other circuits have recognized a privacy interest in similar circumstances. Those decisions hold that "[d]ue process . . . implies an assurance of confidentiality with respect to certain forms of personal information possessed by the state." *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986); *see also Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1387 (10th Cir. 1995), *cert. denied*, 517 U.S. 817 (same); *Walls v. Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (informational privacy right is characterized by a "reasonable expectation[ ] of confidentiality"). This is especially true where, as here, the private information is inseperable from the decision to exercise a "fundamental" right. *Paul v. Davis*, 424 U.S. 693, 713 (1976). Thus, a violation of the right to informational privacy arises when, *inter alia*, the government breaches "a pledge of confidentiality which was instrumental in obtaining the personal information." *Eagle*, 88 F.3d at 625; *James v. City of Douglas, Ga.*, 941 F.2d 1539, 1543–44 (11th Cir. 1991) (similar).[48]

---

business addresses, height, weight, eye and hair color, reason for applying, and personal information of the applicant's spouse. *Id.*

[48] This formulation also recognizes a fundamental aspect of the historical privacy interest: an individual's right to control who receives his or her personal information. *See Reporters Comm.*, 489 U.S. at 763.

39

AB 173 violates this basic right through what is effectively a bait and switch. When Appellants and countless other law-abiding Californians provided their personal information to Cal DOJ as a condition on exercising their Second Amendment rights, the laws then in effect – that is, the versions of Penal Code sections 11106, 14231, and 30352 that were effective before AB 173 amended them – protected personal information from disclosure except for law enforcement purposes; specifically, for criminal investigations, judicial process, or domestic violence cases.[49] The State did not meaningfully contest these allegations below. Nor could it because the text of the statutes is unambiguous.

Instead, the State argued that Appellants have no privacy interest in biographical information such as name, date of birth, driver's license number, and address, or their status as firearms owners.[50]

But that argument misses the key point that Appellants reasonably expected the government to keep their personal information confidential because the statutes at the time narrowly circumscribed the purposes for which the government was authorized to use the information maintained in the Databases and did not authorize disclosure to third parties.

---

[49] *See* 4-ER-546 (¶ 47); 4-ER-555 (¶ 74(c)); 4-ER-556 (¶ 78).

[50] 3-ER-398–99; 3-ER-512–15.

For instance, Penal Code section 11106, which established the AFS database, provided that "[i]n order to assist in the investigation of crime, the prosecution of civil actions by city attorneys . . . , the arrest and prosecution of criminals, and the recovery of lost, stolen, or found property," the California Attorney General "shall permanently keep" and maintain a registry (i.e., the AFS) of, *inter alia*, copies of licenses to carry firearms and all firearms-related transaction information reported to the Cal DOJ. Penal Code §§ 11106(a)(1), (b)(1)(A), (C), (F), & (I). The statute authorized a limited subset of officers and agencies[51] to disclose personal information maintained in the AFS for narrow, law enforcement-related purposes. To that end, Section 11106 restricts the information that may be disclosed and cross references Section 11105, which encompasses only "criminal history information." *Id.* § 11106(c)(1).[52] The California Legislature cannot alter fundamental details of a statutory scheme "in vague terms or ancillary provisions" – policy research is incongruous with these pre-existing law enforecement-related purposes. *Cf. Whitman v. American Trucking Assns., Inc.,* 531 U.S. 457, 468 (2001).

---

[51]   These include only: state courts; peace officers; district attorneys; prosecuting city attorneys; city attorneys pursuing gang injunctions or drug abatement; and probation officers. *Id.* § 11105(b)(1)–(6).

[52]   For a more detailed description of how law enforcement uses the data from the Firearms Databases, see *Armed and Prohibited Persons System (APPS) 2019: Annual Report to the Legislature*, CAL. DEPT. OF JUSTICE (2019), at 5–9, 25–27, 32, *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/apps-2019.pdf.

Other statutes that AB 173 amended were even more explicit. Before AB 173, Section 30352 expressly provided that the Personal Information in the APRF database "shall *remain confidential*" and could be used by the Cal DOJ and other agencies "through the California Law Enforcement Telecommunications System *only for law enforcement purposes*," specifically those cross-referenced purposes under Sections 11105(b) and (c). Penal Code § 30352(b) (eff. Jan. 1, 2017 to Sept. 22, 2021) (emphasis added). "Law enforcement purposes" is delimited by the purposes enumerated in the relevant statutes, which refer to traditional law enforcement functions like investigations, arrests, and prosecutions. *See* ANTONIN SCALIA & BRIAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195–213 (2012) (the "Associated-Words Canon" and "*Ejusdem Generis* Canon"). The only reference to "research" appears in Section 11105(g) which states: "It is not a violation . . . to disseminate statistical or research information obtained from a record, *provided that the identity of the subject of the record is not disclosed*." *Id.* § 11105(g) (emphasis added). In any event, no provision authorized disclosure of personally identifiable information to third parties.

Before AB 173, Cal DOJ was not authorized to disclose firearms-related information to non-law enforcement third parties.[53] Cal DOJ argued below that the

---

[53] There was (and remains) an exception for domestic violence cases, but only if the "subject of the record" first received due process through a criminal or civil proceeding *Id.* § 11106(c). This exception is consistent with the well-established rule

practice of sharing "individual-level data" with researchers was longstanding, but it failed to cite any statute authorizing those disclosures.[54] Instead, it attempted to rely on Section 14231's mandate, enacted in 2016, that Cal DOJ provide the CFVRC "the data necessary . . . to conduct its research." Penal Code § 14231(c). But critically, that direction was "[s]ubject to the conditions and requirements established elsewhere in statute" – conditions and requirements that included the existing prohibition of disclosures to third parties. *See id.* Section 14231 did not amend existing law; it did not specify what "data" the legislature considered "necessary for the [C]enter to conduct its research;" and it did not cross-reference other statutes. Therefore, Section 14231 cannot reasonably be construed as modifying Cal DOJ's obligations under the statutes governing the Databases, nor expanding the scope of authorized disclosure under those statutes.

Any doubts about this interpretation are dispelled by Cal DOJ's previous policies that expressly prohibited disclosure of personal identifying information to third parties, based on its "duty to protect Californians' sensitive personally

---

that there is no right to privacy when criminal activity has been committed. *See, e.g.*, *Eagle*, 88 F.3d at 625; *Nilson v. Layton City,* 45 F.3d 369, 372 (10th Cir. 1995) ("Criminal activity is . . . not protected by the right to privacy."); *Holman v. Central Arkansas Broadcasting Co.,* 610 F.2d 542, 544 (8th Cir. 1979) ("[N]o right to privacy is invaded when state officials allow or facilitate publication of an official act such as an arrest."); *Harmon v. Villasenor*, 2019 WL 188428, at *2 (E.D. Cal. Jan. 14, 2019) (holding that criminal record was not private and citing cases).

[54] *See* 3-ER-506–07.

identifying information" and to "follow the letter of the law regarding disclosures of personal information in the data [Cal DOJ] collect[s] and maintain[s]."[55]

In sum, the pre-AB 173 statutes, taken together, confirm that Appellants had a reasonable and legitimate expectation that Cal DOJ would keep the information stored in the Databases confidential and would not disclose that information to third parties. Appellants and countless other law-abiding Californians relied on this framework when they provided their personal information as a condition on the exercise of their Second Amendment rights. And they have done nothing to forfeit their expectation of confidentiality or to justify the dissemination of their personal information to third parties.

### 3. The Constitution Protects Information Reflecting Individuals' Expressive and Private Decisions to Exercise Their Second Amendment Rights.

There is a recognized distinction between information pertaining to a fundamental right and "a free-standing right not to have the world know bad things about you." *Nelson v. National Aeronautics & Space Admin. ("Nelson II")*, 568 F.3d 1028, 1053 (9th Cir. 2009) (Kozinski, J., dissenting from denial of rehearing en banc). The former interest is of the constitutional dimension and, therefore, is entitled to greater protection. *See id.* That is the case here: the personal biographical

---

[55] Wiley, *supra*, note 15.

and firearms-related information stored in the Databases in inextricably intertwined with the exercise of fundamental Second Amendment rights.

The comprehensive biographical information stored in the Databases is enough to construct a detailed picture of an individual's private decision to exercise her Second Amendment rights. Purchasing firearms and ammunition, or obtaining a CCW, is associated with a distinctive personality trait and provides a strikingly accurate glance at an individual's private self to third parties. Indeed, members of the public rightly expect greater privacy in these kinds of decisions than they would in, for example, the decision to buy a particular cosmetic brand. As one court recognized, the "purchaser does not wish the public to know she had a firearm because such knowledge may increase the risk that it will be stolen, or even that an intruder into her home may tend to shoot without hesitating if he knows the householder has a gun." *Johnson v. Bryco Arms*, 224 F.R.D. 536, 543 (E.D.N.Y. 2004). Thus, the "purchase of a firearm – because of the social, political, and moral controversy that may surround it in our culture" – merits heightened protection. *Id.; cf. Norman-Bloodsaw*, 135 F.3d at 1269–70 (social stigma from disclosure of sexual history and other private matters).

C.   **AB 173's Broad Disclosure Mandate Is Standardless and Untethered to the State's Proclaimed Interest.**

In evaluating the "need for access" to constitutionally-protected private information, this Court has held that "an unbounded, standardless inquiry, even if

founded upon a legitimate state interest, cannot withstand the heightened scrutiny with which [the Court] must view the state's action." *Thorne v. El Segundo*, 726 F.2d 459, 470 (9th Cir. 1983). This means the State must establish objective standards, guidelines, definitions, or limitations that define what is relevant to achieve a particular objective. *Id.* at 469–70.

AB 173 utterly fails on this count. The amended statutes proceed from the erroneous premise that information in the Databases is not confidential in the first instance. The disclosure that AB 173 mandates thus rests on the unfounded assumption that *every* prospective research project requires access to non-aggregated, individual-identifying data. The result of these baseless legislative assumptions is that Cal DOJ is compelled to disclose this confidential information to third-party researchers who make a request, without any limitation and regardless of whether the research in question bears a meaningful relation to the State's professed interest in the prevention of firearm violence. This is manifestly overbroad.

The amended statutes provide that, upon request, information stored in the Databases "shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis" and, at Cal DOJ's discretion, to "any other nonprofit bona fide research institution accredited. . . for the study of the prevention of violence." Penal Code §§ 11106(d) & 30352(b)(2); *see also id.* § 14231(c)(2)

46

(directing Cal DOJ and other agencies to provide, upon the CFVRC's request, "the data necessary for the [CFVRC] to conduct its research").[56] This unconditional mandate evinces a lack of tailoring on its face.

Worse, the third-party researchers to whom the amended statutes mandate disclosure are not subject to the State's direction, control, or oversight. In this sense, the State's interests are conflated with those of the third-party researchers who receive the confidential information from the Databases. Put differently, the statutes implicitly assume that *any* research that these third parties perform inherently advances the State's interest, regardless of whether the research is actually tethered to any concrete legislative objective. Under this scheme, the researchers have the sole authority to dictate the purposes for which confidential information is used without any State oversight. In effect, the State's interest is *whatever the researchers want.* This unqualified mandate subjugates the privacy rights of millions of Californians to the subjective whims of third-party researchers.

Nor do the statutes supply a standard for assessing whether a research project could be completed in a manner less intrusive than the wholesale disclosure of

---

[56] The amended statutes also condition disclosure on approval by "the institution's governing institutional review board or human subjects committee when required." But the purpose of this condition has never been explained, nor did California argue below that this contextual requirement has any relation to the question of whether a researcher has a legitimate need for unlimited access to the personal identifying information in the Databases to begin with.

confidential information from the Databases. For instance, it is not apparent how the confidential biographical information of law-abiding firearm owners who passed background checks is relevant to the issue of firearm violence. Further to this point, the amended statutes do not distinguish between law-abiding citizens and perpetrators of violence.[57] The privacy rights of the former were simply not part of the legislative equation here.

There can be no question that the mandated disclosures intrude on the privacy rights of the Californians whose confidential information is released. Yet, there are no standards or guidelines for determining whether the researchers' use of personal identifying information advances the State's interest, or whether disclosure of personal identifying information is a narrowly tailored means to achieve that interest. The California legislature did not attempt to describe, let alone define, the research topics it considered germane to the prevention of firearms violence. Nor did it establish guidelines or a process to distinguish between projects that require detailed individual-identifying data and those that don't. Instead, the disclosure is automatic – researchers request and they receive. This makes it virtually impossible to asses, under this Court's standard, whether the use of the protected information advances

---

[57] There is a well-established legislative distinction between law-abiding firearms owners and criminals. *See United States v. Marchant*, 55 F.3d 509, 516 (10th Cir. 1995) (evaluating privacy claim and noting the legislative distinction between law-abiding citizens and persons prohibited from possessing or receiving firearms).

the State's interest, or whether the disclosure of personal identifying information is narrowly tailored to achieve that interest.

