*Appeal No. 23-55133*

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JANE DOE,
an individual, et al.,

Plaintiff-Appellants,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California, et al.,

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Southern District of California
Hon. Larry A. Burns
Case No. 22-CV-10-LAB-DEB

---

## PLAINTIFF-APPELLANTS'
## REPLY BRIEF

---

Michael B. Reynolds
Colin R. Higgins
Cameron J. Schlagel
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, California 92626-7689
Telephone: 714.427.7000
Facsimile: 714.427.7799
mreynolds@swlaw.com
chiggins@swlaw.com
cschlagel@swlaw.com

Attorneys for Plaintiff-Appellants Jane Doe, et al.

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................8

ARGUMENT ................................................................................8

I.    AB 173 VIOLATES APPELLANTS' INFORMATIONAL
PRIVACY RIGHTS ............................................................8

    A.    Appellants have a constitutionally-protected privacy interest.............8

    B.    AB 173 impermissibly infringes Appellants' informational
privacy ...................................................................16

II.    AB 173 VIOLATES THE SECOND AMENDMENT ...............................22

    A.    Appellants Have Standing................................................22

    B.    AB 173 fails scrutiny under Bruen.......................................24

    C.    AB 173's mandated disclosure is an unconstitutional condition
on the exercise of Second Amendment rights..................................34

III.    AB 173 IS IMPERMISSIBLY RETROACTIVE ......................................35

IV.    APPELLANTS STATED A PLAUSIBLE PREEMPTION CLAIM ..........36

CONCLUSION ...............................................................................37

CERTIFICATE OF SERVICE ..............................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*,
  273 F.3d 1229 (9th Cir. 2001) ............................................................33

*Camp v. Cason*,
  220 Fed. Appx. 976 (11th Cir. 2007)..................................................36

*In re Crawford*,
  194 F.3d 954 (9th Cir. 1999) .................................................9, 10, 15

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................20, 25

*Doe No. 1 v. Putnam Cnty.*,
  344 F. Supp. 3d 518 (S.D.N.Y. 2018) .................................................24

*Doe v. Garland*,
  17 F.4th 941 (9th Cir. 2021) ...............................................................10

*Eagle v. Morgan*,
  88 F.3d 620 (8th Cir. 1996) ................................................................10

*Elrod v. Burns*,
  427 U.S. 347 (1976) (plurality opinion) ............................................34

*Griswold v. Connecticut*,
  381 U.S. 479 (1965)............................................................................12

*Grosjean v. American Press Co.*,
  297 U.S. 233 (1936)............................................................................32

*Heller v. District of Columbia (Heller II)*,
  670 F.3d 1244 (D.C. Cir. 2011).........................................................30

*Indep. Living Ctr. of S. California, Inc. v. Shewry*,
  543 F.3d 1050 (9th Cir. 2008) ............................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Jackson v. City & County of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ...............................................................23

*Mangels v. Pena*,
789 F.2d 836 (10th Cir. 1986) ............................................................11

*McClung v. Employment Development Dept.*,
34 Cal. 4th 467 (2004) ........................................................................14

*McDonald v. City of Chicago, Ill.*,
561 U.S. 742 (2010) .......................................................................11, 12

*Moore v. City of E. Cleveland*,
431 U.S. 494 (1977) (plurality opinion) ............................................12

*Murdock v. Com. of Pa.*,
319 U.S. 105 (1943) .............................................................................31

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) .............................................................................31

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
–––– U.S. ––––, 142 S. Ct. 2111 (2022) .......................................*passim*

*Nixon v. Adm'r of Gen. Servs.*,
433 U.S. 425 (1977) .......................................................................10, 13

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*,
578 F.3d 1154 (9th Cir. 2009) ............................................................34

*Paul v. Davis*,
424 U.S. 693 (1976) .......................................................................11, 12

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
946 F.3d 1100 (9th Cir. 2020) ......................................................33, 34

*Sheets v. Salt Lake Cnty.*,
45 F.3d 1383 (10th Cir. 1995) ............................................................11

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Stollenwerk v. Miller*,
    2006 WL 463393 (E.D. Pa. Feb. 24, 2006) ........................................36

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ...........................................34

*Teter v. Lopez*,
    —— F.4th ——, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) ..................23, 26, 33

*Tucson Woman's Clinic v. Eden*,
    379 F.3d 531 (9th Cir. 2004), *abrogated by Dobbs v. Jackson*
    *Women's Health Org.*, 142 S. Ct. 2228 (2022) ..........................................11, 18

*United States Dep't of Justice v. Reporters Comm. for Freedom of the
    Press*,
    489 U.S. 749 (1989) ...........................................................10

*United States Department of Defense v. FLRA*,
    510 U.S. 487 (1994) .......................................................15, 17

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ................................................25, 27

*United States v. Boyd*,
    999 F.3d 171 (3d Cir. 2021) ....................................................28

*Walls v. Petersburg*,
    895 F.2d 188 (4th Cir. 1990) ...................................................10

**Statutes**

5 U.S.C. § 552(b)(6).............................................................15

5 U.S.C. § 552a..................................................................22

5 U.S.C. § 552a note ............................................................36

18 U.S.C. § 2721(a) .............................................................15

18 U.S.C. § 27525...............................................................15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Cal. Civ. Code §§ 1798.100, *et seq.* ........................................................22

Cal. Health & Safety Code § 103206.1(a) ...............................................22

Cal. Health & Safety Code § 103206.2(a) ...............................................22

Driver's Privacy Protection Act ...............................................................15

