**ROB BONTA**
*Attorney General*

**State of California**
**DEPARTMENT OF JUSTICE**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 510-4400
Telephone: (415) 510-3592
Facsimile: (415) 703-5480
E-Mail: Sebastian.Brady@doj.ca.gov

January 19, 2024

Molly Dwyer, Clerk of Court
Office of the Clerk
United States Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

RE: *Doe v. Bonta*, Case No. 23-55133 (Oral Argument on Feb. 9, 2024)

Dear Ms. Dwyer:

  The Attorney General submits this letter under Federal Rule of Appellate Procedure 28(j) to inform the Court of a recent relevant decision from the United States Court of Appeals for the Second Circuit, *Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023) (per curiam). That decision further supports the Attorney General's argument that the plaintiff bears the initial burden of establishing that a challenged regulation implicates the Second Amendment. *See* Ans. Br. at 39–40; *see also* Appellants' Opening Br. at 58 (arguing that when the Second Amendment's plain text covers relevant conduct, "*the burden then shifts to the government*") (emphasis added). *Contra* Appellants' Reply Br. at 26 (arguing that *Bruen* "did not impose a threshold burden on plaintiffs").

  In *Gazzola*, the Second Circuit held that the plaintiff firearm retailers were unlikely to succeed on their derivative claim that New York regulations of their businesses violated their customers' Second Amendment rights. 88 F.4th at 192, 194–98. Applying this Court's en banc decision in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc)—which upheld a zoning ordinance against a Second Amendment challenge because the ordinance did not "meaningfully inhibit[] residents from acquiring firearms within their jurisdiction," *id.* at 681— the Second Circuit concluded that "Appellants"—*i.e.*, the plaintiffs—"have not shown that the New York law is so restrictive that it threatens a citizen's right to acquire firearms." *Gazzola*, 88 F.4th at 196.

  In reaching this conclusion, the court placed the burden of establishing that the challenged laws implicate the Second Amendment squarely on the plaintiffs. Though it recognized that commercial regulations of firearms dealers cannot "have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms," the court declined to provide

January 19, 2024
Page 2

specific guidance on assessing evidence of such a claim, "assuming *a plaintiff* one day produces it." *Id.* at 196 & n.6 (emphasis added). It then concluded that "*Appellants* . . . failed to present sufficient evidence that *any* New York firearms dealers . . . may close due to the regulations." *Id*. at 197 (first emphasis added).

         Sincerely,

         */s Sebastian Brady*
         SEBASTIAN BRADY
         Deputy Attorney General

     For  ROB BONTA
         Attorney General

CC: All counsel via ECF

88 F.4th 186
United States Court of Appeals, Second Circuit.

Nadine GAZZOLA, individually, and as co-owner, President, and as BATFE Federal Firearms Licensee Responsible Person for Zero Tolerance Manufacturing, Inc., Seth Gazzola, individually, and as co-owner, Vice President, and as BATFE FFL Responsible Person for Zero Tolerance Manufacturing, Inc., John A. Hanusik, individually, and as owner and as BATFE FFL Responsible Person for d/b/a AGA Sales, Jim Ingerick, individually, and as owner and as BATFE FFL Responsible Person for Ingerick's LLC d/b/a Avon Gun & Hunting Supply, Christopher Martello, individually, and as owner and as BATFE FFL Responsible Person for Performance Paintball, Inc. d/b/a Ikkin Arms, Michael Mastrogiovanni, individually, and as owner and as BATFE FFL Responsible Person for Spur Shooters Supply, Robert Owens, individually, and as owner and as BATFE FFL Responsible Person for Thousand Islands Armory, Craig Serafini, individually, and as owner and as BATFE FFL Responsible Person for Upstate Guns and Ammo, LLC, Nick Affronti, individually, and as BATFE FFL Responsible Person for East Side Traders LLC, Empire State Arms Collectors Association, Inc., Plaintiffs-Appellants,

v.

Kathleen HOCHUL, in her official capacity as Governor of the State of New York, Dominick L. Chiumento, in his official capacity as the Acting Superintendent of the New York State Police, Rossana Rosado, in her official capacity as the Commissioner of the Department of Criminal Justice Services of the New York State Police, Leticia James, in her official capacity as the Attorney General of the State of New York, Defendants-Appellees.[*]

[*] The Clerk of Court is respectfully directed to amend the caption to conform to the above. Steven A. Nigrelli, formerly Superintendent of the New York State Police, was sued in his official capacity. By operation of Federal Rule of Appellate Procedure 43(c)(2), Dominic L. Chiumento was automatically substituted upon assuming the office of Acting Superintendent of the New York State Police on October 5, 2023, following Nigrelli's retirement.

Docket No. 22-3068-cv
|
August Term, 2022
|
Argued: March 20, 2023
|
Decided: December 8, 2023

**Synopsis**
**Background:** Firearms dealers and firearms business organization brought § 1983 action against state officials, including the New York Governor and Attorney General, alleging that New York's commercial regulations on sale of firearms and ammunitions and state's licensing scheme for firearms and background check requirement for ammunition violated their customers' Second Amendment rights. Dealers and organization moved for a preliminary injunction. The United States District Court for the Northern District of New York, Brenda K. Sannes, Chief Judge, 645 F.Supp.3d 37, denied the motion. Dealers and organization appealed.

**Holdings:** The Court of Appeals held that:

[1] dealers and organization had standing to bring derivative Second Amendment claim;

[2] dealers and organization were not entitled to preliminary injunctive relief for their derivative Second Amendment claim;

[3] statute requiring dealers to implement a security plan while firearms were in shipment was not preempted;

[4] statute requiring dealers to keep records and report them semiannually to state police was not preempted;

[5] standing was lacking for challenge to law requiring individuals to have a license to purchase or take possession of a semiautomatic rifle when transfer of ownership occurs;

[6] standing was lacking for challenge to law requiring sellers to run background checks before selling ammunition; and

[7] standing was lacking for challenge to law requiring concealed-carry applicants to successfully complete firearms training.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (27)

[1] **Federal Courts** Preliminary injunction; temporary restraining order

Court of Appeals reviews a district court's decision on a motion for preliminary injunction for abuse of discretion.

[2] **Federal Courts** Abuse of discretion in general

A district court abuses – or more precisely, exceeds – its discretion when its decision rests on an error of law or a clearly erroneous factual finding, or cannot be located within the range of permissible decisions.

[3] **Injunction** Extraordinary or unusual nature of remedy

A preliminary injunction is an extraordinary remedy never awarded as of right.