This automatic and limitless disclosure of information from the Databases stands in stark contrast to the disclosures that other State agencies are required to make to the same third-party researchers. For instance, in addition to Cal DOJ, Section 14231(c)(2) directs other State agencies, including various State health departments, to provide the CFVRC the data "necessary" to conduct its research. But because this mandate is "[s]ubject to the conditions and requirements established elsewhere in statute," those agencies' disclosure of personal identifying information from their databases is strictly limited under the governing statutes. Specifically, the State health agencies are subject to the authority of the Center for Data Insights within California's Health and Human Services Agency, which is responsible for overseeing compliance with State and federal health information privacy laws. *See* Cal. Health & Safety Code §§ 130200–130203. The governing statutes strictly limit researchers' access to personal information and prescribe detailed standards for use and data security. *See id.* §§ 103206.1–103206.2. Among other things, there are limitations on researchers' access to personal identifying information and standards for assessing their need to access that information. *See id.* §§ 103206.1(a) & 103206.2(b).

49

The disparity between the broad disclosure of personal information from the Databases and the limited disclosure by California's health agencies not only evinces a distinct lack of tailoring of the former, but also underscores California's general disdain for the Second Amendment and the personal privacy of citizens who lawfully exercise those rights.

The mandatory disclosures under AB 173 also stand in contrast to California's extensive consumer privacy protections. California's Consumer Privacy Protection Act, for example, strictly limits the use of consumers' personal information. *See generally* Cal. Civ. Code §§ 1798.100, *et seq.* It also grants consumers specific rights to control their personal information, including the right to know what personal information is shared and with whom, and to limit the use of that information. *Id.* §§ 1798.115 & 1798.121.

Similarly, the Federal Privacy Act prohibits the federal government from disclosing private records without the subject's written consent. 5 U.S.C. § 552a(b). It also establishes a process for aggrieved persons to object to the government's use of their information. *Id.* §§ 552a(d)–(f). Perhaps most important, it confers standing on aggrieved individuals by creating a private right of action to remedy violations of the Act. *Id.* § 552a(g)(1).

AB 173 lacks any of these important features and thus fails constitutional scrutiny.

50

### D. There Are No Safeguards to Prevent Unauthorized Disclosure.

Appellants specifically alleged that the AB 173 Amendments lacked adequate safeguards to ensure that personal identifying information is not inadvertently disclosed in the final research product.[58]

In addressing this factor, the district court improperly relied on declaration evidence and found that UC Davis and Stanford specifically employ safeguards to protect shared information.[59] *Cf. Lee*, 250 F.3d at 688–90 (reversing dismissal on the "independent grounds" that the district court impropery relied on extrinsic evidence and disputed factual matters to support its ruling). These "safeguards," however, do not appear anywhere in the text of the amended statutes and would thus appear to be entirely discretionary. The district court also failed to construe the well-pleaded allegations in Appellants' favor, instead finding that Appellants' disclosure-related fears were not reasonable.[60] This analysis was based in large part on the district court's misconception of an "unauthorized disclosure," which in the context of a research product can result from inadequate protocols to prevent the raw research data from being recreated in a manner that reveals personal identifying information.

---

[58] *See* 4-ER-555–59 (¶¶ 76–87).

[59] *See* 1-ER-22–23.

[60] *See* 1-ER-21–30.

The only limitation in the statutes is that reports or publications derived from individual-level data "shall not identify specifc individuals." Penal Code §§ 11106(d), 14231(c)(2), & 30352(b)(2). Nothing stops researchers from disseminating personal information outside of reports or publications, and there is no statutory recourse for aggrieved citizens whose information has been released – as recent events have proven.

Furthermore, this statutory limitation is meaningless without strict standards for reviewing the aggregation methods that researchers use to report outcomes. The amended statutes plainly do not impose any data security requirements or safeguards against subsequent disclosure. As one scholar has observed: "So long as databases identify individuals by a universal identifier, such as a name or a government-issued identity number, records can easily be propagated and merged, and thus they can be employed for secondary purposes to the individual's detriment." Philip E. Agre, *Beyond the Mirror World: Privacy and the Representational Practices of Computing, in* TECHNOLOGY AND PRIVACY: THE NEW LANDSCAPE 29, 53 (Philip E. Agre & Marc Rotenberg eds., 1997).

Former Attorney General Becerra recognized this problem early in 2021 and proposed regulations to "protect Californians' privacy" and ensure "proper protocols

and procedures" to secure data disclosed to researchers from the Databases.[61] This rule was to be based, in part, on guidance from the National Center for Education Statistics that examined protecting personal identifying information in aggregate reporting of educational information, in compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g.[62] The report explained, in pertinent part, that "[e]ven with some methods of aggregation, unintended disclosure of personally identifiable information may occur."[63] Among other examples, it showed how a combination of any three ostensibly anonymous variables would result in a disclosure of personally identifiable information.[64] The report also explained how the widely-used practice of "suppressing data for subgroups but not reporting categories" can increase the risk of unintentional disclosure.[65] Finally, after examing multiple reporting issues, the report concluded by recommending reporting rules designed to protect privacy in aggregate data.

---

[61] *See* Notice of Proposed Rulemaking (rev. Feb. 19, 2021) at 3–5, *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/research/gvro-nopr-rev-021921.pdf.

[62]   *SLDS Technical Brief 3: Statistical Methods for Protecting Personally Identifiable Information in Aggregate Reporting*, NCES 2011-603 (Dec. 2010), https://nces.ed.gov/pubs2011/2011603.pdf.

[63] *Id.* at 5.

[64] *Id.* at 5–6.

[65] *Id.* at 7–8.

Despite the complexities in reporting statistical data and the associated risks to individual privacy, AB 173's amendments do not include any reporting requirements or data review standards to ensure that personal identifying information is not inadvertantly disclosed in aggregated data. In other words, the statutes' only limitation providing that reports "shall not identify specifc individuals" is practically meaningless.

This is important considering the risks attendant to unauthorized disclosure. Firearms are distinctly controversial and being known as an owner or enthusiast invites social stigma. Appellants alleged that firearms owners often encounter concerted harassment and are frequent targets of criminal efforts to steal firearms from homes and businesses.[66] In view of the foregoing, the absence of safeguards and the risks attendant to disclosure weigh decisively in Appellants' favor.

The risk of unauthorized disclosure became a reality during the proceedings below.[67] Cal DOJ repeatedly assured the district court that that, although no safeguards are enshrined in the amended statutes, it had policies in place to protect against unauthorized disclosure of confidential information stored in the Firearms Databases.[68] However, on June 27, 2022, Cal DOJ publicly exposed the names,

---

[66] 4-ER-535 (¶ 12); 4-ER-537 (¶ 18); 4-ER-539 (¶ 24); 4-ER-541 (¶ 30); 4-ER-543 (¶ 37); 4-ER-558–59 (¶¶ 82–87).

[67] *See* 2-ER-161–64.

[68] 2-ER-156–61 (collecting quotes).

addresses and license types of the hundreds of thousands of Californians who had applied for, obtained, or renewed a a CCW permit over the last decade.[69] This data was released during Cal DOJ's launch of its new OpenJustice Data Platform. This incident ironically followed Cal DOJ's public proclamation, in reaction to the Supreme Court's *Bruen* decision, that it would balance "its duties to provide gun violence and firearms data to support research efforts while protecting the personal identifying information in the data the Department collects and maintains."[70] This incident demonstrates that the Appellants' concerns, shared by millions of Californians, are real.

In sum, after weighing the relevant considerations, California cannot show that researchers' unqualified use of the information from the Databases advances the State's interest in developing policies to prevent firearm violence, or that the command to disseminate personal identifying information upon request is narrowly tailored to achieve that interest. AB 173, on its face, violates the privacy rights of millions of Californians.

---

[69] 2-ER-161–64.

[70] *Id.*

## II. AB 173 VIOLATES APPELLANTS' RIGHTS UNDER THE SECOND AND FOURTEENTH AMENDMENTS.

AB 173 directly violates Appellants' Second Amendment rights by imposing a condition on their exercise that lacks historical support. AB 173 impermissibly chills the exercise of Second Amendment rights because now, in order to purchase a firearm or ammunition, or to apply for a CCW, Appellants must forego their privacy interests, risk their security, and submit to being research subjects.

### A. Appellants State a Claim that AB 173 Directly Violates the Second Amendment.

For years, California has pushed the boundaries of the Constitution in an effort to address its well-known gun violence problem. Regardless of intent, however, the State cannot do so in a manner that infringes on "the right of the people to keep and bear arms." U.S. Const. amend. II. This Amendment "guarantee[s] the individual right to possess and carry" arms and "elevates above all other interests the right of law-abiding responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

In a recent landmark decision, *New York Rifle & Pistol Ass'n v. Bruen*, the Supreme Court once again reiterated that self-evident principle and confirmed "[t]he constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." 142 S. Ct. 2111, 2156 (2022) (cleaned up). In so holding, the Supreme Court

56

reaffirmed that the proper constitutional analysis initially expressed in *Heller* and *McDonald* requires a comprehensive review of the text and history of the Second Amendment. Properly applied, the inevitable conclusion is that AB 173 impermissibly infringes the right to keep and bear arms.

### 1. The Text and History Standard Applies to Second Amendment Challenges.

Following \*Heller* and *McDonald*, the Ninth Circuit adopted a two-step test to determine whether a regulation violated the Second Amendment. *See, e.g., Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc). But the Supreme Court expressly rejected this approach in *Bruen*,[71] explaining that the Second Amendment does not permit "judges to assess the costs and benefits of firearms restrictions" under means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.* at 2129 (citations omitted). In other words, because the "Second Amendment is the very product of an interest balancing by the people," no judicial deference is owed to legislative interest balancing. *Id.* at 2131 (cleaned up).

---

[71] The Supreme Court specifically vacated this Court's decisions in *Young v. Hawaii*, 992 F.3d 765, *vacated and remanded*, 142 S. Ct. 2895 (2022), and *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *vacated and remanded*, 142 S. Ct. 2895 (2022).

Instead, the *Bruen* Court clarified the standard of review for any constitutional challenge under the Second Amendment. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. The burden then shifts to the governemnt to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Only if the government makes this showing may a court conlcude the conduct falls outside the Second Amendment's protection. *Id.*

*Bruen* rejected two features of the district court's approach in this case: (i) that the Second Amendment is not violated unless protected conduct is actually prohibited, and (ii) that the Second Amendment inquiry depends on an interest-balancing consideration of the relative severity of a regulatory burden ***before*** an evaluation of text and history. *See Bruen*, 142 S. Ct. at 2129 (rejecting any "interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." (cleaned up)).

Here, the individuals' conduct is purchasing firearms and ammunition, and applying for, obtaining, and renewing a CCW. Because this conduct is unquestionably covered by the Second Amendment, any government regulation that burdens it is presumptively unlawful, meaning "the government must affirmatively

prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.[72]

> **2.    The AB 173 Amendments Burden the Right to Keep and Bear Arms.**

A restriction is presumptively unlawful if it burdens "the right of the people to keep and bear arms," which includes the right to own or carry arms "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Under this well-established principle, AB 173 burdens two core facets of conduct protected by the Second Amendment's text: (1) the acquisition and purchase of firearms and ammunition; and (2) applying for, obtaining, and renewing a license to carry firearms publicly.

First, the right to both "keep" and "bear" arms necessarily includes the right to purchase or acquire them. This Court has consistently recognized this, holding that the "right to possess a firearm includes the right to purchase one" and therefore that "commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense." *Jones v. Bonta*, 34 F.4th 704, 715 (9th Cir. 2022) (citing *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017)); *see also Heller*,

---

[72] While some courts have assumed that they can bypass the historical inquiry by conducting only a precursory review of the Second Amendment's text, a proper understanding of the text in the first instance necessarily requires an analysis of its history and tradition. *See Bruen*, 142 S. Ct. at 2127 (standard must be "rooted in the Second Amendment's text, *as informed by* history." (emphasis added)).