Federal Privacy Act ....................................................................15, 22, 36

FOIA ..........................................................................................................15

Penal Code §§ 11075 ................................................................................19

Penal Code § 11106(a)(2) (2021 version) ................................................13

Penal Code §§ 11106(d), 30352(b) ..........................................................18

Penal Code § 14231(c)(3) .........................................................................18

Penal Code § 28160 ............................................................................12, 29

Privacy Act ................................................................................................36

Pub. L. No. 93–579, 88 Stat. 1909 (1974) ..............................................36

SSNs—the Privacy Act ............................................................................36

**Other Authorities**

First Amendment.......................................................................................32

Second Amendment .............................................................................*passim*

Fourth Amendment ...................................................................................11

Fourteenth Amendment ............................................................................13

*Driver's Privacy Protection Act of 1993: Hearing on H.R. 3365*
   *Before the Subcomm. on Civil and Constitutional Rights of the*
   *House Committee on the Judiciary*, 104th.......................................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Simson L. Garfinkel, *De-Identification of Personal Information* ...........................21

## INTRODUCTION

California's decision to abruptly change course and mandate the sharing of firearm owners' private personal information with third parties, without their consent, strikes at the heart of fundamental constitutional principles. The State misinterprets many of Appellants' arguments and just ignores others.

The State's broad dissemination of private information to third-party researchers without any meaningful standards or restrictions violates Appellants' constitutional right to privacy. It also infringes Appellants' Second Amendment rights without any historical justification. Finally, as the State appears to acknowledge (Ans. Br. at 29 n.7), AB 173 applies retroactively to information already stored in the Databases,[1] which violates due process. This Court should reverse.

## ARGUMENT

### I. AB 173 VIOLATES APPELLANTS' INFORMATIONAL PRIVACY RIGHTS.

#### A. Appellants have a constitutionally-protected privacy interest.

##### 1. The right to informational privacy is characterized by a legitimate expectation of privacy.

This case uniquely implicates the core concern that the Supreme Court articulated in *Whalen v. Roe*, but has not had occasion to elaborate on since: "the

---

[1] Unless otherwise indicated, capitalized terms have the same meaning as in Appellants' Opening Brief.

threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files." 429 U.S. 589, 605 (1977). There is no precedent where the government has, for decades, collected and stored personal information for one purpose, and then suddenly changed course to disseminate that information to third parties for completely unrelated purposes. The information in the databases is not only private in nature, but also inextricably intertwined with the exercise of a personal constitutional right.[2] Appellants therefore have a protectible interest in precluding the State from distributing this information to third parties for uses unrelated to the purpose for which the information was collected.

At the outset, there is no support for the State's conclusion that the Databases do not include constitutionally-protected, "highly sensitive information." *See* Ans. Br. at 19–21. Although the "'precise bounds' of the constitutional right to privacy

---

[2] Appellants sufficiently allege the Databases include Social Security Numbers ("SSNs"). *See* Op. Br. at 18 n.7. The State does not rebut this allegation with any evidence subject to judicial notice. Furthermore, this Court has already recognized the constitutional privacy interest that inheres in SSNs. *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999) (citing authorities supporting conclusion that disclosure of SSNs implicates the right to informational privacy). In any event, Appellants' informational privacy claim succeeds regardless of whether the Databases contain SSNs. Despite the State's emphasis of this issue (Ans. Br. at 22–25), it is at best a factual dispute that cannot be resolved at this stage. For these reasons, Appellants do not repeat the arguments from their Opening Brief (at 38) that the Constitution protects the privacy of SSNs.

are uncertain," the right includes *at least* medical records, information about sexual activity, and social security numbers. *See Doe v. Garland*, 17 F.4th 941, 946–47 (9th Cir. 2021). But these types of information do not mark the outer boundaries of the right. The Court in *Whalen* identified the individual's broader "interest in 'avoiding disclosure of personal matters' as a privacy interest protected by the Constitution." *Id.* at 946 (quoting *Whalen*, 429 U.S. at 599). That is why this Court recognizes that the "relevant considerations" necessarily vary from case to case— usually "the overall context" dictates whether the privacy interest is constitutionally protected. *In re Crawford*, 194 F.3d 954, 959 (9th Cir. 1999).

The Constitution protects personal information in which an individual has a "legitimate expectation of privacy." *Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 458 (1977). The Supreme Court also recognizes that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989). Other Circuits thus agree that "[p]ersonal, private information in which an individual has a reasonable expectation of confidentiality is protected by one's constitutional right to privacy." *Walls v. Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990); *see also Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996) (the test is "whether the person had a legitimate expectation

that the information would remain confidential while in the state's possession"); *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986) (same).[3]

This is especially true where, as here, the private information is inseparable from the decision to exercise a "fundamental" right. *Paul v. Davis*, 424 U.S. 693, 713 (1976). The State dismisses this point out of hand as a "proposition this Court has never recognized." Ans. Br. 21. That is not only incorrect, but also irrelevant because the Supreme Court *has* recognized it. *Paul*, 424 U.S. at 713 ("personal rights found in this guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit in the concept of ordered liberty'"); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551–52 (9th Cir. 2004), *abrogated by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). There can be no dispute that the Second Amendment protects a personal right that is "among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010); *see also id.* at 780 ("the Second

---

[3] The State misinterprets these cases, suggesting that the inquiry turns only upon an assessment of the character of the information, i.e., whether it is *inherently* private. Ans. Br. at 26. Not so. As in the Fourth Amendment context, the nature of the information is relevant to the extent it informs whether the individual's expectation of privacy is reasonable or legitimate. *See, e.g.*, *Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1387 (10th Cir. 1995) ("The legitimacy of this expectation depends, '*at least in part*, upon the intimate or otherwise personal nature of the material which the state possesses.'" (emphasis added)). But this does not mean that *only* highly personal information, like medical diagnoses or sexual activity, is protected.