[4] **Injunction** Grounds in general; multiple factors

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

[5] **Weapons** Violation of right to bear arms

**Weapons** License to own or possess gun; owner identification cards

**Weapons** Prohibited transfers

Firearms dealers and firearms business organization had standing to bring derivative Second Amendment challenge on behalf of their customer base against New York's commercial regulations on sale of firearms and ammunition and firearms licensing scheme. U.S. Const. Amend. 2; N.Y. Penal Law §§ 265.65, 265.66; N.Y. General Business Law § 875-i.

[6] **Weapons** Violation of right to bear arms

**Weapons** What guns are allowed

**Weapons** Prohibited transfers

Second Amendment, as interpreted by the Supreme Court, forbids a state from banning the in-home possession of common-use weapons by law-abiding, responsible citizens and requiring them to show a special need to carry such weapons outside the home; a state cannot circumvent those holdings by banning outright the sale or transfer of common-use weapons and necessary ammunition. U.S. Const. Amend. 2.

[7] **Weapons** Right to bear arms in general

Right to keep arms necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. U.S. Const. Amend. 2.

[8] **Weapons** Right to bear arms in general

Commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms. U.S. Const. Amend. 2.

[9] **Constitutional Law** Constitutional Rights in General

It is a fundamental principle of constitutional law that what cannot be done directly cannot be done indirectly.

[10]   **Injunction**  Weapons and explosives

New York's commercial regulations on sale of firearms and ammunitions did not impose such burdensome requirements on firearms dealers that they would threaten firearms dealers' customers right to acquire firearms and ammunition, and thus, requisite irreparable harm needed for preliminary injunctive relief on firearms dealers' and firearms business organization's derivative Second Amendment claim was lacking; dealers' and organization's allegations focused on financial impact of the commercial regulations and did not provide evidence that customers lacked, or would lack under the regulations, easy access to sellers of firearms. U.S. Const. Amend. 2; N.Y. General Business Law §§ 875-b(1)(a), 875-b(2), 875-f(2), 875-g(2)(a).

[11]   **Weapons**  Right to bear arms in general

Gun buyers have no right to have a gun store in a particular location, nor a right to travel no more than short distances to the most convenient gun store that provides what they deem a satisfactory retail experience. U.S. Const. Amend. 2.

[12]   **Federal Preemption**  Grounds for preemption in general

In general, three types of preemption exist: (1) "express preemption," where Congress has expressly preempted local law; (2) "field preemption," where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) "conflict preemption," where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

[13]   **Federal Preemption**  Conflicting or Conforming Laws or Regulations; Conflict Preemption

**Federal Preemption**  Occupation of field; field preemption

Field preemption and conflict preemption are forms of implied preemption.

[14]   **Federal Preemption**  Other particular laws

**Weapons**  Power to regulate

**Weapons**  Duties and liabilities of licensee

To the extent that New York statute requiring firearms dealers to implement a security plan for securing firearms, rifles, and shotguns, including while those firearms were in shipment, imposed additional duties on a federal firearms licensee (FFL) who was a transferee of firearms, the New York statute did not conflict with, and thus was not preempted by, federal law and regulations requiring licensee to report the theft or loss of a firearm; under federal law and regulations, it was the transferring FFL who had to report lost or stolen firearms, and nothing about the state law altered that duty, posed an obstacle to FFLs fulfilling that duty, or allocated responsibility in a way that conflicted with federal law. 18 U.S.C.A. § 923(g)(6); N.Y. General Business Law § 875-b(1); 27 C.F.R. § 478.39a.

[15]   **Federal Preemption**  Other particular laws

**Weapons**  Power to regulate

**Weapons**  Record-keeping and background checks

New York statute requiring firearms dealers to keep a book or electronic-based record of purchase, sale, inventory, and other records and semiannually report their records to state police did not conflict with, and thus was not preempted by, federal law and implementing regulations requiring federal firearms licensees (FFL) to maintain similar records; while dealers argued that federal law expressly prohibited the Attorney General from requiring such reporting or otherwise establishing a system

of registration of firearms, firearms owners, or firearms transactions, nothing in federal law expressly prohibited states from requiring firearms dealers to routinely report their sale and inventory records to state police, nor did federal law conflict with power of state to exercise broader regulatory authority. 18 U.S.C.A. § 923(g)(1)(A); N.Y. General Business Law § 875-f; 27 C.F.R. § 478.125(e).

[16] **Federal Preemption** Other particular laws

**Weapons** Power to regulate

**Weapons** Record-keeping and background checks

New York law directing dealers who were federal firearms licensees (FFL) to initiate background checks through state police for ammunition sales did not conflict with, and thus was not preempted by, federal law and implementing regulations governing background checks for buyers and transferees of firearms; federal regulations expressly contemplated and directed state police to create a statewide firearms license and records database and to use that database when conducting federal background check, and Congress expressly chose not to occupy field of regulating firearms, so the fact that federal law did not require background checks for ammunition sales did not mean that state could not require such checks. 18 U.S.C.A. §§ 922(d), 922(g)(1), (3)-(4), 922(t)(1)(A)-(B); N.Y. Penal Law § 400.02; N.Y. Executive Law § 228; 28 C.F.R. § 25.1 et seq.; 28 C.F.R. §§ 25.2, 25.6.

[17] **Federal Civil Procedure** In general; injury or interest

**Federal Civil Procedure** Causation; redressability

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. U.S. Const. art. 3, § 2, cl. 1.

[18] **Federal Civil Procedure** In general; injury or interest

An Article III standing-sufficient injury must be concrete and particularized and actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 2, cl. 1.

[19] **Federal Civil Procedure** In general; injury or interest

Pre-enforcement challenges to criminal statutes are cognizable under Article III for standing purposes. U.S. Const. art. 3, § 2, cl. 1.

[20] **Federal Civil Procedure** In general; injury or interest

A plaintiff has suffered an injury-in-fact and has standing to bring a case when he is facing the threatened enforcement of a criminal law that is sufficiently imminent. U.S. Const. art. 3, § 2, cl. 1.

[21] **Constitutional Law** Criminal Law

A plaintiff satisfies the injury-in-fact requirement for Article III standing in a pre-enforcement action where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. U.S. Const. art. 3, § 2, cl. 1.

[22] **Federal Civil Procedure** In general; injury or interest

Article III sanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek. U.S. Const. art. 3, § 2, cl. 1.

**[23]** **Injunction** 🔑 Injunctions Against Enforcement of Laws and Regulations

**Injunction** 🔑 Persons Liable

No court may enjoin the world at large, or purport to enjoin challenged laws themselves.

**[24]** **Federal Civil Procedure** 🔑 In general; injury or interest

Ordinarily, "some day" intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the actual or imminent injury that is required for Article III standing to bring a pre-enforcement challenge. U.S. Const. art. 3, § 2, cl. 1.