554 U.S. at 616–19; *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017). "Without the right to obtain arms, the right to keep and bear arms would be meaningless." *Jones*, 34 F.4th at 716; *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (the core Second Amendment necessarily includes the right to acquire arms); *Andrews v. State*, 50 Tenn. 165, 178 (1871) (same). This logic also applies to ammunition as that term was historically understood. *Jones*, 34 F.4th at 716 ("Still, because 'without bullets, the right to bear arms would be meaningless,' we held that 'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them.").

The Second Amendment also encompasses the right to public carry. In *Bruen*, the Supreme Court had "little difficulty concluding that" the plain text of the Second Amendment protects the right to carry firearms publicly for self-defense. *Bruen*, 142 S. Ct. at 2134. *Bruen* also held that there was no historically significant tradition supporting New York's broad prohibition on public carry of firearms for self-defense. *Id.* at 2138.

Here, AB 173 unquestionably burdens the purchase or acquisition of common firearms and ammunition, as well as the right to carry, because it mandates that anyone who wishes to exercise his Second Amendment rights must subject his private information to the whims of political third-party researchers for policy and "epidemiological" research. Although the district court misclassified this burden as

60

nothing more than a permissible "ministerial" precondition,[73] these *post hoc* disclosure requirements are far more egregious than a routine background check. By conditioning Californians' constitutional rights on their willingness to forego their informational privacy, AB 173 commands current and prospective firearm owners to serve as unwilling subjects of gun control research, and to expose their sensitive personal information to third parties with no means to opt out or provide informed consent.

In addition, AB 173 increases the risk of unauthorized disclosure. Although exposure through hacking is certainly a possibility – which, of course, is compounded as more research institutions are given Appellants' information – the district court dismissed a key point: that even with "strict data security protection protocols," disclosure can still occur through negligence or even intentional malfeasance. And as the Cal DOJ's data exposure debacle demonstrates, this possibility is far from speculative, leaving little room for doubt that AB 173 burdens Appellants' Second Amendment rights.

### 3. The AB 173 Amendments Are Not Consistent with Historical Firearms Regulations.

Examining history and tradition is necessary for evaluating the contours of the right to keep and bear arms. *See Bruen*, 142 S. Ct. at 2127. This "reliance on history

---

[73] 1-ER-16.

to inform the meaning of constitutional text" is "more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions.'" *Id.* at 2130 (quoting *McDonald v. Chicago*, 561 U.S. 742, (2010) (plurality opinion)).

The government carries a heavy burden to demonstrate that the Nation's historical tradition permits a challenged regulation. Specifically, the government must demonstrate that the regulation in question shares specific attributes with a "well-established and representative historical analogue." *Bruen*, 142 S. Ct. at 2133. This inquiry is often "fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* Even if a case involves "unprecedented societal concerns or dramatic technological changes [that] may require a more nuanced approach," the meaning of the Second Amendment remains "fixed according to the understandings of those who ratified it." *Id*. at 2132.

The government's burden is further constrained by several guiding principles adopted by the Supreme Court. First, any proposed historical analogues must generally be from the 18th and mid-19th centuries. *Bruen*, 142 S. Ct. at 2127–28. Any 19th century precedent is "secondary" and is "treated as mere confirmation of what the Court thought had already been established." *Id*. at 2137 (citation omitted). And because the Court cautioned "against giving postenactment history more weight than it can rightly bear," *id*. at 2136, late-19th and 20th Century precedents cannot be used to contradict precedents from the 18th to mid-19th centuries, *id.* at 2154 n.28.

Historical analogues must also reflect "an *enduring* American tradition of state regulation" on the right to keep and bear arms. *Id*. at 2155 (emphasis added). For instance, the Court expressed doubt that three colonial-era regulations were sufficient to establish a tradition. *Id*. at 2143; *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1292 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (identifying six states is not enough to make the "strong showing that such laws are common"). On the other hand, an established tradition may be inferred from the size of the affected population and the length of time the restriction was in effect. *Bruen*, 142 S. Ct. at 2154–55 (discounting western territorial laws that affected less than one percent of the population).

Finally, the modern and historical regulations must be "relevantly similar." *Id.* at 2132 (internal quotations omitted). In other words, the modern and historical restrictions must do more than "remotely resemble[]" one another. *Id.* at 2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). The *Bruen* majority noted that *Heller* and *McDonald* point toward at least two applicable metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. As set forth below, the AB 173 Amendments fail both the "how" and "why" tests.

Here, the district court failed to even address this step of the analysis. Once Appellants established that AB 173 implicates their right to keep and bear arms, the burden shifted to the government to establish (1) AB 173 shares common features with historically analogous regulations from the 18th to the mid-19th Centuries; (2) the analogues were prevalent, not historical outliers; and (3) the modern regulation and the historical analogues are relevantly similar. *See Bruen*, 142 S. Ct. at 2129–32.

Although Appellants have no obligation to supply a historical analysis of AB 173, they can confidently state that there are no common, historically permissible analogues to California's self-described "trailblazing" approach to addressing gun violence. According to Cal DOJ, California is the first State in the union to condition the exercise of core Second Amendment rights on government dissemination of

private information to third-party researchers.[74] Indeed, California's legislature lauds its "uniquely rich [firearm owner] data" that makes possible research that supposedly cannot be done elsewhere. Penal Code § 14230(e). It further directs the Center to work with policymakers to develop and implement "innovative" firearms restrictions. *Id.* § 14231(a)(2). As California officials publicly boasted, this is an entirely novel, historically unprecedented approach.[75]

While the government endeavored to produce historically analogous regulations in the district court below, it fell woefully short of its heavy burden. The government proposed a connection between (1) the "new circumstances" of "large computer systems that allow the collection of storage of information and the advent of researchers who use data to study firearm violence," and (2) California's "closely related" 1917 firearms law "requiring firearms dealers to 'keep a register' containing information about each handgun sold and its purchaser."[76] According to the State, both laws "involve information disclosures to third parties enacted to help address firearm violence." *Id.* But this connection fails for at least four reasons.

*First*, the Supreme Court specifically held that analogues attenuated from the ratification of the Second and Fourteenth Amendments are not enough to establish

---

[74] *See* 3-ER-507–08; Penal Code § 14236.

[75] *Ibid.*

[76] 3-ER-523.

an historical exception to the Second Amendment's broad guarantee. *See Bruen*, 142 S. Ct. at 2131–32, 2154–56; *see also id.* at 2163 (Barrett, J., concurring). Indeed, it specifically admonished that 20th century legislation (such as California's 1917 law) could not serve as a "well-established and representative historical analogue." *See id.* at 2131–32, 2154–56 (New York law from 1911 was enacted far too late to provide meaningful insight into the purposes and contours of the Second Amendment right). Even though evidence from that period can be relevant if it confirms "the public understanding of [the Second Amendment] after its . . . ratification," evidence of "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text," like the evidence the State proffers here, does not "overcome or alter" the Second Amendment's broad guarantee. *Id.* at 2136–37 (citations omitted).

*Second*, the State's identification of a single statute does not come close to "an enduring American tradition of State regulation" on the right to keep and bear arms. *Id.* at 2155.

*Third*, while gun violence is certainly not a new problem, society has traditionally dealt with it by criminalizing the misuse of firearms and preventing prohibited people from obtaining them – not by forcing law-abiding citizens to choose between relinquishing their privacy rights and exercising their Second Amendment rights. *Cf. Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)

("[A] a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand."). AB 173 fails the "how" factor.

*Fourth*, the 1917 California law is readily distinguishable. Far from authorizing the centralized collection of massive amounts of personal identifying data and the disclosure of that information to third parties for research, the 1917 law was designed with law enforcement functions in mind – helping to locate the owner of a lost or stolen firearm, or tracing a gun found at a crime scene back to its original purchaser. These records were decentralized and did not require purchasers to become research test subjects as a condition on their Second Amendment rights. Therefore, AB 173 also fails the "why" factor.

### B.   The AB 173 Amendments Unconstitutionally Chill the Exercise of Second Amendment Rights.

Because of the "deterrent effect on the exercise of [constitutional] rights," *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021), the Supreme Court has "consistently refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes unpopular, activities." *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 767 (1965), *overruled in part on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); s*ee also Lamont v. Postmaster General*, 381 U.S. 301, 306–07 (1965) (invalidating USPS requirement

67

that addressee request delivery of "communist" materials in order to receive them); *Talley v. California*, 362 U.S. 60, 64–65 (1960) (municipal ban on unsigned handbills); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–65 (1958) (disclosure of NAACP membership list). What matters is not whether the government's disclosure of private personal information is "an effort to suppress" the constitutional rights in question, but rather the "practical effect of the compelled disclosure on the free exercise of constitutional rights." *NAACP*, 357 U.S. at 461.

Accordingly, public disclosure is barred if it would suppress, curtail, discourage, dissuade, or otherwise deter the free exercise of protected liberties. *Id.* at 461–63. Although traditionally applied to the First Amendment, the chilling doctrine has also been applied in other contexts. This is especially true when the dissemination of information threatens the exercise of a politically divisive, controversial, or unpopular constitutional right, because an individual may become "reluctant" to exercise it "if there exists a possibility that her decision and identity will become known publicly." *Thornburgh*, 476 U.S. at 766–67. For instance, in *Thornburgh*, the Supreme Court struck down a statute mandating the compilation of and permitting public access to personal identifying information of women who had

had an abortion. *Id.* at 765–66.[77] Because the "reporting requirements raise the specter of public exposure and harassment of women who choose to exercise their personal, intensely private, right, with their physician, to end a pregnancy[,] . . . they pose an unacceptable danger of deterring the exercise of that right, and must be invalidated." 476 U.S. at 767–68 (citations omitted); *see also Bellotti v. Baird*, 443 U.S. 622, 655 (1979) (Stevens, J., concurring) ("It is inherent . . . that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties.")

Given that overburdensome regulations also have a "deterrent effect on the exercise of" Second Amendment rights, the same reasoning applies here. *See Americans for Prosperity*, 141 S. Ct. at 2383; *cf. Bruen*, 142 S. Ct. at 2132, 2138, 2156 (favorably comparing the First Amendment to the Second Amendment). As a condition of exercising their Second Amendment rights, Appellants were required to provide private information to the Cal DOJ – which, until recently, they understood would remain confidential with the State and subject only to disclosure for law enforcement purposes.

---

[77] Although *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), overruled *Thornburgh's* treatment of abortion as a constitutional right, the reasoning underlying the chilling analysis still applies.

But now, because of AB 173, Appellants must either agree to the disclosure of their identifying information to potentially adversarial "nonprofit bona fide research institutions," or relinquish their constitutional right to purchase firearms and ammunition. This disclosure effectively renders Appellants and other law-abiding Californians unwilling research subjects for California's gun control agenda without any opportunity to opt out, or even know whether (let alone how) their information has been utilized.

Cal DOJ's June 27 data release further underscores that AB 173 dramatically increases the risk that Appellants' sensitive information will be made public – subjecting them to the same kind of harassment, violence, and other risks that this Court cited for rejecting the statute in *Thornburgh*. And in the absence of a remedy for these harms, prospective gun purchasers and CCW applicants are thinking twice about exercising their fundamental constitutional rights. [78]

## C. AB 173 Imposes Unconstitutional Conditions on the Exercise of the Second Amendment Rights.

The "unconstitutional conditions" doctrine generally prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize the exercise of a constitutional right. *See Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality opinion)

---

[78] *See* 4-ER-536 (¶ 13); 4-ER-537–38 (¶ 19); 4-ER-540–41 (¶ 29); 4-ER-541 (¶ 31).

("[t]he denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly."); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests"). "A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 612 (2013).

Nor does there need to be a complete ban on the exercise of Second Amendment rights. *See, e.g.*, *Bruen*, 142 S. Ct. at 2125; *id.* at 2138 n.9 (noting that excessive fees and legnthy delays may violate Second Amendment); *Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

It is beyond dispute that there is an individual right to aquire firearms. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (en banc). And there can be no question that Californians cannot acquire firearms without providing their personal identifying information and authorizing the State to disseminate their information to third-party researchers. This condition violates the Constitution.

71

### III.   AB 173 is Unconstitutionally Retroactive.

The antiretroactivity principle finds expression in several constitutional provisions, including the Fourteenth Amendment Due Process Clause. *See Landgraf v. Usi Film Prods.*, 511 U.S. 244, 266 (1994). That right "protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Id.* (citation omitted). Fundamental considerations of fairness "dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at 265. Statutory construction thus favors prospective application, absent clear legislative language to the contrary. *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982).