Amendment protects a personal right"). This right is thus "incorporated in the concept of due process." *Id.* at 767. Information concerning the exercise of the *personal* Second Amendment right is consequently protected by the guarantee of personal privacy.[4] *See, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 484–85 (1965) (describing the "zones of privacy" created by various constitutional guarantees); *Paul*, 424 U.S. at 712–13 ("'zones of privacy' may be created by more specific constitutional guarantees and thereby impose limits upon government power.").

Indeed, the doctrines of selective incorporation (e.g., *McDonald*) and substantive due process (e.g., *Whalen* and *Paul*) are closely related. The touchstone of both is whether the right is "fundamental" or "implicit in the concept of ordered liberty." *See Moore v. City of E. Cleveland*, 431 U.S. 494, 503 n.10 (1977) (plurality opinion) (noting the similarity between the substantive due process inquiry and the incorporation test). This supports Appellants' argument that the informational privacy interest, which is founded on substantive due process, is particularly acute when it is inseparable from the exercise of an incorporated fundamental right, like the Second Amendment right.

---

[4] To be clear, the information stored in the Databases provides a detailed picture of an individual's decision to exercise her Second Amendment rights. It includes not only sensitive personal details like driver's license information, fingerprints, and home addresses, but also *all* firearm, ammunition, and licensing transaction records associated with each person. *See* Penal Code § 28160 (content of register of firearms transfers).

Appellants have a legitimate expectation of privacy in their personal information not only because it concerns their exercise of a personal constitutional right, but also because the statutory scheme that existed for decades before AB 173 fostered that expectation. The State argues that "this Court has never held that an individual's mere expectation of privacy in certain information triggers Fourteenth Amendment protection." Ans. Br. at 25. This is a red herring because, again, the Supreme Court has recognized that a legitimate expectation of privacy can create a constitutional privacy interest subject to scrutiny like any other right. *See Nixon*, 433 U.S. at 458.

The State's purely semantic argument that the prior statute went beyond "narrow, law enforcement-related purposes" is belied by the recognition that immediately follows—the prior statute authorized dissemination only to *other government agencies*, *if needed in the course of official duties*. Ans. Br. at 27–28. These duties were by-and-large law enforcement and law enforcement related. Before AB 173, then, individuals whose sensitive information is stored in the Databases had a reasonable expectation their personal data would be disclosed only to the enumerated government officers for official purposes. *See* Penal Code § 11106(a)(2) (2021 version) (cross-referencing only those officials listed in section 11105).

What is more, before AB 173, there was no plausible circumstance where one of the cross-referenced government officers would have requested *all* records stored in the Databases. Rather, only the records of specific subjects would be relevant to an officer's official duties. By contrast, after AB 173, the amended statutes (sections 11106 and 30352) mandate dissemination of *all* information stored in the Databases to third-party researchers.

Nor is it true, as the State argues, that AB 173 is a mere "clarifying" statute. *See* Ans. Br. at 27. It *requires* Cal DOJ to turn over vast amounts of personal information to the Center and *permits* the disclosure to other research institutions. This is a great expansion of the list of recipients of personal information—as confirmed by the legislative history of the prior statute, and by former Attorney General Becerra's interpretation of it. *See* Op. Br. at 20–25, 41–44. AB 173 also changed the purposes for which the information could be collected—broad-based policy and "epidemiological" research, as opposed to law enforcement and administrative purposes. *Id.* More recent legislative declarations to the contrary are of no consequence. "A declaration that a statutory amendment merely clarified the law 'cannot be given an obviously absurd effect, and the court cannot accept the Legislative statement that an unmistakable change in the statute is nothing more than a clarification and restatement of its original terms.'" *McClung v. Employment Development Dept.*, 34 Cal. 4th 467, 473 (2004) (citation omitted).

Nor does the State's argument bear on the question of whether the (newly-authorized) dissemination to third-party researchers is constitutional.

If any doubt remains, "[j]udicial and legislative actions in other contexts" further support the conclusion that the disclosure of the information stored in the Databases "raises serious privacy concerns." *Crawford*, 194 F.3d at 958–59. For instance, home addresses are entitled to privacy under FOIA, which exempts from disclosure personal files "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Likewise, the Supreme Court has held that the Federal Privacy Act forbids the disclosure by federal agencies of employee addresses to collective bargaining representatives. *United States Department of Defense v. FLRA*, 510 U.S. 487, 501 (1994) (individuals at least "have some nontrivial privacy interest in nondisclosure").

Perhaps most notable, the Driver's Privacy Protection Act restricts the ability of third parties to obtain personal information[5] from motor vehicle departments without the consent of the individual whose information is being released. *See* 18 U.S.C. § 2721(a). In developing that statute, Congress heard testimony directly supporting the conclusion that Americans' expectations of privacy include the expectation that states will not disseminate personal information for uses unrelated

---

[5] *See* 18 U.S.C. § 27525 (defining categories of "personal information").

to the purpose for which it was collected, or to any regulatory purpose. *See Driver's Privacy Protection Act of 1993: Hearing on H.R. 3365 Before the Subcomm. on Civil and Constitutional Rights of the House Committee on the Judiciary*, 104th Cong. (1994) (statement of Dr. Mary J. Culnan, Associate Professor, Georgetown University School of Business), 1994 WL 14168083, at 16 ("Information privacy concerns primarily arise from secondary use of personal information: the use of information collected for one purpose for a different purpose without the knowledge or consent of the individual. Privacy concerns are especially likely to arise when the reuse is not compatible with the original purpose for collecting the information . . . ."); *id*. at 17 ("[p]ublic opinion supports this distinction"). As discussed, before AB 173, sections 11106 and 30352 authorized dissemination only to other government agencies for official use, mostly law enforcement-related.