**[25]** **Weapons** 🔑 Violation of right to bear arms

**Weapons** 🔑 License to own or possess gun; owner identification cards

Individual firearms dealer lacked Article III standing to bring pre-enforcement challenge based on violation of Second Amendment rights to New York law requiring individuals to have a license to purchase or take possession of a semiautomatic rifle when transfer of ownership occurs against state officials including the Governor and Attorney General, where his objection to licensing requirement was that county where he resided was not providing license applications, and he failed to show how that injury was fairly traceable to officials' challenged actions in enacting and enforcing the law. U.S. Const. Amend. 2; U.S. Const. art. 3, § 2, cl. 1; 🚩 N.Y. Penal Law § 400.00(2).

**[26]** **Weapons** 🔑 Violation of right to bear arms

**Weapons** 🔑 Record-keeping and background checks

Individual firearms dealer lacked Article III standing to bring pre-enforcement challenge based on violation of Second Amendment rights to New York law requiring sellers of ammunition to run background checks against newly created statewide records and license database before selling such ammunition against state officials including the Governor and Attorney General, where dealer, as a seller of ammunition, was not required to undergo background checks when he purchased ammunition, as the law's background check requirement applied only to persons who were not dealers in firearms or sellers of ammunition. U.S. Const. Amend. 2; U.S. Const. art. 3, § 2, cl. 1; 🚩 N.Y. Penal Law § 400.02(2).

**[27]** **Weapons** 🔑 Violation of right to bear arms

**Weapons** 🔑 Permits to carry guns

Individual firearms dealers lacked Article III standing to bring pre-enforcement challenge based on violation of Second Amendment rights to New York law requiring applicants for concealed-carry licenses to provide a licensing officer with a certificate verifying successful completion of firearms training satisfying certain specifications against state officials including the Governor and Attorney General, since the training requirement did not apply to them, as dealers already had concealed-carry licenses and none of them resided in counties where licensed needed to be renewed, so that their licenses would remain in full force and effect so long as the licenses were not revoked or cancelled. U.S. Const. Amend. 2; U.S. Const. art. 3, § 2, cl. 1; 🚩 N.Y. Penal Law § 400.00(1)(o)(iii).

**Attorneys and Law Firms**

**\*191** Paloma A. Capanna, Law Office of Paloma A. Capanna, Beaufort, NC, for Plaintiffs-Appellants.

Beezly J. Kiernan, Assistant Solicitor General (Barbara D. Underwood, Jeffrey W. Lang, on the brief), for Letitia James, Attorney General of the State of New York, New York, NY, for Defendants-Appellees.

Before: Jacobs, Lynch, and Lee, Circuit Judges.

**Opinion**

Per Curiam:

Plaintiff-Appellants are eight firearms and ammunition dealers, one firearms pawnbroker, and one business organization. They appeal from an order of the United States District Court for the Northern District of New York (Brenda K. Sannes, *C.J.*) denying their motion for preliminary injunctive relief. They argue that the district court erroneously rejected their claims that New York's commercial regulations on the sale of firearms and ammunition violate their customers' Second Amendment right to acquire firearms and ammunition, and that several provisions of New York law conflict with, and are thus preempted by, federal law. They also challenge the district court's conclusion that they lack standing to challenge New York's licensing scheme for semiautomatic rifles, background-check requirement for ammunition purchases, and firearms-training requirement for concealed-carry licenses. Finding no merit to their arguments, we **AFFIRM**.

## BACKGROUND

Appellants are nine individual "responsible persons" who operate businesses throughout the State of New York that have federal firearms licenses ("FFLs"), and one business organization that does not have an FFL but whose members do. [1] **\*192** An FFL is a license that is issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to engage in the business of manufacturing, importing, or dealing in firearms or ammunition. *See* 18 U.S.C. § 923(a). The individual Appellants are eight licensed dealers in firearms and ammunition and one licensed firearms pawnbroker.

[1] The firearms and ammunition dealers are John A. Hanusik, Jim Ingerick, Christopher Martello, Michael Mastrogiovanni, Robert Owens, Craig Serafini, Nick Affronti, Nadine Gazzola, and Seth Gazzola. They are associated, respectively, with AGA Sales, Ingerick's LLC d/b/a Avon Gun & Hunting Supply, Performance Paintball, Inc. d/b/a Ikkin Arms, Spur Shooters Supply, Thousand Islands Armory, Upstate Guns and Ammo, LLC, East Side Traders LLC, and Zero Tolerance Manufacturing, Inc. (both Gazzolas). The business organization is Empire State Arms Collectors Association, Inc.

On November 1, 2022, Appellants filed suit in the Northern District of New York, naming several New York defendants in their official capacities: Governor Kathleen Hochul; Attorney General Leticia James; then Acting Superintendent of the New York State Police Steven A. Nigrelli; [2] and Commissioner of the Department of Criminal Justice Services of the New York State Police Rossana Rosado. A week later, Appellants moved for preliminary injunctive relief, and, as recounted by the district court, their claims in that initial motion were sprawling, purporting to challenge "thirty-one statutory firearms provisions." *Gazzola v. Hochul*, 645 F. Supp. 3d 37, 48 (N.D.N.Y. 2022). Their claims, however, have since narrowed, and can be summarized as follows.

[2] Defendant-Appellant Chiumento assumed the office of Acting Superintendent of the New York State Police on October 5, 2023, while this appeal was pending. By operation of Federal Rule of Appellate Procedure 43(c)(2), Chiumento was automatically substituted as the Defendant-Appellant in place of the former Acting Superintendent of the New York State Police, Nigrelli.

First, Appellants claim that New York's commercial laws regulating the sale and transfer of firearms are too onerous and will thus "financially burden the Plaintiffs to a point that they will be forced out of business." J. App'x 88, ¶ 180. That, they say, in turn threatens their customers' right to acquire firearms in violation of the Second Amendment. The laws to which they object require them to secure firearms "in a locked fireproof safe or vault" outside of business hours, *see* N.Y. Gen. Bus. L. § 875-b(1)(a); install security alarm systems at each point of exit, entrance, and sale, *see id.* § 875-b(2); provide State Police-developed training to their employees, *see id.* § 875-e(1); perform monthly inventory checks, *see id.* § 875-f(2); provide State Police with full access to their premises during periodic onsite inspections, *see id.* § 875-g(2)(a); prohibit minors from entering their stores without a parent or guardian, *see id.* § 875-c; and hire employees who are at least twenty-one years old, *see id.* § 875-e(3).