Before AB 173, Penal Code sections 11106 and 30352 expressly limited disclosure of Appellants' personal information to a restricted class of statutorily-defined governmental actors, and only for enumerated law-enforcement purposes such as assisting with criminal investigations, arrests and prosecutions. *Compare* Cal. Pen. Code §§ 11106(a)(2) & (c) (eff. Jan. 1, 2021 to Sept. 22, 2021), *with id.* §§ 11106(c)-(d) (eff. Sept. 23, 2021); *and compare id.* § 30352(b) (eff. Jan. 1, 2017), *with id.* § 30352(b) (eff. Sept. 23, 2021).

AB 173 swept away these protections, on which Appellants relied when disclosing their constitutionally-protected, personally identifying information. AB 173 thus attached new consequences – disclosure of private information to third parties – to conduct that took place before the statute was enacted, violating Appellants' right to informational privacy. Applying AB 173 retroactively to Appellants (and their personally identifying information *collected under prior law*) is unlawful, without valid justification, and constitutes a deprivation of liberty without due process of law. Retroactive application deprives Appellants of an opportunity to conform their conduct to the new statute; nor can they request Cal DOJ to refrain from disclosing their personally identifying information.[79] *Cf., e.g.*, *Martin v. Hadix*, 527 U.S. 343, 358–62 (1999) (new fee schedule could not constitutionally apply to work performed before its enactment); *Ditullio v. Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011) (amendment creating a civil cause of action could not apply to violations that occurred before effective date).

## IV. APPELLANTS STATED A CLAIM THAT THE FEDERAL PRIVACY ACT PREEMPTS CAL DOJ'S CCW APPLICATION FORM AND THE GOVERNING STATUTES.

Appellants sought declaratory and injunctive relief on the grounds that Cal DOJ's mandatory CCW application and renewal form, and the governing statutes, are preempted by Section 7 of the Federal Privacy Act of 1974 (the "Privacy Act"),

---

[79] *See* note 48, *supra*.

Pub. L. No. 93–579, 88 Stat. 1909 (1974), *reprinted in* 5 U.S.C. § 552a note.[80]

Section 7(b) of the Privacy Act provides as follows:

> Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it.

88 Stat. at 1909.

California law directs the California Attorney General to develop a uniform application for CCW licenses, amendments, and renewals. Penal Code § 26175(a). Applicants' information is also stored in the AFS database and, after AB 173, subject to disclosure to third-party researchers. *See id.* §§ 11106(a)(1)(B)–(C) & (d).

The uniform application form, in turn, asks for an applicant's SSN,[81] which Appellant Doe No. 4 provided to obtain, and then renew, his CCW.[82] The standard Cal DOJ application form does not, however, specify whether disclosure of the SSN is mandatory or voluntary; by what statutory or other authority the number was requested; what uses would be made of the number; the specific consequences of not

---

[80]  4-ER-572–74 (¶¶ 156–61). The district court erroneously limited this claim to only AB 173, despite that Appellants' claim, on its face, asserts preemption of Cal DOJ's standard application form and Penal Code sections 26175 and 11106(d). *Compare id.*, *with* Order at 25:2–22.

[81]  4-ER-573 (¶¶ 157–58); 4-ER-713 (§ 7)); *see also id.*, 4-ER-706 (¶¶ 2–3) (instructions for providing information for section 7).

[82]  4-ER-542–43 (¶ 36); 4-ER-573–74 (¶ 159).

providing the number; or the possible dissemination of the number.[83] Nor was Doe No. 4 notified of these facts before he applied for, or when he renewed, his license to carry a concealed firearm.[84]

These allegations are sufficient to state a claim upon which relief may be granted. Even if Cal DOJ's form makes SSN disclosure optional, Section 7(b) of the Privacy Act requires the form to state not only "whether [the SSN] disclosure is mandatory or voluntary," but also "by what statutory or other authority such number is solicited, and what uses will be made of it." 88 Stat. at 1909; *see also Camp v. Cason*, 220 Fed. Appx. 976, 981–82 (11th Cir. 2007) (plaintiff stated a claim that Georgia's CCW application form requiring an applicant's SSN violated Section 7 of the Privacy Act). Because the standard form violates the Privacy Act, so too does disclosure of SSNs wrongfully obtained from that form in violation of the Privacy Act.

## CONCLUSION

For the foregoing reasons, the district court committed reversable error in granting Appellee's motion to dismiss. Accordingly, Appellants respectfully request that this Court reverse that order and remand for further proceedings.

---

[83] 4-ER-573–74 (¶ 159); *see also id.*, 4-ER-705–18.

[84] *Id.*

75

Respectfully submitted this 16th day of June, 2023.

SNELL & WILMER L.L.P.

By: */s/ Michael B. Reynolds*
Michael B. Reynolds
Colin R. Higgins
Cameron J. Schlagel
*Attorneys for Plaintiff-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of June, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants.

*/s/ Michael B. Reynolds*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55133

I am the attorney or self-represented party.

**This brief contains** | 13,648 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [            ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Cameron J. Schlagel | **Date** | June 16, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

# ADDENDUM

**U.S. Const. Amend. II**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**U.S. Const. Amend. V**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**U.S. Const. Amend. XIV**

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

1

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**PENAL CODE**

**Section 11106**

---

11106. (a) (1) In order to assist in the investigation of crime, the prosecution of civil actions by city attorneys pursuant to paragraph (3) of subdivision (b), the arrest and prosecution of criminals, and the recovery of lost, stolen, or found property, the Attorney General shall keep and properly file a complete record of all of the following:

(A) All copies of fingerprints.

(B) Copies of licenses to carry firearms issued pursuant to Section 26150, 26155, 26170, or 26215.

(C) Information reported to the Department of Justice pursuant to subdivision (e) of Section 18120, Section 26225, 26556, 27875, 27920, 27966, 28050, 29180, 29830, or paragraph (2) of subdivision (e) of Section 32000.

(D) Dealers' Records of Sale of firearms.

(E) Reports provided pursuant to Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6, or pursuant to any provision listed in subdivision (a) of Section 16585.

(F) Forms provided pursuant to Section 12084, as that section read prior to being repealed on January 1, 2006.

(G) Reports provided pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6, that are not Dealers' Records of Sale of firearms.

(H) Information provided pursuant to Section 28255.

(I) Reports of stolen, lost, found, pledged, or pawned property in any city or county of this state.

(2) The Attorney General shall, upon proper application therefor, furnish the information to the officers referred to in Section 11105.

(b) (1) The Attorney General shall permanently keep and properly file and maintain all information reported to the Department of Justice pursuant to the following provisions as to firearms and maintain a registry thereof:

(A) Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6.

(B) Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6.

(C) Chapter 5 (commencing with Section 28050) of Division 6 of Title 4 of Part 6.

(D) Any provision listed in subdivision (a) of Section 16585.

(E) Former Section 12084.

(F) Section 28255.

(G)  Section 29180.

(H)  Paragraph (2) of subdivision (e) of Section 32000.

(I)  Any other law.

(2)  The registry shall consist of all of the following:

(A)  The name, address, identification of, place of birth (state or country), complete telephone number, occupation, sex, description, and all legal names and aliases ever used by the owner or person being loaned the particular firearm as listed on the information provided to the department on the Dealers' Record of Sale, the Law Enforcement Firearms Transfer (LEFT), as defined in former Section 12084, or reports made to the department pursuant to any provision listed in subdivision (a) of Section 16585, Section 28255 or 29180, or any other law.

(B)  The name and address of, and other information about, any person (whether a dealer or a private party) from whom the owner acquired or the person being loaned the particular firearm and when the firearm was acquired or loaned as listed on the information provided to the department on the Dealers' Record of Sale, the LEFT, or reports made to the department pursuant to any provision listed in subdivision (a) of Section 16585 or any other law.

(C)  Any waiting period exemption applicable to the transaction which resulted in the owner of or the person being loaned the particular firearm acquiring or being loaned that firearm.

(D)  The manufacturer's name if stamped on the firearm, model name or number if stamped on the firearm, and, if applicable, the serial number, other number (if more than one serial number is stamped on the firearm), caliber, type of firearm, if the firearm is new or used, barrel length, and color of the firearm, or, if the firearm is not a handgun and does not have a serial number or any identification number or mark assigned to it, that shall be noted.

(3)  Information in the registry referred to in this subdivision shall, upon proper application therefor, be furnished to the officers referred to in Section 11105, to a city attorney prosecuting a civil action, solely for use in prosecuting that civil action and not for any other purpose, or to the person listed in the registry as the owner or person who is listed as being loaned the particular firearm.

(4)  If any person is listed in the registry as the owner of a firearm through a Dealers' Record of Sale prior to 1979, and the person listed in the registry requests by letter that the Attorney General store and keep the record electronically, as well as in the record's existing photographic, photostatic, or nonerasable optically stored form, the Attorney General shall do so within three working days of receipt of the request. The Attorney General shall, in writing, and as soon as practicable, notify the person requesting electronic storage of the record that the request has been honored as required by this paragraph.

(c)  (1)  If the conditions specified in paragraph (2) are met, any officer referred to in paragraphs (1) to (6), inclusive, of subdivision (b) of Section 11105 may disseminate the name of the subject of the record, the number of the firearms listed in the record, and the description of any firearm, including the make, model, and caliber, from the

record relating to any firearm's sale, transfer, registration, or license record, or any information reported to the Department of Justice pursuant to any of the following:

(A)  Section 26225, 26556, 27875, 27920, 27966, or 29180.

(B)  Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6.

(C)  Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6.

(D)  Chapter 5 (commencing with Section 28050) of Division 6 of Title 4 of Part 6.

(E)  Article 2 (commencing with Section 28150) of Chapter 6 of Division 6 of Title 4 of Part 6.

(F)  Article 5 (commencing with Section 30900) of Chapter 2 of Division 10 of Title 4 of Part 6.

(G)  Chapter 2 (commencing with Section 33850) of Division 11 of Title 4 of Part 6.

(H)  Any provision listed in subdivision (a) of Section 16585.

(I)  Paragraph (2) of subdivision (e) of Section 32000.

(2)  Information may be disseminated pursuant to paragraph (1) only if all of the following conditions are satisfied:

(A)  The subject of the record has been arraigned for a crime in which the victim is a person described in subdivisions (a) to (f), inclusive, of Section 6211 of the Family Code and is being prosecuted or is serving a sentence for the crime, or the subject of the record is the subject of an emergency protective order, a temporary restraining order, or an order after hearing, which is in effect and has been issued by a family court under the Domestic Violence Prevention Act set forth in Division 10 (commencing with Section 6200) of the Family Code.

(B)  The information is disseminated only to the victim of the crime or to the person who has obtained the emergency protective order, the temporary restraining order, or the order after hearing issued by the family court.

(C)  Whenever a law enforcement officer disseminates the information authorized by this subdivision, that officer or another officer assigned to the case shall immediately provide the victim of the crime with a "Victims of Domestic Violence" card, as specified in subparagraph (H) of paragraph (9) of subdivision (c) of Section 13701.

(3)  The victim or person to whom information is disseminated pursuant to this subdivision may disclose it as they deem necessary to protect themselves or another person from bodily harm by the person who is the subject of the record.

(d)  All information collected pursuant to this section shall be maintained by the department and shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis for academic and policy research purposes upon proper request and following approval by the center's governing institutional review board when required. At the department's discretion, and subject to Section 14240, information collected pursuant to this section may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the

prevention of violence and following approval by the institution's governing institutional review board or human subjects committee when required. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of such data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

(Amended by Stats. 2021, Ch. 253, Sec. 2.5. (AB 173) Effective September 23, 2021. Operative January 1, 2022, pursuant to Sec. 14 of Stats. 2021, Ch. 253.)



**State of California**

**PENAL CODE**

**Section 14231**

---

14231. (a) It is the intent of the Legislature to establish a center for research into firearm-related violence. It is the intent of the Legislature that the center be administered by the University of California pursuant to the following principles:

(1) Interdisciplinary work of the center shall address the following:

(A) The nature of firearm violence, including individual and societal determinants of risk for involvement in firearm violence, whether as a victim or a perpetrator.

(B) The individual, community, and societal consequences of firearm violence.

(C) Prevention and treatment of firearm violence at the individual, community, and societal levels.

(2) The center shall conduct basic, translational, and transformative research with a mission to provide the scientific evidence on which sound firearm violence prevention policies and programs can be based. Its research shall include, but not be limited to, the effectiveness of existing laws and policies intended to reduce firearm violence, including the criminal misuse of firearms, and efforts to promote the responsible ownership and use of firearms.