These considerations, taken together, demonstrate that Appellants have a protected privacy interest in the information warehoused in the Databases.

### B. AB 173 impermissibly infringes Appellants' informational privacy.

The State ignores many of the ways in which Appellants exposed that AB 173 is not tailored at all, let alone narrowly. The legislative findings are divorced from the operative text of the statute, which mandates limitless disclosure upon request, regardless of whether the request advances the State's professed interests. The statutory "safeguard" prohibiting researchers from identifying individuals is wholly

inadequate without standards and procedures for data security and anonymization. And the State misleadingly tries to minimize the various risks of harm that Appellants fear will result from any subsequent disclosure, all the while ignoring that the principal injury *is* the unlimited and involuntary disclosure of protected information to the third-party researchers in the first place.

      **1.    *AB 173's mandate to disclose sensitive personal information to third-party researchers, upon request, evinces a distinct lack of tailoring.***

In *Tucson Woman's Health Clinic v. Eden*, this Court invalidated part of an Arizona regulation granting the state Department of Health Services ("DHS") broad access to *unredacted* medical records. 379 F.3d at 552–53. As in this case, the "type of information that [could] be requested under the regulation [was] extremely broad" and included the "names and addresses of patients." *Id.* at 552. This Court held the statute violated the patients' right to informational privacy because, among other things, it did not "limit the purpose for which access can be sought," nor did it sufficiently safeguard against release of the information to government employees who had no need for the information. *Id.* Furthermore, the state failed to show why DHS required access to information "such as the names and addresses of patients." *Id.* This Court expressly rejected the state's argument that it needed "access to patient identifying information" to ensure compliance with the statutory scheme, holding that this goal could be achieved in a less intrusive manner, including

17

examination of redacted records and use of "a coding system to track records without the release of patient identifying information." *Id.* at 552–53.

AB 173 suffers from the same infirmities as the regulation in *Tucson Woman's Health Clinic*. At the outset, the amended statutes do not limit the purposes for which third-party researchers can *access* the Databases, or the permissible *uses* of information from the Databases. *See* Penal Code §§ 11106(d), 30352(b). Although section 14231 provides that "[m]aterial identifying individuals shall only be provided for research or statistical activities,"[6] this is practically meaningless because sections 11106(d) and 30352(b)—which govern the collection and use of information stored in the Databases—*do not* contain this limitation. *Cf. Tucson Woman's Health Clinic*, 379 F.3d at 552. Moreover, section 14231 concerns only the CFVRC, so this limitation plainly does not apply to the dissemination of data to the "other nonprofit bona fide research institution[s]" referenced in sections 11106 and 30352. *Compare* Penal Code § 14231(c)(3), *with id.* §§ 11106(d), 30352(b).

In addition, the State has not established any relationship between AB 173's broad mandate to disseminate firearm owner information—expressly including "material identifying individuals"—and the State's professed interest in preventing

---

[6] Furthermore, as discussed below, this condition does not evince tailoring because the authorized "research and statistical activities" are neither defined, nor linked to the State's interests in any manner.

18

firearm violence. Indeed, although the State parrots the legislative finding that "data related to firearm violence" is "crucial to 'important, timely, policy-relevant research,'" it does not explain how personal information like Plaintiff Jane Doe's name, phone number, and address is "'uniquely rich data related to firearm violence'" or even "relevant" to the issue of firearm violence, let alone how *every* research project requires researchers to have unbounded access to the Databases. *See* Ans. Br. at 30–31.

Nor is the relevance of this information readily apparent. For instance, it is impossible to assess the need for researchers to access "material identifying individuals" without knowing what a particular research project entails. Furthermore, there are separate databases that contain information about criminals. *See* Penal Code §§ 11075 (criminal offender information); 30000 & 30005 (Prohibited Persons System); 14231.5 (discussing Restraining and Protective Order System); 18115 (gun violence restraining orders). The Databases, by contrast, contain the personal information of law-abiding citizens.[7] Moreover, even assuming, *arguendo*, there is a need to access law-abiding citizens' identified data— though the State has *not* established this—"[t]he enshrinement of constitutional

---

[7] To the extent the Databases contain information of individuals who are no longer law-abiding, such information can be obtained by connecting the information from the criminal offender databases.

rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

At base, the disclosure that AB 173 mandates thus rests on the unfounded assumption that *every* prospective research project requires access to "material identifying individuals." The result is that Cal DOJ is compelled to disclose this confidential information to any third-party researcher who makes a request, without limitation and regardless of whether the research is related to the State's professed interest in preventing firearm violence. This mandate is manifestly overbroad. Indeed, this broad and standardless disclosure distinguishes AB 173 from other State and federal statutes authorizing the use of government-collected personal information for research purposes.