Second, they claim that New York law is preempted by federal law in three ways: (1) by requiring all FFLs to devise a plan for securing firearms, even while those firearms are "in shipment," *see* N.Y. Gen. Bus. L. § 875-b(1); (2) by directing FFLs to maintain records of sale and inventory information

and submit those records to the State Police on a semi-annual basis, *see* N.Y. Gen. Bus. L. § 875-f; and (3) by setting up a background-check system that will result in a misuse of the National Instant Criminal Background Check System ("NICS"), principally by requiring background checks for ammunition sales, *see* N.Y. Exec. L. § 228; N.Y. Pen. L. § 400.02. Appellants purport that federal law (1) relieves an FFL of responsibility over the security of firearms that are in shipment if the FFL is merely receiving, as opposed to sending, firearms; (2) prohibits the Attorney General, and by extension **\*193** the States, from requiring routine reporting of sale and inventory records; and (3) prohibits using the NICS to conduct background checks for ammunitions sales.

Third, Appellants claim that New York law violates their Fifth Amendment right to be free from self-incrimination by requiring them to annually certify their compliance with New York law. *See* N.Y. Gen. Bus. L. § 875-g(1)(b). They claim that such certification is impossible because if they were to comply with New York law they would necessarily violate federal law. We understand this claim to rest on their preemption theories.

Fourth, Appellants claim that New York law violates their own Second Amendment rights as individuals by requiring them to obtain a special license to possess semiautomatic rifles, undergo background checks to purchase ammunition, and undergo firearms training to renew their concealed-carry licenses.

The district court denied Appellants' motion for preliminary injunctive relief on jurisdictional, merits, and procedural grounds. *Gazzola*, 645 F. Supp. 3d 37. In particular, the district court held that, while Appellants had standing as firearms dealers to challenge New York's commercial laws, they lacked standing as individuals to challenge New York's laws regulating semiautomatic rifles, ammunition sales, and concealed carry. *Id.* at 51-54. The court also held that Governor Hochul and Attorney General James were not proper defendants because they lacked a sufficient connection to enforcing the challenged provisions of New York law, and thus were entitled to sovereign immunity. *Id.* at 58-59. Turning to the merits, the court held that Appellants lacked Second Amendment rights as commercial dealers in firearms, *id.* at 65, and that they failed to offer a "basis" for their "novel" derivative right-to-acquire claim, *id.* at 70-71. The court rejected Appellants' preemption claims because federal law expressly did not occupy the field of firearms regulations, *id.* at 59-60, citing 18 U.S.C. § 927, and because federal and New York law were not in conflict, *id.* at 59-63. For that same reason, the court found no merit to Appellants' self-incrimination claim, which it understood, as we do, to be premised on their preemption theories. *Id.* at 69-70. Finally, the court found that Appellants would not suffer irreparable harm in the absence of an injunction because they failed to show that they would suffer a constitutional deprivation or anything more than lost profits. *Id.* at 54-57.

Appellants timely appealed.

## DISCUSSION

[1] [2] We have appellate jurisdiction over a denial of a motion for preliminary injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). "[W]e review a district court's decision on a motion for preliminary injunction for abuse of discretion." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 167 (2d Cir. 2001). A district court abuses – or more precisely, exceeds – its discretion when its decision rests on an "error of law" or a "clearly erroneous factual finding," or "cannot be located within the range of permissible decisions." *Id.* at 169. [3]

3  As we have recounted several times, the word "abuse" is an imprecise way to describe instances where, as will inevitably happen, a district court commits an error of law, makes a clearly erroneous finding of fact, or renders a decision outside the range of reasonable ones. *See, e.g.*, *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666 n.1 (2d Cir. 2023) (collecting cases). None of those things involve "abuse" as that term is understood in its ordinary sense; the word "exceeds" is more accurate. *Id.*

[3] [4] "A preliminary injunction is an extraordinary remedy never awarded as of **\*194** right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20, 129 S.Ct. 365. [4]

4
    Under our precedents, a plaintiff must satisfy a heightened standard when seeking a so-called "mandatory injunction" – that is, an injunction that "alter[s] the status quo." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). The district court held that the heightened standard applied but concluded that it was "immaterial" because Appellants failed under the "lesser," ordinary standard for preliminary injunctive relief. *Gazzola*, 645 F. Supp. 3d at 51. Because the district court did not exceed its discretion in denying Appellants' motion under the ordinary standard, we do not address whether the court correctly determined that the heightened standard should apply.

Appellants argue that the district court erred in rejecting the merits of their derivative Second Amendment claim, federal-preemption claim, and self-incrimination claim; in holding that they lacked standing to assert Second Amendment claims as individuals; and in rejecting their plea of irreparable harm in the absence of an injunction.[5] Because we conclude that the district court correctly assessed the merits and standing, we do not reach the issue of irreparable harm.

5
    In the district court, Appellants also claimed that New York law was unconstitutionally vague in violation of the Fourteenth Amendment, and that New York law burdened their Second Amendment right to sell firearms. The district court rejected those claims, *Gazzola*, 645 F. Supp. 3d at 64-69, and Appellants do not press any error on appeal. We therefore do not consider those claims. For the first time on appeal, Appellants raise a discrimination claim, and for the first time in their reply brief, they substantively challenge, in more than a perfunctory manner, the district court's conclusion that Governor Hochul and Attorney General James are entitled to sovereign immunity.

Those arguments are forfeited. *Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 140-41 (2d Cir. 1999) (arguments made for the first time in reply are forfeited); *Katel Liab. Co. v. AT & T Corp.*, 607 F.3d 60, 68 (2d Cir. 2010) ("An argument raised for the first time on appeal is typically forfeited."); *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) (perfunctory arguments are forfeited). While we may consider forfeited arguments in our discretion to avoid a risk of manifest injustice, "there is no such risk here." *Katel Liab. Co.*, 607 F.3d at 68.

**I. Derivative Second Amendment Claim**

Appellants first claim that New York law is so onerous that it will put them and other firearms dealers out of business, and thereby threaten their customers' Second Amendment right to acquire firearms.

[5] We have no trouble concluding that Appellants have standing to bring such a derivative claim. "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc), quoting *Craig v. Boren*, 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *see also Carey v. Population Servs., Int'l*, 431 U.S. 678, 683-84, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (holding that a provider of contraceptives could bring a derivative constitutional challenge on behalf of potential customers). Several circuits have extended that principle to purveyors of firearms and ammunition, and we follow suit. *See Teixeira*, 873 F.3d at 678 (holding that a "would-be operator of a gun store" had "derivative standing to assert the subsidiary right to acquire arms *195 on behalf of his potential customers"); *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 215-16 (4th Cir. 2020), *as amended* (Aug. 31, 2020) (holding that a firearms dealer had derivative standing to challenge restrictions on potential customers' right to acquire firearms); *Ezell v. City of Chicago* ("*Ezell I*"), 651 F.3d 684, 696 (7th Cir. 2011) (holding that a supplier of firing-range facilities had standing to challenge a Chicago ordinance that burdened its potential customers' firearms training). We therefore hold that Appellants have derivative standing to pursue Second Amendment claims on behalf of their customer base.