(3) The center shall work on a continuing basis with policymakers in the Legislature and state agencies to identify, implement, and evaluate innovative firearm violence prevention policies and programs.

(4) To help ensure a long-term and successful effort to understand and prevent firearm violence, the center shall recruit and provide specialized training opportunities for new researchers, including experienced investigators in related fields who are beginning work on firearm violence, young investigators who have completed their education, postdoctoral scholars, doctoral students, and undergraduates.

(5) As a supplement to its own research, the center may administer a small grant program for research on firearm violence. All research funds shall be awarded on the basis of scientific merit as determined by an open, competitive peer review process that assures objectivity, consistency, and high quality. All qualified investigators, regardless of institutional affiliation, shall have equal access and opportunity to compete for the funds.

(6) The peer review process for the selection of grants awarded under this program shall be modeled on the process used by the National Institutes of Health in its grantmaking process.

(b) It is further the intent of the Legislature that on or before December 31, 2017, and every five years thereafter, the University of California transmit programmatic, as well as financial, reports to the state, including a report on the grants made, pending

grants, program accomplishments, and the future direction of the program. The report shall be submitted in compliance with Section 9795 of the Government Code.

(c)  (1)  It is the intent of the Legislature that the center be provided with access to data kept by state agencies that is necessary for the conduct of its research.

(2)  Subject to the conditions and requirements established elsewhere in statute, state agencies, including, but not limited to, the Department of Justice, the State Department of Public Health, the State Department of Health Care Services, the Office of Statewide Health Planning and Development, and the Department of Motor Vehicles, shall provide to the center, upon proper request and following approval by the center's governing institutional review board when required, the data necessary for the center to conduct its research.

(3)  Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Recognizing the time-sensitive nature of the center's research, data shall be provided in a timely manner. Reasonable costs to the state agency associated with the agency's processing of that data may be billed to the center. If a request for data or letter of support for research using the data is denied, the state agency shall provide a written statement of the specific reasons for the denial.

(d)  The center and all recipients of grants shall provide copies of their research publications to the Legislature and to agencies supplying data used in the conduct of that research as soon as is practicable following publication. These submissions shall be submitted in compliance with Section 9795 of the Government Code.

(e)  Toward these ends, the Legislature requests that the Regents of the University of California establish a Firearm Violence Research Center and administer the center and grant program pursuant to, and consistent with, the principles and goals stated herein.

(f)  The center shall be named the California Firearm Violence Research Center at UC Davis.

(g)  Ten thousand dollars ($10,000) is hereby appropriated from the General Fund to the Department of Justice to implement this section.

(Amended by Stats. 2021, Ch. 253, Sec. 5.  (AB 173)  Effective September 23, 2021.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**

**PENAL CODE**

**Section 30352**

---

30352. (a) Commencing July 1, 2019, an ammunition vendor shall not sell or otherwise transfer ownership of any ammunition without, at the time of delivery, legibly recording the following information on a form to be prescribed by the Department of Justice:

(1) The date of the sale or other transfer.

(2) The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(3) The brand, type, and amount of ammunition sold or otherwise transferred.

(4) The purchaser's or transferee's full name and signature.

(5) The name of the salesperson who processed the sale or other transaction.

(6) The purchaser's or transferee's full residential address and telephone number.

(7) The purchaser's or transferee's date of birth.

(b) (1) Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. Except as provided in paragraph (2), this information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share the information for any purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.

(2) The information collected by the department as provided in paragraph (1) shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis following approval by the institution's governing institutional review board, when required. At the department's discretion, and subject to Section 14240, the data may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required, for academic and policy research purposes. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of

that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

(c) Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:

(1) A person authorized to purchase ammunition pursuant to Section 30370.

(2) A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer, and the ammunition is delivered to the person in the same transaction as the firearm.

(d) Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.

(e) Subdivisions (a) and (d) shall not apply to sales or other transfers of ownership of ammunition by ammunition vendors to any of the following, if properly identified:

(1) An ammunition vendor.

(2) A person who is on the centralized list of exempted federal firearms licensees maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of Title 4 of Part 6.

(3) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.

(4) A gunsmith.

(5) A wholesaler.

(6) A manufacturer or importer of firearms or ammunition licensed pursuant to Chapter 44 (commencing with Section 921) of Part I of Title 18 of the United States Code, and the regulations issued pursuant thereto.

(7) An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the handgun ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

(8) (A) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn

federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.

(B)  (i)  Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.

(ii)  The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that the purchaser transferee is the person authorized in the certification.

(iii)  The vendor shall keep the certification with the record of sale and submit the certification to the department.

(f)  The department is authorized to adopt regulations to implement the provisions of this section.

(Amended by Stats. 2021, Ch. 253, Sec. 11.  (AB 173)  Effective September 23, 2021.)



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

## Assembly Bill No. 173

### CHAPTER 253

An act to amend Sections 171c, 11106, 13202, 14230, 14231, 14231.5, 14236, 28220, 30000, 30352, and 30452 of, and to add Chapter 3 (commencing with Section 14240) to Title 12.2 of Part 4 of, the Penal Code, and to add Section 8106 to the Welfare and Institutions Code, relating to public safety, and making an appropriation therefor, to take effect immediately, bill related to the budget.

[Approved by Governor September 23, 2021. Filed with
Secretary of State September 23, 2021.]

LEGISLATIVE COUNSEL'S DIGEST

AB 173, Committee on Budget. Public Safety.

Existing law prohibits the bringing or possession of, a loaded firearm or other specified weapon, to the State Capitol and legislative offices, as specified, punishable as either a misdemeanor or a felony.

This bill would include the state office building located at 1021 O Street in the City of Sacramento within these prohibitions. By expanding the scope of an existing crime, this bill would impose a state-mandated local program.

Existing law outlines the procedures for agencies to follow in the collection, maintenance, and dissemination of personal information, as defined, in order to protect the privacy of individuals. Existing law generally prohibits an agency from disclosing any personal information in a manner that would link the information disclosed to the individual to whom it pertains. Existing law permits the disclosure of that information to the University of California or a nonprofit educational institution, under specified conditions.

Existing law establishes a center for research into firearm-related violence, administered by the University of California, to research with a mission to provide the scientific evidence on which sound firearm violence prevention policies can be based, as specified. Existing law allows for the collection of various data relating to crimes and firearms, including, among other things, criminal history information, a database of gun violence restraining orders, and a database of firearm precursor parts purchases. Existing law makes the unauthorized furnishing of criminal history information a crime. Existing law, as amended by the Safety for All Act of 2016, an initiative statute approved by voters as Proposition 63 at the November 8, 2016, statewide general election, created a database of ammunition purchases and made that database confidential. Proposition 63 allows its provisions to be amended by a vote of 55% of the Legislature so long as the amendments are consistent with, and further the intent of, the act.

95

This bill would name the center for research into firearm-related violence the California Firearm Violence Research Center at UC Davis. The bill would generally require that the information above be made available to the center and researchers affiliated with the center, and, at the department's discretion, to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation, as specified, for the study of the prevention of violence. The bill would require that material identifying individuals only be provided for research or statistical activities, and require that information to only be used for those purposes and would prohibit reports or publications derived from that information from identifying specific individuals. By providing access to criminal history information, the unauthorized furnishing of which is a crime, this bill would expand a crime and create a state-mandated local program. The bill would additionally require the Department of Justice to establish procedures for these requests, as specified.

This bill would incorporate additional changes to Sections 11106 and 28220 of the Penal Code proposed by Senate Bill 715 to be operative only if this bill and Senate Bill 715 are enacted and this bill is enacted last.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

This bill would declare that it is to take effect immediately as a bill providing for appropriations related to the Budget Bill.

Appropriation: yes.

*The people of the State of California do enact as follows:*

SECTION 1. Section 171c of the Penal Code is amended to read:

171c. (a) (1) Any person who brings a loaded firearm into, or possesses a loaded firearm within, the State Capitol, the state office building at 1021 O Street in the City of Sacramento, any legislative office, any office of the Governor or other constitutional officer, or any hearing room in which any committee of the Senate or Assembly is conducting a hearing, or upon the grounds of the State Capitol, which is bounded by 10th, L, 15th, and N Streets in the City of Sacramento, shall be punished by imprisonment in a county jail for a period of not more than one year, a fine of not more than one thousand dollars ($1,000), or both such imprisonment and fine, or by imprisonment pursuant to subdivision (h) of Section 1170.

(2) Any person who brings or possesses, within the State Capitol, any legislative office, any hearing room in which any committee of the Senate or Assembly is conducting a hearing, the Legislative Office Building at 1020 N Street in the City of Sacramento, the state office building at 1021 O Street in the City of Sacramento, or upon the grounds of the State Capitol, which is bounded by 10th, L, 15th, and N Streets in the City of Sacramento,

any of the following, is guilty of a misdemeanor punishable by imprisonment in a county jail for a period not to exceed one year, or by a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment, if the area is posted with a statement providing reasonable notice that prosecution may result from possession of any of these items:

(A) Any firearm.

(B) Any deadly weapon described in Section 21510 or in any provision listed in Section 16590.

(C) Any knife with a blade length in excess of four inches, the blade of which is fixed or is capable of being fixed in an unguarded position by the use of one or two hands.

(D) Any unauthorized tear gas weapon.

(E) Any stun gun, as defined in Section 244.5.

(F) Any instrument that expels a metallic projectile, such as a BB or pellet, through the force of air pressure, $CO_2$ pressure, or spring action, or any spot marker gun or paint gun.

(G) Any ammunition as defined in Sections 16150 and 16650.

(H) Any explosive as defined in Section 12000 of the Health and Safety Code.

(b) Subdivision (a) shall not apply to, or affect, any of the following:

(1) A duly appointed peace officer as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, a retired peace officer with authorization to carry concealed weapons as described in Article 2 (commencing with Section 25450) of Chapter 2 of Division 5 of Title 4 of Part 6, a full-time paid peace officer of another state or the federal government who is carrying out official duties while in California, or any person summoned by any of these officers to assist in making arrests or preserving the peace while that person is actually engaged in assisting the officer.

(2) A person holding a valid license to carry the firearm pursuant to Chapter 4 (commencing with Section 26150) of Division 5 of Title 4 of Part 6, and who has permission granted by the Chief Sergeants at Arms of the State Assembly and the State Senate to possess a concealed weapon upon the premises described in subdivision (a).

(3) A person who has permission granted by the Chief Sergeants at Arms of the State Assembly and the State Senate to possess a weapon upon the premises described in subdivision (a).

(c) (1) Nothing in this section shall preclude prosecution under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of Title 4 of Part 6 of this code, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a penalty greater than is set forth in this section.

(2) The provisions of this section are cumulative, and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by different provisions of law shall not be punished under more than one provision.

SEC. 2.   Section 11106 of the Penal Code is amended to read:

11106. (a) (1) In order to assist in the investigation of crime, the prosecution of civil actions by city attorneys pursuant to paragraph (3) of subdivision (b), the arrest and prosecution of criminals, and the recovery of lost, stolen, or found property, the Attorney General shall keep and properly file a complete record of all of the following:

(A) All copies of fingerprints.

(B) Copies of licenses to carry firearms issued pursuant to Section 26150, 26155, 26170, or 26215.

(C) Information reported to the Department of Justice pursuant to subdivision (e) of Section 18120, Section 26225, 26556, 27875, 27920, 27966, 29180, 29830, or paragraph (2) of subdivision (e) of Section 32000.

(D) Dealers' Records of Sale of firearms.

(E) Reports provided pursuant to Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6, or pursuant to any provision listed in subdivision (a) of Section 16585.

(F) Forms provided pursuant to Section 12084, as that section read prior to being repealed on January 1, 2006.

(G) Reports provided pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6, that are not Dealers' Records of Sale of firearms.

(H) Information provided pursuant to Section 28255.

(I) Reports of stolen, lost, found, pledged, or pawned property in any city or county of this state.

(2) The Attorney General shall, upon proper application therefor, furnish the information to the officers referred to in Section 11105.

(b) (1) The Attorney General shall permanently keep and properly file and maintain all information reported to the Department of Justice pursuant to the following provisions as to firearms and maintain a registry thereof:

(A) Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6.

(B) Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6.

(C) Chapter 5 (commencing with Section 28050) of Division 6 of Title 4 of Part 6.

(D) Any provision listed in subdivision (a) of Section 16585.

(E) Former Section 12084.

(F) Section 28255.

(G) Section 29180.

(H) Paragraph (2) of subdivision (e) of Section 32000.

(I) Any other law.