Allowing third-party interests to dictate the standard for accessing the Databases is ripe for abuse and opens the door to misuse or manipulation of data for personal gain or to serve a political agenda. The Constitution protects against this misuse by requiring the State to show that the disclosure of Appellants' personal information is narrowly tailored to achieve a clearly-defined, legitimate interest. The State has not made the required showing.

### 2. *AB 173 lacks necessary safeguards.*

The State does not address any of the absent safeguards that Appellants identified in their Opening Brief. Op. Br. at 51–55. Instead, it rests on AB 173's

language prohibiting researchers from "publishing data that would identify any individual," and then tries to minimize the risk of harm from any subsequent disclosure. *See* Ans. Br. at 31–32. That argument misses the point.

Again, the principal injury to Appellants' privacy interest *is* the dissemination of their private information to third-party researchers in the first place. As discussed in Appellants' Opening Brief, the statutory limitation the State cites is meaningless without strict standards for anonymization of data. *See* Op. Br. at 51–54. Data de-identification and aggregation standards are crucial to ensuring the privacy of research subjects and maintaining the ethical integrity of research endeavors. *See, e.g.*, Simson L. Garfinkel, *De-Identification of Personal Information*, NAT'L INST. OF STANDARDS & TECH. (2015) (providing "an overview of de-identification issues and terminology," discussing the importance of de-identification, and summarizing "significant publications to date involving de-identification and re-identification"), https://nvlpubs.nist.gov/nistpubs/ir/2015/NIST.IR.8053.pdf

Furthermore, AB 173 is an outlier among other statutes because it does not incorporate any standards for data access, use, or security. For instance, with respect to "Disclosure of information to qualified researchers" by the Center for Data Insights, California's Health and Safety Code imposes strict requirements, including that:

> (1) The center shall develop a comprehensive program for the use, access, and disclosure of personal information that includes

> data use agreements that require data users to comply with this division. The purpose of the program is to ensure that only aggregated, deidentified information is publicly accessible. The program shall be designed to recognize a consumer's right of privacy and shall include at least the privacy protection standards specified in Section 103206.2.
>
> (2) Access to personal information shall be governed by the use, access, and disclosure program to be developed by the center pursuant to paragraph (1).
>
> (3) The center shall establish a secure research environment for access to personal information. The environment shall include access controls sufficient to ensure that users access only the personal information specified in an approved request and that personal information is protected from unapproved use.

Cal. Health & Safety Code § 103206.1(a). Section 103206.2 imposes additional limitations, including that the "center shall only grant access to the minimum amount of personal information necessary for an approved project or access to a dataset designed for an approved purpose." Cal. Health & Safety Code § 103206.2(a). California's Consumer Privacy Protection Act strictly limits the use of consumers' personal information. *See generally* Cal. Civ. Code §§ 1798.100, *et seq.* So too does the Federal Privacy Act. *See generally* 5 U.S.C. § 552a.

Given the absence of any similar safeguards or limitations, AB 173 fails constitutional scrutiny.

## II. AB 173 VIOLATES THE SECOND AMENDMENT.

### A. Appellants Have Standing.

The State's new argument that Appellants lack standing to assert a Second Amendment claim is erroneous. "To satisfy Article III standing, a plaintiff must

show: (1) an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (cleaned up).

Under this Court's precedents, it is enough that Appellants allege that, but for AB 173, they would purchase firearms and ammunition, and, in one instance, apply for a CCW. *See Jackson*, 746 F.3d at 967 (the plaintiff established an injury in fact because she "allege[d] that the Second Amendment provide[d] her with a legally protected interest to purchase hollow-point ammunition, and that but for [the ban], she would do so within San Francisco."); *Teter v. Lopez*, ––– F.4th –––, 2023 WL 5008203, at *4–*5 (9th Cir. Aug. 7, 2023) (to similar effect).

The focus of the State's argument appears to be the injury requirement. *See* Ans. Br. at 35. But Appellants sufficiently allege that the new condition that AB 173 imposes on their Second Amendment rights, and the attendant injury to their personal privacy from the disclosure of their information to third parties, has dissuaded them from purchasing firearms and ammunition and from applying for or renewing CCWs. *See* 4-ER-536–43. The State places too much emphasis on Appellants' fear that their personal information may be leaked into the public domain. *See* Ans. Br. at 35. But this neglects Appellants' argument that the

government's sharing of private information with third-party researchers, by itself, violates Appellants' informational privacy rights. The risk of subsequent disclosures aggravates that injury.[8] And the risk of improper disclosure is far from speculative: private information from the Databases was improperly publicized *while this case was pending* in the district court.[9] The remaining two elements are also met: the mandated disclosure directly injures Appellants' constitutional right to privacy and Second Amendment right to purchase firearms and ammunition, or to apply for a license to carry a concealed weapon, and this injury would be redressed by a favorable decision enjoing the statute. *See, e.g.*, *Doe No. 1 v. Putnam Cnty.*, 344 F. Supp. 3d 518, 531–32 (S.D.N.Y. 2018) (finding standing for Second Amendment claim where plaintiff alleged statute infringed his Second Amendment rights by "requiring his personal information to be a matter of public record before exercising his Second Amendment right to own a firearm").[10]

## B.    AB 173 fails scrutiny under *Bruen*.

This Court recently quoted the *Bruen* test as follows:

[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To

---

[8] *See* 4-ER-534–43 (¶¶ 9–37); 4-ER-555–57 (¶¶ 76–87); 4-ER-562–64 (¶¶ 99–109).

[9] *See* 2-ER-161–64.