Without questioning Appellants' derivative standing, the district court held that there was "no basis for their novel theory" that New York law violated their customers' right to acquire firearms by imposing too many burdens on them as commercial dealers. *Gazzola*, 645 F. Supp. 3d at 71. We conclude that there is a sufficient basis for that theory, but we hold that Appellants are not entitled to preliminary injunctive relief. As the district court found in its irreparable harm analysis (a finding that likewise bears on the merits

of Appellants' derivative claim), Appellants failed to show that they would suffer the type of burden that is required for their derivative claim to succeed. *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004) ("We review the denial of a preliminary injunction for an abuse of discretion. But we may affirm on any ground supported by the record." (internal citation omitted)).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codifies a pre-existing individual right to keep and bear arms for self-defense in case of confrontation – a right that is not limited to service in an organized militia. 554 U.S. 570, 592, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In doing so, the Court observed several limitations on the right. Importantly, the Court made clear that "nothing in [its] opinion should be taken to cast doubt on ... laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27, 128 S.Ct. 2783. The Court identified such "regulatory measures," and others, as "presumptively lawful." *Id.* at 627 n.26, 128 S.Ct. 2783. Two years later, when the Court held that the Second Amendment is "fully applicable to the States," *McDonald v. City of Chicago*, 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Court's principal opinion "repeat[ed]" *Heller*'s "assurance[ ]" concerning the presumptive constitutionality of " 'laws imposing conditions and qualifications on the commercial sale of arms.' " *Id.* at 786, 130 S.Ct. 3020 (plurality opinion), quoting *Heller*, 554 U.S. at 626-27, 128 S.Ct. 2783. Nothing in the Court's more recent decision in *New York State Rifle & Pistol Association v. Bruen* casts doubt on that understanding of the Second Amendment's scope. *See* 597 U.S. 1, 142 S. Ct. 2111, 2162, 213 L.Ed.2d 387 (2022) (Kavanaugh, *J.*, concurring).

**[6] [7]** Still, the presumption of legality can be overcome. The Second Amendment, as interpreted by the Supreme Court, forbids a State from banning the in-home possession of common-use weapons by law-abiding, responsible citizens, *Heller*, 554 U.S. at 635, 128 S.Ct. 2783, and requiring them to show a special need to carry such weapons outside the home, *Bruen*, 142 S. Ct. at 2156. A State cannot circumvent those holdings by banning outright the sale or transfer of common-use weapons and necessary ammunition. As the Tennessee **\*196** Supreme Court observed in 1871, "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Our pre-*Bruen* law recognized as much, observing, albeit in dicta, that "restrictions that limit the ability of firearms owners to acquire and maintain proficiency in the use of their weapons" may violate the Second Amendment under certain circumstances. *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 883 F.3d 45, 58 (2d Cir. 2018), *vacated and remanded on other grounds*, —— U.S. ——, 140 S. Ct. 1525, 206 L.Ed.2d 798 (2020). Other circuits have recognized that principle too. *Ezell I*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use ...."); *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) (similar); *Teixeira*, 873 F.3d at 677-78 (similar); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (similar); *see also Heller*, 554 U.S. at 617-18, 128 S.Ct. 2783 (explaining that the right "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use" (internal quotation marks omitted)).

**[8] [9]** It follows that commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms.[6] For example, when the Supreme Court recognized a right to abortion, it correspondingly recognized that a State could not circumvent the Fourteenth Amendment's prohibition on abortion bans by imposing unnecessary special regulations on abortion providers as a class that had "the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion"; such would constitute "an undue burden on the right." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 2309, 195 L.Ed.2d 665 (2016), *as revised* (June 27, 2016) (internal

quotation marks omitted), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L.Ed.2d 545 (2022). It is indeed a fundamental principle of constitutional law that "what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *Cummings v. Missouri*, 71 U.S. 277, 325, 4 Wall. 277, 18 L.Ed. 356 (1866); *accord Trump v. Mazars USA, LLP*, ––– U.S. ––––, 140 S. Ct. 2019, 2035, 207 L.Ed.2d 951 (2020) (explaining that "separation of powers concerns are no less palpable ... simply because the subpoenas [for the President's information] were issued to third parties").

6    We have no present occasion to set out specific guidance as to how a trial court must assess evidence that a commercial regulation is stifling the individual right of access to firearms (assuming a plaintiff one day produces it). But whatever the standard is, a State cannot impose a regulation on commercial firearms dealers as a class that has the effect of prohibiting law-abiding, responsible citizens from possessing common-use weapons.

Still, Appellants have not shown that the New York law is so restrictive that it threatens a citizen's right to acquire firearms. To that end, we find the Ninth Circuit's *en banc* decision in *Teixeira* persuasive. At issue in *Teixeira* was an Alameda County zoning ordinance that prohibited gun stores within "five hundred feet" of "schools, day care centers, liquor stores or establishments serving liquor, other gun **\*197** stores, and residentially zoned districts." 873 F.3d at 674. Prospective vendors challenged the law, claiming that it violated their potential customers' right to acquire firearms and ammunition because the ordinance made it impossible to open a new gun store in Alameda County. *Id.* at 676. The district court dismissed their complaint, and the Ninth Circuit affirmed. The Ninth Circuit recognized, as we do today, "that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense," and explained that "the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Id.* at 677, quoting *Ezell I*, 651 F.3d at 704. But, "[w]hatever the scope" of the right to acquire firearms, the prospective vendors failed to state a claim. *Id.* at 678. Exhibits attached to their complaint "demonstrate[d] that Alameda County residents may freely purchase firearms within the County." *Id.* at 679. Those exhibits showed that "there were ten gun stores in Alameda County," including one located "approximately 600 feet away from the [challengers'] proposed site." *Id.* And "gun buyers have no right to have a gun store in a particular location, at least as long as their access is not meaningfully constrained." *Id.* at 680. Nor do they have a right to "travel" only short "distances" or receive "a certain type of retail experience." *Id.* at 679-80 & n.13.