(2) The registry shall consist of all of the following:

(A) The name, address, identification of, place of birth (state or country), complete telephone number, occupation, sex, description, and all legal names and aliases ever used by the owner or person being loaned the particular firearm as listed on the information provided to the department on the

95

15

— 5 —                                    Ch. 253

Dealers' Record of Sale, the Law Enforcement Firearms Transfer (LEFT), as defined in former Section 12084, or reports made to the department pursuant to any provision listed in subdivision (a) of Section 16585, Section 28255 or 29180, or any other law.

(B) The name and address of, and other information about, any person (whether a dealer or a private party) from whom the owner acquired or the person being loaned the particular firearm and when the firearm was acquired or loaned as listed on the information provided to the department on the Dealers' Record of Sale, the LEFT, or reports made to the department pursuant to any provision listed in subdivision (a) of Section 16585 or any other law.

(C) Any waiting period exemption applicable to the transaction which resulted in the owner of or the person being loaned the particular firearm acquiring or being loaned that firearm.

(D) The manufacturer's name if stamped on the firearm, model name or number if stamped on the firearm, and, if applicable, the serial number, other number (if more than one serial number is stamped on the firearm), caliber, type of firearm, if the firearm is new or used, barrel length, and color of the firearm, or, if the firearm is not a handgun and does not have a serial number or any identification number or mark assigned to it, that shall be noted.

(3) Information in the registry referred to in this subdivision shall, upon proper application therefor, be furnished to the officers referred to in Section 11105, to a city attorney prosecuting a civil action, solely for use in prosecuting that civil action and not for any other purpose, or to the person listed in the registry as the owner or person who is listed as being loaned the particular firearm.

(4) If any person is listed in the registry as the owner of a firearm through a Dealers' Record of Sale prior to 1979, and the person listed in the registry requests by letter that the Attorney General store and keep the record electronically, as well as in the record's existing photographic, photostatic, or nonerasable optically stored form, the Attorney General shall do so within three working days of receipt of the request. The Attorney General shall, in writing, and as soon as practicable, notify the person requesting electronic storage of the record that the request has been honored as required by this paragraph.

(c) (1) If the conditions specified in paragraph (2) are met, any officer referred to in paragraphs (1) to (6), inclusive, of subdivision (b) of Section 11105 may disseminate the name of the subject of the record, the number of the firearms listed in the record, and the description of any firearm, including the make, model, and caliber, from the record relating to any firearm's sale, transfer, registration, or license record, or any information reported to the Department of Justice pursuant to any of the following:

(A) Section 26225, 26556, 27875, 27920, 27966, or 29180.

(B) Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6.

95

16

(C)  Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6.

(D)  Chapter 5 (commencing with Section 28050) of Division 6 of Title 4 of Part 6.

(E)  Article 2 (commencing with Section 28150) of Chapter 6 of Division 6 of Title 4 of Part 6.

(F)  Article 5 (commencing with Section 30900) of Chapter 2 of Division 10 of Title 4 of Part 6.

(G)  Chapter 2 (commencing with Section 33850) of Division 11 of Title 4 of Part 6.

(H)  Any provision listed in subdivision (a) of Section 16585.

(I)  Paragraph (2) of subdivision (e) of Section 32000.

(2)  Information may be disseminated pursuant to paragraph (1) only if all of the following conditions are satisfied:

(A)  The subject of the record has been arraigned for a crime in which the victim is a person described in subdivisions (a) to (f), inclusive, of Section 6211 of the Family Code and is being prosecuted or is serving a sentence for the crime, or the subject of the record is the subject of an emergency protective order, a temporary restraining order, or an order after hearing, which is in effect and has been issued by a family court under the Domestic Violence Prevention Act set forth in Division 10 (commencing with Section 6200) of the Family Code.

(B)  The information is disseminated only to the victim of the crime or to the person who has obtained the emergency protective order, the temporary restraining order, or the order after hearing issued by the family court.

(C)  Whenever a law enforcement officer disseminates the information authorized by this subdivision, that officer or another officer assigned to the case shall immediately provide the victim of the crime with a "Victims of Domestic Violence" card, as specified in subparagraph (H) of paragraph (9) of subdivision (c) of Section 13701.

(3)  The victim or person to whom information is disseminated pursuant to this subdivision may disclose it as they deem necessary to protect themselves or another person from bodily harm by the person who is the subject of the record.

(d)  All information collected pursuant to this section shall be maintained by the department and shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis for academic and policy research purposes upon proper request and following approval by the center's governing institutional review board when required. At the department's discretion, and subject to Section 14240, information collected pursuant to this section may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence and following approval by the institution's governing institutional review board or human subjects committee when required. Material identifying individuals shall only be provided for research or

95

17

statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of such data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

SEC. 2.5.  Section 11106 of the Penal Code is amended to read:

11106.  (a) (1) In order to assist in the investigation of crime, the prosecution of civil actions by city attorneys pursuant to paragraph (3) of subdivision (b), the arrest and prosecution of criminals, and the recovery of lost, stolen, or found property, the Attorney General shall keep and properly file a complete record of all of the following:

(A)  All copies of fingerprints.

(B)  Copies of licenses to carry firearms issued pursuant to Section 26150, 26155, 26170, or 26215.

(C)  Information reported to the Department of Justice pursuant to subdivision (e) of Section 18120, Section 26225, 26556, 27875, 27920, 27966, 28050, 29180, 29830, or paragraph (2) of subdivision (e) of Section 32000.

(D)  Dealers' Records of Sale of firearms.

(E)  Reports provided pursuant to Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6, or pursuant to any provision listed in subdivision (a) of Section 16585.

(F)  Forms provided pursuant to Section 12084, as that section read prior to being repealed on January 1, 2006.

(G)  Reports provided pursuant to Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6, that are not Dealers' Records of Sale of firearms.

(H)  Information provided pursuant to Section 28255.

(I)  Reports of stolen, lost, found, pledged, or pawned property in any city or county of this state.

(2)  The Attorney General shall, upon proper application therefor, furnish the information to the officers referred to in Section 11105.

(b)  (1)  The Attorney General shall permanently keep and properly file and maintain all information reported to the Department of Justice pursuant to the following provisions as to firearms and maintain a registry thereof:

(A)  Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6.

(B)  Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6.

(C)  Chapter 5 (commencing with Section 28050) of Division 6 of Title 4 of Part 6.

(D)  Any provision listed in subdivision (a) of Section 16585.

(E)  Former Section 12084.

(F)  Section 28255.

(G)  Section 29180.

(H)  Paragraph (2) of subdivision (e) of Section 32000.

(I)  Any other law.

(2)  The registry shall consist of all of the following:

(A)  The name, address, identification of, place of birth (state or country), complete telephone number, occupation, sex, description, and all legal names and aliases ever used by the owner or person being loaned the particular firearm as listed on the information provided to the department on the Dealers' Record of Sale, the Law Enforcement Firearms Transfer (LEFT), as defined in former Section 12084, or reports made to the department pursuant to any provision listed in subdivision (a) of Section 16585, Section 28255 or 29180, or any other law.

(B)  The name and address of, and other information about, any person (whether a dealer or a private party) from whom the owner acquired or the person being loaned the particular firearm and when the firearm was acquired or loaned as listed on the information provided to the department on the Dealers' Record of Sale, the LEFT, or reports made to the department pursuant to any provision listed in subdivision (a) of Section 16585 or any other law.

(C)  Any waiting period exemption applicable to the transaction which resulted in the owner of or the person being loaned the particular firearm acquiring or being loaned that firearm.

(D)  The manufacturer's name if stamped on the firearm, model name or number if stamped on the firearm, and, if applicable, the serial number, other number (if more than one serial number is stamped on the firearm), caliber, type of firearm, if the firearm is new or used, barrel length, and color of the firearm, or, if the firearm is not a handgun and does not have a serial number or any identification number or mark assigned to it, that shall be noted.

(3)  Information in the registry referred to in this subdivision shall, upon proper application therefor, be furnished to the officers referred to in Section 11105, to a city attorney prosecuting a civil action, solely for use in prosecuting that civil action and not for any other purpose, or to the person listed in the registry as the owner or person who is listed as being loaned the particular firearm.

(4)  If any person is listed in the registry as the owner of a firearm through a Dealers' Record of Sale prior to 1979, and the person listed in the registry requests by letter that the Attorney General store and keep the record electronically, as well as in the record's existing photographic, photostatic, or nonerasable optically stored form, the Attorney General shall do so within three working days of receipt of the request. The Attorney General shall, in writing, and as soon as practicable, notify the person requesting electronic storage of the record that the request has been honored as required by this paragraph.

(c)  (1)  If the conditions specified in paragraph (2) are met, any officer referred to in paragraphs (1) to (6), inclusive, of subdivision (b) of Section

11105 may disseminate the name of the subject of the record, the number of the firearms listed in the record, and the description of any firearm, including the make, model, and caliber, from the record relating to any firearm's sale, transfer, registration, or license record, or any information reported to the Department of Justice pursuant to any of the following:

(A)  Section 26225, 26556, 27875, 27920, 27966, or 29180.

(B)  Article 1 (commencing with Section 26700) and Article 2 (commencing with Section 26800) of Chapter 2 of Division 6 of Title 4 of Part 6.

(C)  Article 1 (commencing with Section 27500) of Chapter 4 of Division 6 of Title 4 of Part 6.

(D)  Chapter 5 (commencing with Section 28050) of Division 6 of Title 4 of Part 6.

(E)  Article 2 (commencing with Section 28150) of Chapter 6 of Division 6 of Title 4 of Part 6.

(F)  Article 5 (commencing with Section 30900) of Chapter 2 of Division 10 of Title 4 of Part 6.

(G)  Chapter 2 (commencing with Section 33850) of Division 11 of Title 4 of Part 6.

(H)  Any provision listed in subdivision (a) of Section 16585.

(I)  Paragraph (2) of subdivision (e) of Section 32000.

(2)  Information may be disseminated pursuant to paragraph (1) only if all of the following conditions are satisfied:

(A)  The subject of the record has been arraigned for a crime in which the victim is a person described in subdivisions (a) to (f), inclusive, of Section 6211 of the Family Code and is being prosecuted or is serving a sentence for the crime, or the subject of the record is the subject of an emergency protective order, a temporary restraining order, or an order after hearing, which is in effect and has been issued by a family court under the Domestic Violence Prevention Act set forth in Division 10 (commencing with Section 6200) of the Family Code.

(B)  The information is disseminated only to the victim of the crime or to the person who has obtained the emergency protective order, the temporary restraining order, or the order after hearing issued by the family court.

(C)  Whenever a law enforcement officer disseminates the information authorized by this subdivision, that officer or another officer assigned to the case shall immediately provide the victim of the crime with a "Victims of Domestic Violence" card, as specified in subparagraph (H) of paragraph (9) of subdivision (c) of Section 13701.

(3)  The victim or person to whom information is disseminated pursuant to this subdivision may disclose it as they deem necessary to protect themselves or another person from bodily harm by the person who is the subject of the record.

(d)  All information collected pursuant to this section shall be maintained by the department and shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis for academic

and policy research purposes upon proper request and following approval by the center's governing institutional review board when required. At the department's discretion, and subject to Section 14240, information collected pursuant to this section may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence and following approval by the institution's governing institutional review board or human subjects committee when required. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of such data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

SEC. 3.   Section 13202 of the Penal Code is amended to read:

13202.   (a) Notwithstanding subdivision (g) of Section 11105 and subdivision (a) of Section 13305, every public agency or bona fide research institution concerned with the prevention or control of crime, the quality of criminal justice, or the custody or correction of offenders may be provided with criminal offender record information, including criminal court records, as required for the performance of its duties, including the conduct of research. The California Firearm Violence Research Center at UC Davis and researchers affiliated with the center shall be provided with criminal offender record information as required for its research. The material identifying individuals shall only be provided for research and statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities. Reports or publications derived from this information shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial. A person shall not be denied information pursuant to this section solely on the basis of that person's criminal record unless the person has been convicted of a felony or another offense that involves moral turpitude, dishonesty, or fraud.

SEC. 4.   Section 14230 of the Penal Code is amended to read:

14230.   The Legislature finds and declares the following:

(a) Firearm violence is a significant public health and public safety problem in California and nationwide. Nationally, rates of fatal firearm violence have remained essentially unchanged for more than a decade, as declines in homicide have been offset by increases in suicide.