[10] Like plaintiff Doe No. 2 in *Putnam County*, here, Doe No. 3 alleges that he has not yet applied for a CCW because of AB 173's mandate to disclose his personal information to third-party researchers. *Compare* 4-ER-540–41 (¶ 29), *with Putnam Cnty.*, 344 F. Supp. 3d at 530–32.

justify its regulation, . . . the government must demonstrate that the
regulation is consistent with this Nation's historical tradition of firearm
regulation.  Only if a firearm regulation is consistent with this Nation's
historical tradition may a court conclude that the individual's conduct
falls outside the Second Amendment's "unqualified command."

*United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *New York State
Rifle & Pistol Association, Inc. v. Bruen*, —— U.S. ——, 142 S. Ct. 2111, 2126
(2022)).

"Constitutional rights are enshrined with the scope they were understood to
have when the people adopted them."  *District of Columbia v. Heller*, 554 U.S. 570,
634–35 (2008); *see also id.* at 577 ("In interpreting this text, we are guided by the
principle that '[t]he Constitution was written to be understood by the voters; its
words and phrases were used in their normal and ordinary as distinguished from
technical meaning.'").  As *Heller* and *Bruen* illustrate, constitutional interpretation
requires analysis of the "plain text" (i.e., technical meaning), history, *and* tradition,
which, taken together, delimit the scope of the right as originally understood.  *See
Bruen*, 142 S. Ct. at 2127 ("the government must affirmatively prove that its firearms
regulation is part of the historical tradition that delimits the outer bounds of the right
to keep and bear arms").

### 1. The plain text of the Second Amendment, as originally understood, includes Appellants' conduct.

The State contends that AB 173 does not implicate, let alone violate, the Second Amendment because the statute does not regulate Second Amendment-protected conduct. Not so.

### a. The State must show that AB 173 regulates activity falling outside the scope of the Second Amendment.

Although Appellants disagree that *Bruen* adopted a "two-part" or "two-step" test, the Supreme Court certainly did not impose a threshold burden on plaintiffs. The first step in the *Bruen* test is instead a "textual analysis." *Teter*, 2023 WL 5008203 at *7. And if any party has a burden, it is the government.

This analysis is illustrated in *Heller*. As described in *Bruen*, the Court in *Heller* "began with a textual analysis focused on the normal and ordinary meaning of the Second Amendment's language," which "suggested" the conclusion that the Second Amendment protected an individual right to bear arms. *Bruen*, 142 S. Ct. at 2127 (cleaned up). The Court "confirmed" this conclusion by analyzing the historical record before the founding and immediately after. *Id.* at 2127–28. *Bruen*, in turn, disfavors multi-step tests and places the burden squarely on the government. *See id.* at 2127; *Teter*, 2023 WL 5008203, at *8–*9 (conducting textual analysis).

Imposing a threshold burden on plaintiffs would not only be inconsistent with *Bruen* and *Teter*, but also would upend the analytical framework that traditionally

26

applies in any constitutional challenge. The State's argument is misleading in its very first clause, where it cites *Bruen* as direct support for the contention that "[i]t is a plaintiff's burden to demonstrate that the plain text covers the proposed course of conduct." Ans. Br. at 39 (citing *Bruen*, 142 S. Ct. at 2134). *Bruen* says nothing of the sort. The part of the opinion that the State cites merely explains that the Court had "little difficulty concluding" that the plain text of the Second Amendment covered the plaintiffs' proposed course of conduct ("carrying handguns publicly for self-defense"), and noted the absence of any dispute over the issue. *Bruen*, 142 S. Ct. at 2134.

If anything, *Bruen* counsels against the State's proposed burden-shifting framework. As the State notes, the Supreme Court "did not purport to overturn or call into question any aspect of the Court's decision in *Heller*." Ans. Br. at 37. Indeed, although the Court rejected the two-step approach developed by Courts of Appeals after *Heller*, it held the first step of that approach was "broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2126–27; *see also Alaniz*, 69 F.4th at 1128 (noting that "*Bruen* upheld the step one inquiry used by the Courts of Appeals").

The Court explained: "At the first step, *the government* may justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)) (emphasis added). "If *the*

*government* can prove that the regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there; the regulated activity is categorically unprotected.'" *Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)) (emphasis added). The Court clearly chose this formulation, which places the burden on the government, instead of the Third Circuit's formulation, which places an initial burden on the claimant. *See id.* (using "But see" signal in reference to *United States v. Boyd*, 999 F.3d 171, 185 (3d Cir. 2021)).

The Court's description of the first step of the post-*Heller* framework completely discredits the State's argument. If the *Bruen* test has a threshold step, and if that step requires a "showing" as opposed to a pure textual analysis by the court, then the government bears the initial burden, not the plaintiff.

### b. AB 173 covers conduct protected by the Second Amendment.

*Bruen* does not instruct courts to ask whether *the state's proposed regulation* falls within the Second Amendment's plain text. It instructs them to ask whether the "individual's conduct" that the State would regulate falls within "the Second Amendment's plain text." *Bruen*, 142 S.Ct. at 2126. As the State acknowledges, Appellants' proposed course of conduct is "purchasing firearms and ammunition, and applying for, obtaining, and renewing a CCW." Ans. Br. at 40. Because the State cannot legitimately contest that this conduct falls within the Second Amendment's plain text, it attempts to reframe Appellants' conduct as "preventing

28

the transfer of data in DOJ's possession to researchers." Ans. Br. at 41. That framing purposely misses the point.