There is even less evidence here than in *Teixeira* that New York citizens will be meaningfully constrained – or, for that matter, constrained at all – in acquiring firearms and ammunition. Appellants claim that New York law will put them and other FFLs out of business by requiring them to secure firearms "in a locked fireproof safe or vault" outside of business hours, *see* N.Y. Gen. Bus. L. § 875-b(1)(a); install security alarm systems at each point of exit, entrance, and sale, *see id.* § 875-b(2); provide State Police-developed training to their employees, *see id.* § 875-e(1); perform monthly inventory checks, *see id.* § 875-f(2); provide State Police with full access to their premises during periodic onsite inspections, *see id.* § 875-g(2)(a); prohibit minors from entering their stores without a parent or guardian, *see id.* § 875-c; and hire employees who are at least twenty-one years old, *see id.* § 875-e(3). But, besides Appellants' say-so, there is no evidence that those regulations will impose such burdensome requirements on firearms dealers that they restrict protections conferred by the Second Amendment.

**[10]** **[11]** Urging otherwise, Appellants estimate that the challenged laws could impose more than $1 billion dollars in compliance costs on all FFLs in the State. That figure, however, finds no support in record evidence. Appellants rely principally on their unverified, unsworn complaint. While a few of Appellants' sworn declarations contain some estimates of the financial impact of New York's commercial regulations, their declarations are speculative, focus only on their businesses, and offer no documentary evidence in support. The district court thus did not err, let alone clearly err, in holding that Appellants failed to "present sufficient evidence to demonstrate" that "their businesses may close absent injunctive relief." *Gazzola*, 645 F. Supp. 3d at 56-57. It follows that Appellants, whose declarations (again) focused only on their anticipated costs, failed to present sufficient evidence that *any* New York firearms dealers – let alone a critical mass of the more than 1,700 such dealers – may close due to the challenged regulations. It bears repeating

that "gun buyers have no right to have a gun store in a particular location," nor a right to "travel" no more than short "distances" to the most convenient gun store that provides what **\*198** they deem a satisfactory "retail experience." *Teixeira*, 873 F.3d at 679-80 & n.13. On the record before us in this case, there is no evidence that New Yorkers currently lack, or will lack under the challenged statutes, relatively easy access to sellers of firearms.

Accordingly, the district court did not exceed its discretion in denying Appellants' motion for preliminary injunctive relief on their derivative Second Amendment claim.

## II. Preemption

Appellants claim that several provisions of New York law are preempted by federal law and thus violate the Supremacy Clause. The district court thoroughly examined and rejected each of Appellants' theories of preemption, and we perceive no error.

**[12]** **[13]** "In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010), quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005). "The latter two are forms of implied preemption." *Figueroa v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017).

In arguing that federal law preempts state law, Appellants rely on 18 U.S.C. §§ 923 and 926 and regulations promulgated pursuant to § 926. But they ignore that Congress, in 18 U.S.C. § 927, expressly disclaimed field preemption:

> No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

18 U.S.C. § 927. Thus, because "[t]he key to the preemption inquiry is the intent of Congress[,]" *New York SMSA Ltd. P'ship*, 612 F.3d at 104, Appellants must rely on conflict preemption, demonstrating "a direct and positive conflict between" federal and state law such "that the two cannot be reconciled or consistently stand together," 18 U.S.C. § 927. They fail to satisfy that burden.

*A. New York General Business Law § 875-b*

Appellants challenge New York General Business Law § 875-b(1), which requires them to "implement a security plan" satisfying certain minimum specifications "for securing firearms, rifles and shotguns," including while those firearms are "in shipment." N.Y. Gen. Bus. L. § 875-b(1). Appellants assert that § 875-b(1) conflicts with federal law because, when an FFL ships a firearm to another FFL, § 875-b(1) makes *both* FFLs responsible for maintaining a security plan while those firearms are "in shipment," *id.*, whereas federal law makes only the *transferring FFL* responsible for firearms that are in shipment. In support of that theory, they cite 18 U.S.C. § 923(g)(6) and 27 C.F.R. § 478.39a. But neither supports that theory.

**[14]** Both provisions require FFLs to report firearms that were lost or stolen from their "inventory" or "collection" to **\*199** the Attorney General and appropriate local authorities within forty-eight hours, 18 U.S.C. § 923(g)(6); 27 C.F.R. § 478.39a(a)(1), and the federal regulation provides that, "[w]hen a firearm is stolen or lost in transit on a common or contract carrier (which for purposes of this paragraph includes the U.S. Postal Service), it is considered stolen or lost from the transferor/sender licensee's inventory *for reporting purposes*. Therefore, the transferor/sender of the stolen or lost firearm shall *report* the theft or loss of the firearm within 48 hours after the transferor/sender discovers the theft or loss." 27 C.F.R. § 478.39a(a)(2) (emphases added). In other words, under federal law, it is the transferring FFL who must *report* a lost or stolen firearm. Nothing about New York law alters that duty, poses an obstacle to FFLs fulfilling that duty, or allocates responsibility in a way that conflicts with federal law. To the

extent that New York law imposes *additional* duties on the transferee FFL, there is no conflict between federal and state law.

### B. *New York General Business Law § 875-f*

Next, Appellants claim that New York General Business Law § 875-f is preempted by 18 U.S.C. §§ 923(g) and 926(a).

New York General Business Law § 875-f requires firearms dealers to "establish and maintain a book" or "electronic-based record of purchase, sale, inventory, and other records at the dealer's place of business in such form and for such period as the superintendent shall require." N.Y. Gen. Bus. L § 875-f. Among other information, those records must include, "at a minimum," (1) "the make, model, caliber or gauge, manufacturer's name, and serial number of all firearms, rifles and shotguns that are acquired or disposed of not later than one business day after their acquisition or disposition"; (2) an accounting, by means of a monthly "inventory check," of "all firearms, rifles and shotguns acquired but not yet disposed of"; (3) "firearm, rifle and shotgun disposition information, including the serial numbers of firearms, rifles and shotguns sold, dates of sale, and identity of purchasers"; and (4) "records of criminal firearm, rifle and shotgun traces initiated by [ATF]." *Id.* § 875-f(1)-(4).

**[15]** 18 U.S.C. § 923(g)(1)(A) and its implementing regulation require FFLs to maintain similar records. *See* 18 U.S.C. § 923(g)(1)(A); 27 C.F.R. § 478.125(e). However, and central to Appellants' theory of preemption, while New York law requires firearms dealers to semi-annually report their records to the State Police, N.Y. Gen. Bus. L. § 875-f, federal law does not. Moreover, federal law expressly prohibits the Attorney General from enacting any "rule or regulation" requiring such reporting or otherwise establishing a "system of registration of firearms, firearms owners, or firearms transactions or dispositions." 18 U.S.C. § 926(a)(3). According to Appellants, if the Attorney General cannot require FFLs to semi-annually report their disposition records or establish a firearm registry, neither can New York.