(b) California has been the site of some of the nation's most infamous mass shootings, such as those at a McDonald's in San Ysidro, at Cleveland Elementary School in Stockton, near the University of California, Santa Barbara in Isla Vista, and most recently at the Inland Regional Center in

San Bernardino. Yet public mass shootings account for less than 1 percent of firearm violence. In 2014, there were 2,939 firearm-related deaths in California, including 1,582 suicides, 1,230 homicides, 89 deaths by legal intervention, and 38 unintentional or undetermined deaths. In communities where firearm violence is a frequent occurrence, the very structure of daily life is affected.

(c)  Nationwide, the annual societal cost of firearm violence was estimated at $229,000,000,000 in 2012. A significant share of this burden falls on California. In 2013, the Office of Statewide Health Planning and Development noted that government-sponsored insurance programs covered nearly two-thirds of the costs of hospitalizations for firearm assaults in California, and about one-half of the costs of hospitalizations for unintentional injuries or those resulting from deliberate self-harm.

(d)  California has been a leader in responding to this continuing crisis. However, although rates of fatal firearm violence in California are well below average for the 50 states, they are not low enough.

(e)  Too little is known about firearm violence and its prevention. This is in substantial part because too little research has been done. The need for more research and more sophisticated research has repeatedly been emphasized. California's uniquely rich data related to firearm violence have made possible important, timely, policy-relevant research that cannot be conducted elsewhere. Because there has been so little support for research, only a small number of trained investigators are available.

(f)  When confronted by other major health and social problems, California and the nation have mounted effective responses, coupling an expanded research effort with policy reform in the public's interest. Motor vehicle accidents, cancer, heart disease, and tobacco use are all examples of the benefits of this approach.

(g)  Federal funding for firearm violence research through the federal Centers for Disease Control and Prevention has been virtually eliminated by Congress since 1996, leaving a major gap that must be filled by other sources.

SEC. 5.  Section 14231 of the Penal Code is amended to read:

14231.   (a)  It is the intent of the Legislature to establish a center for research into firearm-related violence. It is the intent of the Legislature that the center be administered by the University of California pursuant to the following principles:

(1)  Interdisciplinary work of the center shall address the following:

(A)  The nature of firearm violence, including individual and societal determinants of risk for involvement in firearm violence, whether as a victim or a perpetrator.

(B)  The individual, community, and societal consequences of firearm violence.

(C)  Prevention and treatment of firearm violence at the individual, community, and societal levels.

(2)  The center shall conduct basic, translational, and transformative research with a mission to provide the scientific evidence on which sound

95

firearm violence prevention policies and programs can be based. Its research shall include, but not be limited to, the effectiveness of existing laws and policies intended to reduce firearm violence, including the criminal misuse of firearms, and efforts to promote the responsible ownership and use of firearms.

(3) The center shall work on a continuing basis with policymakers in the Legislature and state agencies to identify, implement, and evaluate innovative firearm violence prevention policies and programs.

(4) To help ensure a long-term and successful effort to understand and prevent firearm violence, the center shall recruit and provide specialized training opportunities for new researchers, including experienced investigators in related fields who are beginning work on firearm violence, young investigators who have completed their education, postdoctoral scholars, doctoral students, and undergraduates.

(5) As a supplement to its own research, the center may administer a small grant program for research on firearm violence. All research funds shall be awarded on the basis of scientific merit as determined by an open, competitive peer review process that assures objectivity, consistency, and high quality. All qualified investigators, regardless of institutional affiliation, shall have equal access and opportunity to compete for the funds.

(6) The peer review process for the selection of grants awarded under this program shall be modeled on the process used by the National Institutes of Health in its grantmaking process.

(b) It is further the intent of the Legislature that on or before December 31, 2017, and every five years thereafter, the University of California transmit programmatic, as well as financial, reports to the state, including a report on the grants made, pending grants, program accomplishments, and the future direction of the program. The report shall be submitted in compliance with Section 9795 of the Government Code.

(c) (1) It is the intent of the Legislature that the center be provided with access to data kept by state agencies that is necessary for the conduct of its research.

(2) Subject to the conditions and requirements established elsewhere in statute, state agencies, including, but not limited to, the Department of Justice, the State Department of Public Health, the State Department of Health Care Services, the Office of Statewide Health Planning and Development, and the Department of Motor Vehicles, shall provide to the center, upon proper request and following approval by the center's governing institutional review board when required, the data necessary for the center to conduct its research.

(3) Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Recognizing the time-sensitive nature of the center's research, data shall be provided in a timely manner. Reasonable costs to the state agency associated with the agency's processing of that data may be billed to the

95

center. If a request for data or letter of support for research using the data is denied, the state agency shall provide a written statement of the specific reasons for the denial.

(d) The center and all recipients of grants shall provide copies of their research publications to the Legislature and to agencies supplying data used in the conduct of that research as soon as is practicable following publication. These submissions shall be submitted in compliance with Section 9795 of the Government Code.

(e) Toward these ends, the Legislature requests that the Regents of the University of California establish a Firearm Violence Research Center and administer the center and grant program pursuant to, and consistent with, the principles and goals stated herein.

(f) The center shall be named the California Firearm Violence Research Center at UC Davis.

(g) Ten thousand dollars ($10,000) is hereby appropriated from the General Fund to the Department of Justice to implement this section.

SEC. 6.  Section 14231.5 of the Penal Code is amended to read:

14231.5.  (a) Notwithstanding any other law, the Department of Justice shall make information that is maintained in the California Restraining and Protective Order System or any other data relating to prohibitions on firearm ownership, available to researchers affiliated with the California Firearm Violence Research Center at UC Davis upon proper request and following approval by the center's governing institutional review board when required. At the department's discretion, the information may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence and following approval by the institution's governing institutional review board or human subjects committee when required. Information may only be used for academic and policy research purposes. Any material identifying individuals shall not be transferred, revealed, or used for other than research or statistical activities and reports or publications derived therefrom shall not identify specific individuals.

(b) Where material described in subdivision (a) that identifies individuals is necessary for the center to conduct research, that material shall be provided. Material identifying individuals shall only be provided for research or statistical activities and shall not be revealed or used for purposes other than research or statistical activities. Reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

SEC. 7.  Section 14236 of the Penal Code is amended to read:

14236.  (a) The California Firearm Violence Research Center at UC Davis shall develop multifaceted education and training programs for medical

and mental health providers on the prevention of firearm-related injury and death.

(b) The center shall develop education and training programs that address all of the following:

(1) The epidemiology of firearm-related injury and death, including the scope of the problem in California and nationwide, individual and societal determinants of risk, and effective prevention strategies for all types of firearm-related injury and death, including suicide, homicide, and unintentional injury and death.

(2) The role of health care providers in preventing firearm-related harm, including how to assess individual patients for risk of firearm-related injury and death.

(3) Best practices for conversations about firearm ownership, access, and storage.

(4) Appropriate tools for practitioner intervention with patients at risk for firearm-related injury or death, including, but not limited to, education on safer storage practices, gun violence restraining orders, and mental health interventions.

(5) Relevant laws and policies related to prevention of firearm-related injury and death and to the role of health care providers in preventing firearm-related harm.

(c) The center shall launch a comprehensive dissemination program to promote participation in these education and training programs among practicing physicians, mental health care professionals, physician assistants, nurse practitioners, nurses, health professional students, and other relevant professional groups in the state.

(d) The center shall develop curricular materials for medical and mental health care practitioners in practice and in training, tailored to the profession and suitable for use through a variety of methods. Educators from the center shall provide didactic education in person and by remote link at medical education institutions, and recruit and train additional health professionals to provide such education.

(e) The center shall develop education and training resources on firearm-related injury and death, including but not limited to, continuing medical education videos, additional training modules, a website with current information on relevant research and legislation, and handouts and written materials for clinicians to provide to patients. The center shall serve as a resource for the many professional and educational organizations in the state whose members seek to advance their knowledge of firearm-related injury and death and effective prevention measures.

(f) The center shall conduct rigorous research to further identify specific gaps in knowledge and structural barriers that prevent counseling and other interventions, and to evaluate the education and training program. The center shall incorporate the research findings into the design and implementation of the program to support the mission of the center to deliver content to health care providers and patients that is effective in guiding clinical decisions and reducing firearm-related injury and death.

95

SEC. 8.   Chapter 3 (commencing with Section 14240) is added to Title 12.2 of Part 4 of the Penal Code, to read:

### Chapter 3.  Research by Other Institutions

14240.   (a) The Department of Justice shall establish procedures to implement subdivision (t) of Section 1798.24 of the Civil Code to provide materials relating to individuals for research related to firearm violence. These procedures shall include, but not be limited to, requests for data and timely review of requests. At the department's discretion, the information may be provided to any nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the purpose of studying the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required.

(b)  Material identifying individuals shall only be provided for research or statistical activities and shall not be revealed or used for purposes other than research or statistical activities. Reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of the data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

SEC. 9.   Section 28220 of the Penal Code is amended to read:

28220.   (a) Upon submission of firearm purchaser information, the Department of Justice shall examine its records, as well as those records that it is authorized to request from the State Department of State Hospitals pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine if the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(b)  The Department of Justice shall participate in the National Instant Criminal Background Check System (NICS), as described in subsection (t) of Section 922 of Title 18 of the United States Code, and shall notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, that the purchaser is a person prohibited from acquiring a firearm under federal law.

(c)  If the department determines that the purchaser is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm or is a person described in subdivision (a) of Section 27535, it shall immediately notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact.

95

(d)  If the department determines that the copies of the register submitted to it pursuant to subdivision (d) of Section 28210 contain any blank spaces or inaccurate, illegible, or incomplete information, preventing identification of the purchaser or the handgun or other firearm to be purchased, or if any fee required pursuant to Section 28225 is not submitted by the dealer in conjunction with submission of copies of the register, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall submit corrected copies of the register to the department, or shall submit any fee required pursuant to Section 28225, or both, as appropriate and, if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(e)  If the department determines that the information transmitted to it pursuant to Section 28215 contains inaccurate or incomplete information preventing identification of the purchaser or the handgun or other firearm to be purchased, or if the fee required pursuant to Section 28225 is not transmitted by the dealer in conjunction with transmission of the electronic or telephonic record, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall transmit corrections to the record of electronic or telephonic transfer to the department, or shall transmit any fee required pursuant to Section 28225, or both, as appropriate, and if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(f)  (1)  (A)  The department shall immediately notify the dealer to delay the transfer of the firearm to the purchaser if the records of the department, or the records available to the department in the National Instant Criminal Background Check System, indicate one of the following:

(i)  The purchaser has been taken into custody and placed in a facility for mental health treatment or evaluation and may be a person described in Section 8100 or 8103 of the Welfare and Institutions Code and the department is unable to ascertain whether the purchaser is a person who is prohibited from possessing, receiving, owning, or purchasing a firearm, pursuant to Section 8100 or 8103 of the Welfare and Institutions Code, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(ii)  The purchaser has been arrested for, or charged with, a crime that would make the purchaser, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(iii)  The purchaser may be a person described in subdivision (a) of Section 27535, and the department is unable to ascertain whether the purchaser, in

95

fact, is a person described in subdivision (a) of Section 27535, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(B)  The dealer shall provide the purchaser with information about the manner in which the purchaser may contact the department regarding the delay described in subparagraph (A).

(2)  The department shall notify the purchaser by mail regarding the delay and explain the process by which the purchaser may obtain a copy of the criminal or mental health record the department has on file for the purchaser. Upon receipt of that criminal or mental health record, the purchaser shall report any inaccuracies or incompleteness to the department on an approved form.

(3)  If the department ascertains the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), after the waiting period described in Sections 26815 and 27540, but within 30 days of the dealer's original submission of the purchaser information to the department pursuant to this section, the department shall do the following:

(A)  If the purchaser is not a person described in subdivision (a) of Section 27535, and is not prohibited by state or federal law, including, but not limited to, Section 8100 and 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer of that fact and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to the purchaser.

(B)  If the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer and the chief of the police department in the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact in compliance with subdivision (c) of Section 28220.

(4)  If the department is unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), within 30 days of the dealer's original submission of purchaser information to the department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer

indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to the purchaser.

(g) (1) Commencing July 1, 2017, upon receipt of information demonstrating that a person is prohibited from possessing a firearm pursuant to federal or state law, the department shall submit the name, date of birth, and physical description of the person to the National Instant Criminal Background Check System Index, Denied Persons Files. The information provided shall remain privileged and confidential, and shall not be disclosed, except for the purpose of enforcing federal or state firearms laws.

(2) This subdivision does not prohibit the department from sharing information pertaining to a person that is prohibited from possessing a firearm if the department is otherwise expressly authorized or required by state law to share that information with the recipient party.