Part of AB 173's context "is the *corpus juris* of which it forms a part." SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252–53 (2012). As the State acknowledges, the broader statutory scheme requires Appellants to provide their personal information to the State for purposes like background checks and firearm registration, which undoubtedly covers Second Amendment rights.[11] *See* Ans. Br. at 3–7. These laws work in unison, as evinced by Section 11106's numerous cross-references to statutes that directly regulate Second Amendment rights.[12] Although the State emphasizes that Cal DOJ already possesses much of this data, it ignores that a purchaser's personal information and transaction record is updated each time she buys a new firearm or ammunition.

---

[11] To be clear, Appellants do not contend that common background check and registration requirements are unconstitutional. The constitutionality of these requirements, however, is decided at the "how" and "why" stage of the *Bruen* test, not at the "plain text" stage. *See Bruen*, 142 S. Ct. at 2138 & n.9. There is no question in the first instance that the underlying conduct is presumptively protected by the Second Amendment. *See id.*

[12] For example, section 1106(a)(1) cross-references: (i) section 28160, which details the information that firearms dealers must collect from purchasers to facilitate a background check; (ii) section 28220, which requires Cal DOJ to use the dealer-reported purchaser information to conduct a background check; and (iii) section 29180, which requires self-manufactured firearms to be serialized and registered.

There can be no question that administrative requirements like background checks and firearms registration cover protected conduct. For instance, although the licensing and registration laws at issue in *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011) did not ban any "arms" or preclude individuals from obtaining them, the majority nonetheless held that many of the administrative conditions, such as re-registering each firearm after three years and submitting to a background check every six years, covered Second Amendment-protected conduct under the first prong of the pre-*Bruen* two-step test. *Id.* at 1255–56. Then-judge Kavanaugh—whose concurrence in *Bruen* the State cites—dissented from the majority's decision to use means-end scrutiny instead of *Heller's* standard, but he agreed that D.C.'s firearm registration laws covered Second Amendment conduct. *Id.* at 1291 (Kavanaugh, J., dissenting).

The fact that *Bruen*, *McDonald*, and *Heller*, in the State's words, "addressed laws that directly *prevented* the plaintiffs from exercising Second Amendment rights" does not delimit the scope of the Second Amendment right. Ans. Br. at 41. Many lower courts employed similar logic to interpret *Heller* as confining the right to "bear" arms only to one's home. But the Court in *Bruen* rejected that cramped interpretation, explaining: "Although we remarked in *Heller* that the need for armed self-defense is perhaps 'most acute' in the home . . . we did not suggest that the need was insignificant elsewhere." *Bruen*, 142 S. Ct. at 2135 (citations omitted).

30

Likewise, *Bruen*, *McDonald*, and *Heller* cannot faithfully be interpreted as holding that the Second Amendment protects against only direct bans on bearable arms.

The dissemination of law-abiding firearm owners' personal information to third-party researchers will also have the practical effect of indimidating and discouraging individuals from exercising their Second Amendment rights. As the Supreme Court has explained, in some cases the "governmental action challenged may appear to be totally unrelated to protected liberties" but nevertheless *directly* infringes the underlying right. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 461 (1958). For instance, the *NAACP* Court held that the "compelled disclosure of affiliation with groups engaged in advocacy" was an effective restraint on freedom of association. *Id*. at 462. This was not a ban on joining the NAACP; it was an attempt to obtain the membership list, i.e., a disclosure of personal information. *Id*. at 453–54. Even so, the Court ruled that when the disclosure of personal information would "suppress," "curtail[ ]," "discourag[e]," "dissuade," or otherwise "deter[ ]" the "free exercise" of "protected liberties," then disclosure is barred. *Id*. at 461–63. Likewise, "[s]tatutes imposing taxes upon rather than prohbiting [consituionaly protected] activity have been struck down . . . ." *Id*. at 461–62 (citing *Grosjean v. American Press Co.*, 297 U.S. 233, 243–45 (1936)); *Murdock v. Com. of Pa*., 319

U.S. 105, 112 (1943) ("The power to tax the exercise of a privilege is the power to control or suppress its enjoyment.").[13]

In the same manner, AB 173's mandated disclosure of firearm owner information burdens conduct that the Second Amendment presumptively protects. The textual inquiry does not ask to what degree a law burdens conduct protected by the Second Amendment. It simply asks whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S.Ct. at 2126. If it does, then "how and why [a law] burden[s] a law abiding citizen's right to armed self-defense" are considerations that come into play under the inquiry into whether that law is consistent with historical tradition. *Id.* at 2133. *Cf. Grosjean*, 297 U.S. at 245 (the ultimate "determination of the question whether the tax [was] valid" required "an examination of the history and circumstances which antedated and attended the adoption of the abridgement clause of the First Amendment").

### 2. There is no historical analogue for AB 173's mandate.

The State does not even attempt to justify AB 173 by presenting evidence of historical analogues. Instead, the State asks this Court to remand for further development of the factual record. Ans. Br. at 43. Confusingly, however, the State cites *Teter*, where this Court *declined* to remand for further factual development

---

[13] This concept encompasses Appellants' argument that AB 173 will "chill" the exercise of Second Amendment rights. *See* Opening Br. at 67–71. *Cf.* Ans. Br. at 43–44.

because "the historical research required under *Bruen* involves issues of so-called 'legislative facts'—those 'which have relevance to legal reasoning and the lawmaking process,' such as 'the formulation of a legal principle or ruling by a judge or court'—rather than adjudicative facts, which 'are simply the facts of the particular case.'" *Teter*, 2023 WL 5008203, at *6 (citation omitted). Moreover, *Bruen* was decided while the appeal in *Teter* was pending. Here, by contrast, the State had ample opportunity to present historical evidence but failed to do so.[14] This is because there is no historical analogue that would justify AB 173's mandatory disclosure of firearm owners' personal information to third-party researchers as a condition on the exercise of Second Amendment rights.