But that conclusion does not logically follow. Again, Congress expressly declined to "occupy the field," and instructed courts that state law is preempted only where "there is a direct and positive conflict between" federal and state law such "that the two cannot be reconciled or consistently stand together." 18 U.S.C. § 927. Nothing in federal law expressly prohibits States from requiring firearms dealers to routinely report their sale and inventory records to State Police. And, simply put, a limitation on the *Attorney General*'s regulatory authority is not in direct and positive conflict with the power of *New York* to exercise broader regulatory authority. As **\*200** the district court observed, it "is a hallmark of federalism" that a State may presumptively exercise regulatory authority in areas over which the federal government may not or does not. *Gazzola*, 645 F. Supp. 3d at 62, citing *Gonzales v. Raich*, 545 U.S. 1, 74, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (Thomas, *J.*, dissenting) ("Our federalist system, properly understood, allows ... States to decide ... how to safeguard the health and welfare of their citizens.").

### C. *New York Executive Law § 228* & *New York Penal Law § 400.02*

Finally, Appellants challenge New York Executive Law § 228 and New York Penal Law § 400.02 on the ground that they will result in a misuse of the federal background check system – the NICS – and are therefore preempted.

Federal law prohibits certain classes of people, like felons, drug addicts, and the mentally ill, from purchasing or possessing firearms or ammunition. 18 U.S.C. § 922(g)(1), (3)-(4). Concomitantly, federal law prohibits "any person" from "sell[ing] or otherwise dispos[ing] of any firearm or ammunition" to individuals whom they know or have reasonable cause to believe fall within those classes of people. *Id.* § 922(d). As a special check, federal law requires FFLs to submit certain identifying information of a buyer or transferee to the NICS, which is maintained by the Federal Bureau of Investigation ("FBI"), which in turn checks a database known as the NICS Index for whether federal law prohibits the buyer or transferee from possessing a firearm. 18 U.S.C. § 922(t)(1)(A)-(B); *see also* 28 C.F.R. § 25.1, *et seq.*

While the FBI ordinarily conducts that check, *see* 28 C.F.R. § 25.6(b)-(c), a State may alternatively designate a "law enforcement agency" as a point of contact ("POC") to "serv[e] as an intermediary between an FFL and the federal databases checked by the NICS," *id.* § 25.2; *see also id.* §

25.6(d)-(h). In that scenario, the "POC will receive NICS background check requests from FFLs, check state or local record systems, perform NICS inquiries, determine whether matching records provide information demonstrating that an individual is disqualified from possessing a firearm under Federal or state law, and respond to FFLs with the results of a NICS background check." *Id.* § 25.2. When conducting "a NICS background check, POCs may also conduct a search of available files in state and local law enforcement and other relevant record systems." *Id.* § 25.6(e).

Importantly, a POC may not purposely use the NICS for "unauthorized purposes," *id.* § 25.11(b)(2), and "[a]ccess to the NICS Index for purposes unrelated to NICS background checks" is prohibited unless for:

> (1) Providing information to Federal, state, tribal, or local criminal justice agencies in connection with the issuance of a firearm-related or explosives-related permit or license, including permits or licenses to possess, acquire, or transfer a firearm, or to carry a concealed firearm, or to import, manufacture, deal in, or purchase explosives;
>
> (2) Responding to an inquiry from the Bureau of Alcohol, Tobacco, Firearms, and Explosives in connection with a civil or criminal law enforcement activity relating to the Gun Control Act (18 U.S.C. Chapter 44) or the National Firearms Act (26 U.S.C. Chapter 53); or,
>
> (3) Disposing of firearms in the possession of a Federal, state, tribal, or local criminal justice agency.

*Id.* § 25.6(j)(1)-(3).

Appellants claim that New York Executive Law § 228 and New York Penal Law § 400.02 will result in misuse of the NICS. **\*201** But they do not explain how. New York Executive Law § 228 designates the State Police as a point of contact for NICS background checks, N.Y. Exec. L. § 228(1)(a), as federal regulations expressly contemplate, 28 C.F.R. §§ 25.2, 25.6(d)-(h). New York Executive Law § 228 also directs the State Police to create a "statewide firearms license and records database" containing records provided by various other state-level agencies, including "the division of criminal justice services, office of court administration, New York state department of health, New York state office of mental health, and other local entities." N.Y. Exec. L. § 228(3). The State Police are directed to use that database when conducting NICS background checks upon an FFL's request, *id.*, and its doing so, again, is expressly authorized by federal regulations, *see* 28 C.F.R. § 25.6(e) ("Upon receiving a request for a NICS background check, POCs may also conduct a search of available files in state and local law enforcement and other relevant record systems ....").

[16] Appellants seem to take issue with New York law directing FFLs to initiate background checks through the State Police for ammunition sales. In particular, Appellants speculate that, when conducting background checks for ammunition sales, the State Police will use the NICS Index, checks that are not expressly authorized by federal law and thus, they claim, unlawful. But even if such use would be unlawful, New York law authorizes no such thing. New York law requires firearms and ammunition dealers to initiate background checks for ammunition sales through a "*statewide* license and record database" maintained by the State Police – not through the NICS Index – before transferring ammunition to a non-dealer. N.Y. Pen. L. § 400.02(2)(a) (emphasis added); *see also id.* § 400.02(2) (directing the State Police to create and maintain a "statewide license and record database specific for ammunition sales"); N.Y. Exec. L. § 228(3) (directing the State Police to consult the "statewide firearms license and records database" for purposes of "firearm permit[ ]" certification and recertification, "assault weapon registration," and "ammunition sales"). And Appellants cite nothing that prohibits a State from conducting background checks for ammunition sales. Again, Congress expressly chose not to occupy the field of regulating firearms. *See* 18 U.S.C. § 927. So, the fact that federal law does not require background checks for ammunition sales does not mean that New York cannot require such checks. New York's residual authority to do so is, as the district court aptly put it, "a hallmark of federalism." *Gazzola*, 645 F. Supp. 3d at 62.[7]

---

[7] We understand Appellants to accuse New York of "authoriz[ing] [itself] to hack NICS and steal FFL paper dealer records," Appellants' Reply Br. 12, and of authorizing State Police to retain NICS-related information in violation of 28 C.F.R. § 25.9, which governs the destruction and retention of such information, *id.* at 10. Those imputations, however, are not backed by any legal or evidentiary support.

In sum, Appellants' preemption theories lack merit. The district court therefore did not exceed its discretion in

denying their motion for preliminary injunctive relief on those claims.[8]

---

[8] It follows that the district court appropriately rejected Appellants' self-incrimination claim. Appellants claim that New York law violates their right to be free from self-incrimination by compelling them to annually certify their compliance with New York law. *See* N.Y. Gen. Bus. L. § 875-g(1)(b). That claim rests on their predicate claim that New York law conflicts with federal law, such that compliance with New York law would implicitly be a violation of federal law. Because Appellants failed to show that predicate, their self-incrimination claim necessarily fails.