SEC. 9.5.  Section 28220 of the Penal Code is amended to read:

28220.  (a) (1)  Upon submission of firearm purchaser information, the Department of Justice shall examine its records, as well as those records that it is authorized to request from the State Department of State Hospitals pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine if the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(2)  Commencing July 1, 2025, for the sale or transfer of a firearm to a person under 21 years of age pursuant to subdivision (b) of Section 27510, the Department of Justice shall verify the validity of the purchaser's hunting license with the Department of Fish and Wildlife.

(b)  The Department of Justice shall participate in the National Instant Criminal Background Check System (NICS), as described in subsection (t) of Section 922 of Title 18 of the United States Code, and shall notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, that the purchaser is a person prohibited from acquiring a firearm under federal law.

(c)  If the department determines that the purchaser is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm or is a person described in subdivision (a) of Section 27535, it shall immediately notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact.

(d)  If the department determines that the copies of the register submitted to it pursuant to subdivision (d) of Section 28210 contain any blank spaces or inaccurate, illegible, or incomplete information, preventing identification of the purchaser or the handgun or other firearm to be purchased, or if any fee required pursuant to Section 28225 is not submitted by the dealer in conjunction with submission of copies of the register, the department may

95

29

notify the dealer of that fact. Upon notification by the department, the dealer shall submit corrected copies of the register to the department, or shall submit any fee required pursuant to Section 28225, or both, as appropriate and, if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(e) If the department determines that the information transmitted to it pursuant to Section 28215 contains inaccurate or incomplete information preventing identification of the purchaser or the handgun or other firearm to be purchased, or if the fee required pursuant to Section 28225 is not transmitted by the dealer in conjunction with transmission of the electronic or telephonic record, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall transmit corrections to the record of electronic or telephonic transfer to the department, or shall transmit any fee required pursuant to Section 28225, or both, as appropriate, and if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(f) (1) (A) The department shall immediately notify the dealer to delay the transfer of the firearm to the purchaser if the records of the department, or the records available to the department in the National Instant Criminal Background Check System, indicate one of the following:

(i) The purchaser has been taken into custody and placed in a facility for mental health treatment or evaluation and may be a person described in Section 8100 or 8103 of the Welfare and Institutions Code and the department is unable to ascertain whether the purchaser is a person who is prohibited from possessing, receiving, owning, or purchasing a firearm, pursuant to Section 8100 or 8103 of the Welfare and Institutions Code, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(ii) The purchaser has been arrested for, or charged with, a crime that would make the purchaser, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(iii) The purchaser may be a person described in subdivision (a) of Section 27535, and the department is unable to ascertain whether the purchaser, in fact, is a person described in subdivision (a) of Section 27535, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(B) The dealer shall provide the purchaser with information about the manner in which the purchaser may contact the department regarding the delay described in subparagraph (A).

(2) The department shall notify the purchaser by mail regarding the delay and explain the process by which the purchaser may obtain a copy of the

criminal or mental health record the department has on file for the purchaser. Upon receipt of that criminal or mental health record, the purchaser shall report any inaccuracies or incompleteness to the department on an approved form.

(3) If the department ascertains the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), after the waiting period described in Sections 26815 and 27540, but within 30 days of the dealer's original submission of the purchaser information to the department pursuant to this section, the department shall do the following:

(A) If the purchaser is not a person described in subdivision (a) of Section 27535, and is not prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer of that fact and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to the purchaser.

(B) If the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer and the chief of the police department in the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact in compliance with subdivision (c) of Section 28220.

(4) If the department is unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), within 30 days of the dealer's original submission of purchaser information to the department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to the purchaser.

(5) Commencing July 1, 2025, if the department is unable to ascertain the validity of a hunting license required pursuant to Section 27510, the department shall immediately notify the dealer to cancel the sale of the firearm. The department shall notify the purchaser by mail that the hunting

95

license was not valid and unexpired or the Department of Fish and Wildlife was unable to verify the license based upon the information provided.

(g) (1) Commencing July 1, 2017, upon receipt of information demonstrating that a person is prohibited from possessing a firearm pursuant to federal or state law, the department shall submit the name, date of birth, and physical description of the person to the National Instant Criminal Background Check System Index, Denied Persons Files. The information provided shall remain privileged and confidential, and shall not be disclosed, except for the purpose of enforcing federal or state firearms laws.

(2) This subdivision does not prohibit the department from sharing information pertaining to a person that is prohibited from possessing a firearm if the department is otherwise expressly authorized or required by state law to share that information with the recipient party.

SEC. 10.   Section 30000 of the Penal Code is amended to read:

30000.   (a)   The Attorney General shall establish and maintain an online database to be known as the Prohibited Armed Persons File. The purpose of the file is to cross-reference persons who have ownership or possession of a firearm on or after January 1, 1996, as indicated by a record in the Consolidated Firearms Information System, and who, subsequent to the date of that ownership or possession of a firearm, fall within a class of persons who are prohibited from owning or possessing a firearm.

(b)   Except as provided in subdivision (c), the information contained in the Prohibited Armed Persons File shall only be available to those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, for the purpose of determining if persons are armed and prohibited from possessing firearms.

(c)   The information contained in the Prohibited Armed Persons File shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis following approval by the institution's governing institutional review board, when required. At the department's discretion, and subject to Section 14240, the data may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required, for academic and policy research purposes. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

SEC. 11.   Section 30352 of the Penal Code is amended to read:

30352.  (a)  Commencing July 1, 2019, an ammunition vendor shall not sell or otherwise transfer ownership of any ammunition without, at the time of delivery, legibly recording the following information on a form to be prescribed by the Department of Justice:

(1)  The date of the sale or other transfer.

(2)  The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(3)  The brand, type, and amount of ammunition sold or otherwise transferred.

(4)  The purchaser's or transferee's full name and signature.

(5)  The name of the salesperson who processed the sale or other transaction.

(6)  The purchaser's or transferee's full residential address and telephone number.

(7)  The purchaser's or transferee's date of birth.

(b) (1)  Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. Except as provided in paragraph (2), this information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share the information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.

(2)  The information collected by the department as provided in paragraph (1) shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis following approval by the institution's governing institutional review board, when required. At the department's discretion, and subject to Section 14240, the data may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required, for academic and policy research purposes. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

(c)  Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be

95

33

authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:

(1) A person authorized to purchase ammunition pursuant to Section 30370.

(2) A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer, and the ammunition is delivered to the person in the same transaction as the firearm.

(d) Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.

(e) Subdivisions (a) and (d) shall not apply to sales or other transfers of ownership of ammunition by ammunition vendors to any of the following, if properly identified:

(1) An ammunition vendor.

(2) A person who is on the centralized list of exempted federal firearms licensees maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of Title 4 of Part 6.

(3) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.

(4) A gunsmith.

(5) A wholesaler.

(6) A manufacturer or importer of firearms or ammunition licensed pursuant to Chapter 44 (commencing with Section 921) of Part I of Title 18 of the United States Code, and the regulations issued pursuant thereto.

(7) An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the handgun ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

(8) (A) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.

(B) (i) Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace

95

officer who is authorized to carry a firearm in the course and scope of the officer's duties.

(ii)  The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that the purchaser transferee is the person authorized in the certification.

(iii)  The vendor shall keep the certification with the record of sale and submit the certification to the department.

(f)  The department is authorized to adopt regulations to implement the provisions of this section.

SEC. 12.  Section 30452 of the Penal Code is amended to read:

30452.  (a) (1) Commencing July 1, 2022, a firearm precursor part vendor shall not sell or otherwise transfer ownership of a firearm precursor part without, at the time of delivery, legibly recording the following information on a form to be prescribed by the Department of Justice:

(A)  The date of the sale or other transfer.

(B)  The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(C)  The brand, type, and amount of firearm precursor parts sold or otherwise transferred.

(D)  The purchaser's or transferee's full name and signature.

(E)  The name of the salesperson who processed the sale or other transaction.

(F)  The purchaser's or transferee's full residential address and telephone number.

(G)  The purchaser's or transferee's date of birth.

(2)  A firearm precursor part vendor is not required to report to the department any firearm precursor part that is attached or affixed to a firearm involved in a successful dealer record of sale transaction.

(b)  (1)   Commencing July 1, 2022, a firearm precursor part vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of a firearm precursor part. The department shall retain this information in a database to be known as the Firearm Precursor Part Purchase Records File. Except as provided in paragraph (2), this information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The firearm precursor part vendor shall not use, sell, disclose, or share the information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.

(2)  The information collected by the department as provided in paragraph (1) shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis following approval by the institution's governing institutional review board, when required. At the department's discretion, and subject to Section 14240, the data may be

95

provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required, for academic and policy research purposes. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

(c) Commencing on July 1, 2022, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase firearm precursor parts. Prior to delivering any firearm precursor part, a firearm precursor part vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the firearm precursor part is a person or entity listed in subdivision (e) or one of the following:

(1) A person authorized to purchase firearm precursor parts pursuant to Section 30470.

(2) A person who was approved by the department to receive a firearm from the firearm precursor part vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer, and the firearm precursor part is delivered to the person in the same transaction as the firearm.

(d) Commencing July 1, 2022, the firearm precursor part vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase firearm precursor parts. If the person is not listed as an authorized firearm precursor part purchaser, the vendor shall deny the sale or transfer.

(e) Subdivisions (a) and (d) shall not apply to sales or other transfers of ownership of firearm precursor parts by firearm precursor part vendors to any of the following, if properly identified:

(1) A firearm precursor part vendor.

(2) A person who is on the centralized list of exempted federal firearms licensees maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of Title 4 of Part 6.

(3) A gunsmith.

(4) A wholesaler.

(5) A manufacturer or importer of firearms or ammunition licensed pursuant to Chapter 44 (commencing with Section 921) of Part I of Title 18 of the United States Code, and the regulations issued pursuant thereto.

(6) An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that governmental agency, and, prior to the sale, delivery, or transfer of the firearm precursor part, written

95

authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

(7) (A) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer who is authorized to carry a firearm in the course and scope of the officer's duties.

(B) (i) Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.

(ii) The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that they are the person authorized in the certification.

(iii) The vendor shall keep the certification with the record of sale and submit the certification to the department.

(f) The department is authorized to adopt regulations to implement the provisions of this section.

SEC. 13. Section 8106 is added to the Welfare and Institutions Code, to read:

8106. Individual data required to be reported to the Department of Justice pursuant to this chapter related to prohibition of ownership and possession of a firearm and ammunition shall be available to researchers affiliated with the California Firearm Violence Research Center at UC Davis following approval by the institution's governing institutional review board, when required. At the department's discretion, and subject to Section 14240 of the Penal Code, the data may be provided to any other nonprofit bona fide research institution accredited by the United States Department of Education or the Council for Higher Education Accreditation for the study of the prevention of violence, following approval by the institution's governing institutional review board or human subjects committee, when required, for academic and policy research purposes. Material identifying individuals shall only be provided for research or statistical activities and shall not be transferred, revealed, or used for purposes other than research or statistical activities, and reports or publications derived therefrom shall not identify specific individuals. Reasonable costs to the department associated with the department's processing of that data may be billed to the researcher. If a request for data or letter of support for research using the data is denied, the department shall provide a written statement of the specific reasons for the denial.

95

SEC. 14.   (a)  Section 2.5 of this bill incorporates amendments to Section 11106 of the Penal Code proposed by both this bill and Senate Bill 715. That section of this bill shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2022, but this bill becomes operative first, (2) each bill amends Section 11106 of the Penal Code, and (3) this bill is enacted after Senate Bill 715, in which case Section 11106 of the Penal Code, as amended by Section 2 of this bill, shall remain operative only until the operative date of Senate Bill 715, at which time Section 2.5 of this bill shall become operative.

(b)  Section 9.5 of this bill incorporates amendments to Section 28220 of the Penal Code proposed by both this bill and Senate Bill 715. That section of this bill shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2022, but this bill becomes operative first, (2) each bill amends Section 28220 of the Penal Code, and (3) this bill is enacted after Senate Bill 715, in which case Section 28220 of the Penal Code, as amended by Section 9 of this bill, shall remain operative only until the operative date of Senate Bill 715, at which time Section 9.5 of this bill shall become operative.

SEC. 15.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

SEC. 16.   This act is a bill providing for appropriations related to the Budget Bill within the meaning of subdivision (e) of Section 12 of Article IV of the California Constitution, has been identified as related to the budget in the Budget Bill, and shall take effect immediately.

O