This Court has jurisdiction to decide this pure legal issue on the merits. *See, e.g.*, *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020) (deciding purely legal question passed on by the district court); *Ariz. Cattle Growers' Ass'n v. U.S. Fish and*

---

[14] Although Appellants appeal the district court's order of dismissal, the parties fully briefed a motion for temporary restraining order and a motion for preliminary injunction, both of which provided the State opportunities to submit evidence of historical analogues. The only "historical analogue" the State produced was a 1917 California law requiring firearms dealers to keep a register. *See* 3-ER-523; *but see also* 2-ER-140–41. But that 1917 law is too attenuated from the ratification periods to establish a historical exception to the Second Amendment's broad guarantee. *See Bruen*, 142 S. Ct. at 2131–32, 2154–56.

33

*Wildlife*, 273 F.3d 1229, 1241 (9th Cir. 2001) ("We maintain the discretion to review a purely legal issue, including the interpretation of a statute").

Here, "the factual record is so fully developed as to render any further development irrelevant." *Planned Parenthood*, 946 F.3d at 1111. This case involves only legislative facts. And, in any event, the State had an opportunity to develop the historical record but failed to do so. *See* note 14, *supra*. Accordingly, because the State has not and cannot sustain its burden under *Bruen*, this Court should find that AB 173 violates the Second Amendment.

## C.     AB 173's mandated disclosure is an unconstitutional condition on the exercise of Second Amendment rights.

The "unconstitutional conditions" doctrine generally prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize the exercise of a constitutional right. *See Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality opinion). It is beyond dispute that there is an individual right to acquire firearms and ammunition, *see Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (en banc), or carrying a firearm under *Bruen*. And there can be no question that Californians cannot acquire firearms or CCWs without providing their personal identifying information and authorizing the State to disseminate their information to third-party researchers. This condition violates the Constitution.

Appellants raised these arguments below,[15] so this theory of violation was not waived. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158–59 (9th Cir. 2009) ("tacking" theory was not forfeited; although appellant did not "use the word 'tack'" in the district court, it "raised the essence of the claim"). *Cf.* Ans. Br. at 46.

## III.   AB 173 IS IMPERMISSIBLY RETROACTIVE.

The State dismisses Appellants' retroactivity claim out of hand with only minimal discussion, based on the incorrect view that AB 173 did not change existing law. As discussed, it did. And in doing so, AB 173 removed the protections on which Appellants relied when disclosing their constitutionally-protected personal information—*after* Appellants and millions of other law-abiding Californians had already turned over their personal information as a condition of exercising their fundamental Second Amendment rights, reasonably assuming it would not be disseminated to third parties.

The State counters that AB 173 does not violate Appellants' privacy rights in the first place. *See* Ans. Br. at 47–48. But it does, as discussed above in detail. Because there is no legitimate State interest in this violation, retroactive application of AB 173 violates Appellants' due process rights under any standard of scrutiny.

---

[15] 3-ER-435–36 (prospectively, AB 173's disclosure mandate is a condition on the exercise of Second Amendment rights); *see also* 2-ER-118–19 (to similar effect).

AB 173 disrupts settled expectations and exposes individuals to legal consequences they could not have reasonably foreseen. This not only undermines due process, but also the principles of fairness and justice that are fundamental to the rule of law.

## IV. APPELLANTS STATED A PLAUSIBLE PREEMPTION CLAIM.

Contrary to the State's contention, Ans. Br. at 50–51, this Court has held that: "A party may seek injunctive relief under the Supremacy Clause regardless of whether the federal statute at issue confers any substantive rights on would-be plaintiffs." *Indep. Living Ctr. of S. California, Inc. v. Shewry*, 543 F.3d 1050, 1062 (9th Cir. 2008). This includes claims for violation of the Federal Privacy Act. *See Camp v. Cason*, 220 Fed. Appx. 976, 981–82 (11th Cir. 2007) (plaintiff stated a claim that CCW application form requiring applicant's SSN violated Privacy Act); *Stollenwerk v. Miller*, 2006 WL 463393, at *1 (E.D. Pa. Feb. 24, 2006) (similar).

As discussed above, because AB 173 is part of California's firearms regulations, including the statute authorizing the CCW application form, it does not matter that the "challenged application form is not created or authorized by AB 173." Ans. Br. at 50. Nor does it matter that the statute does not *require* collection of SSNs—the Privacy Act requires the State to inform individuals whether the disclosure of the SSN "is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." Pub. L. No. 93–579, 88 Stat. 1909 (1974), *reprinted in* 5 U.S.C. § 552a note. The State fails to

do so. Consequently, the disclosure to third-party researchers of wrongfully obtained SSNs violates the Privacy Act.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the District Court's order of dismissal.

Respectfully submitted this 6th day of September, 2023.

SNELL & WILMER L.L.P.

By: */s/ Michael B. Reynolds*
Michael B. Reynolds
Colin R. Higgins
Cameron J. Schlagel
*Attorneys for Plaintiff-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2023 I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants.

*/s/ Michael B. Reynolds*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55133

I am the attorney or self-represented party.

**This brief contains** | 6,996 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [         ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Cameron J. Schlagel | **Date** | September 6, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**          *Rev. 12/01/22*