**\*202 III. Individual Claims**

Appellants, proceeding now as individuals, claim that New York law violates their Second Amendment rights by requiring them to obtain a license to possess semiautomatic rifles, N.Y. Pen. L. § 400.00(2); undergo background checks to purchase ammunition, N.Y. Pen. L. § 400.02(2); and undergo firearms training to renew their concealed-carry licenses, N.Y. Pen. L. § 400.00(1)(o)(iii). The district court held that Appellants lacked Article III standing to challenge each law, *Gazzola*, 645 F. Supp. 3d at 53-54, and we agree.

[17] [18] "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.' " *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014) (alterations adopted), quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An Article III-sufficient injury, however, must be " 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.' " *Id.* at 158, 134 S.Ct. 2334, quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

[19] [20] [21] [22] "Pre-enforcement challenges to criminal statutes are 'cognizable under Article III.' " *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022), quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). "As the Supreme Court has made clear, a plaintiff has suffered an injury-in-fact and has standing to bring a case when he is facing the 'threatened enforcement of a law' that is 'sufficiently imminent.' " *Id.*, quoting *Susan B. Anthony List*, 573 U.S. at 158-59, 134 S.Ct. 2334. "Specifically, a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (internal quotation marks omitted). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 141 S. Ct. 2190, 2208, 210 L.Ed.2d 568 (2021).

First, Appellants challenge New York Penal Law § 400.00(2), which requires an individual to have a license "to purchase or take possession of ... a semiautomatic rifle when such transfer of ownership occurs." N.Y. Pen. L. § 400.00(2). Upon application, such a license "shall be issued" by the appropriate licensing authority if the applicant satisfies all relevant statutory criteria. *Id.* That licensing requirement does not apply retroactively; it applies only to future purchases or transfers of semiautomatic rifles. *Id.*

[23] [24] [25] Christopher Martello is the only party who plausibly claims a desire to purchase a semiautomatic rifle, stating in his sworn declaration: "I desire to purchase additional semi-automatic rifles for personal self-defense and sporting purposes." J. App'x 271, ¶ 11. But his objection to the licensing requirement is not that he must obtain a license; instead, he complains that Livingston County, where he resides, is not providing license applications. As the district court pointed out, however, he fails to show how the *non-defendant* county's failure to provide license applications is fairly traceable to the challenged action of the *named defendants* – Governor Hochul, Attorney General James, Superintendent Chiumento, and **\*203** Commissioner Rosado. *See Gazzola*, 645 F. Supp. 3d at 53, citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). "[N]o court may 'enjoin the world at large,' or purport to enjoin challenged 'laws themselves.' " *Whole Woman's Health v. Jackson*, 595 U.S. 30, 142 S. Ct. 522, 535, 211

L.Ed.2d 316 (2021), first quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (Hand, *J.*), and then quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 141 S. Ct. 2494, 2495, 210 L.Ed.2d 1014 (2021) (on application for injunctive relief).[9]

[9] Moreover, even if Martello had sued Livingston County, we are skeptical that his bald claim – that he "desire[s] to purchase additional semi-automatic rifles," J. App'x 271, ¶ 11 – is sufficient to state an actual or imminent injury within the meaning of Article III. Ordinarily, " 'some day' intentions – without any description of concrete plans, or indeed even any specification of when the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564, 112 S.Ct. 2130; *see also Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 553 (10th Cir. 2016) ("The mere possibility that 'some day' a member of Outdoor Buddies might wish to obtain or retain a firearm before or after a hunt and that he or she might then experience difficulties obtaining the requisite background check is insufficient to establish an imminent injury for purposes of Article III standing.").

Second, Appellants challenge New York Penal Law § 400.02(2), which requires sellers of ammunition to run background checks against a newly created statewide records and license database before selling such ammunition. N.Y. Pen. L. § 400.02(2)(a). In doing so, the seller must provide the database with the transferee's identity and "the amount, caliber, manufacturer's name and serial number, if any, of such ammunition." *Id.* § 400.02(2)(a).

[26] Craig Serafini is the only party who complains about that requirement in his individual capacity, claiming that he has not purchased ammunition since the law went into effect because, like others, he does not want to disclose his personal information to the government. But Serafini is a seller of ammunition, and the background-check requirement applies only to "any *other* person who is *not* a dealer in firearms ... or a seller of ammunition." *Id.* § 400.02(2) (emphases added). Thus, because New York Penal Law § 400.02(2) does not require him to undergo a background check when he purchases ammunition, he does not have standing to challenge it.

Finally, Appellants challenge New York Penal Law § 400.00(1)(o)(iii), which requires an applicant for a concealed-carry license to provide a licensing officer with a certificate verifying his successful completion of firearms training that satisfies certain specifications. N.Y. Pen. L. § 400.00(1)(o)(iii); *see also id.* § 400.00(19) (outlining the training requirements). That training requirement applies also to an individual who "renew[s]" an existing license. *Id.* § 400.00(1). But an individual who already has a concealed-carry license, and who does not reside in New York City or Nassau, Suffolk, or Westchester Counties, need not renew the license. *Id.* § 400.00(10)(a). Instead, the license remains "in force and effect" so long as it is not "revoked or cancelled." *Id.* That individual need only "recertif[y]" the license by submitting the appropriate recertification form with all necessary information before the license expires. *Id.* § 400.00(10)(b).

[27] The individual Appellants lack standing to challenge the training requirement because, simply put, it does not apply to them. The record indicates that eight of them have a concealed-carry license, and **\*204** that none of those eight resides in New York City or Nassau, Suffolk, or Westchester Counties. Meanwhile, the record contains no information about Jim Ingerick's licensing situation. But he bears the burden to show he has standing. He therefore lacks standing to challenge the firearms training requirement because he has failed to show that it applies to him.

Accordingly, the district court correctly held that Appellants lacked standing to bring their individual Second Amendment claims.

## CONCLUSION

We have considered Appellants' remaining arguments on appeal and find them to be without merit. Accordingly, we **AFFIRM** the district court's order denying their motion for preliminary injunctive relief.

**All Citations**

88 F.4th 186

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# CERTIFICATE OF SERVICE

Case Name:  ***Doe, Jane, et al. v. Rob Bonta***   Case No.  23-55133

I hereby certify that on January 19, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **FEDERAL RULE OF APPELLATE PROCEDURE 28(J) LETTER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on January 19, 2024, at San Francisco, California.

M. Mendiola  
Declarant

*[signature: M. Mendiola]*  
Signature

SA2023300886  
44031210.docx